UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

No. \_\_\_22mj02719 Goodman\_\_\_

UNITED STATES OF AMERICA,

v.

ANDREW ALTURO FAHIE,
    a/k/a "Head Coach,"
    a/k/a "Coach,"
OLEANVINE PICKERING MAYNARD,
    a/k/a "Rose,"
    a/k/a "P,"
and KADEEM STEPHAN MAYNARD,
    a/k/a "Blacka,"

    Defendants.
_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)? \_\_\_Yes  _X_ No

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)? \_\_\_Yes  _X_ No

Respectfully submitted,

JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY

By: _____
Frederic C. Shadley
Assistant United States Attorney
Court ID No. A5502298
11200 N.W. 20th Street
Miami, Florida 33172
(305) 715-7649
(305) 715-7639 (fax)
Frederic.Shadley@usdoj.gov

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br>Andrew Alturo Fahie, et al.,<br>*Defendant(s)* | Case No. 22mj02719 Goodman |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of **October 16, 2021 to April 28, 2022** in the county of **Miami-Dade** in the **Southern** District of **Florida**, and elsewhere, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 963, 952 | Conspiracy to Import Five Kilograms or More of Cocaine |
| 18 U.S.C. §§ 1956(h), 1956(a)(2)(A), and 1956(a)(2)(B)(i) | Conspiracy to Launder Money |

This criminal complaint is based on these facts:
SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

*Complainant's signature*

Special Agent Shad Aschleman, DEA
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Federal Rule of Criminal Procedure 4.1 by **Face Time**.

Date: 4/28/2022

*Judge's signature*

City and state: Miami, FL

Hon. Jonathan Goodman, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Shad Aschleman, being duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I have been a Special Agent with the United States Department of Justice, Drug Enforcement Administration (DEA) since 2004, and am currently assigned to DEA Miami Field Division, High Intensity Drug Trafficking Area (HIDTA) Task Force, Group 41. I am a criminal investigator for the United States within the meaning of Title 21, United States Code, Section 878, and therefore I am empowered to conduct investigations of, and make arrests for, offenses enumerated in Title 21 and Title 18.

2. Based on information contained in this Affidavit, I respectfully submit that there is probable cause for the issuance of a criminal complaint charging Andrew Alturo Fahie, a/k/a "Head Coach," a/k/a "Coach," Oleanvine Pickering Maynard, a/k/a "Rose," a/k/a "P," and Kadeem Stephan Maynard, a/k/a "Blacka," as follows:

   a. Conspiracy to import five kilograms or more of a mixture and substance containing a detectable amount of cocaine, in violation of 21 U.S.C. §§ 963, 952, and 960(b)(1)(A);

   b. Conspiracy to launder money, in violation of 18 U.S.C. §§ 1956(a)(2)(A), 1956(a)(2)(B)(i), 1956(c)(7)(A), and 1956(c)(7)(B)(iv); all in violation of 18 U.S.C. § 1956(h).

3. The facts set forth in this Affidavit are based on my personal knowledge and observations, the knowledge and observations of other law enforcement personnel and civilian witnesses, information and documents received in my official capacity from other sources of information, and information gained through my training and experience. This Affidavit is

1

submitted for the limited purpose of establishing probable cause for the offenses charged, and therefore does not include each and every fact known to law enforcement about this investigation.

## BACKGROUND

4. Based on information provided by the Department of Justice, Office of International Affairs, I know that Section 80 of the criminal code of the British Virgin Islands makes it an offense for a public official to directly or indirectly solicit, accept or obtain a gratification for: (1) doing or abstaining from an act in the execution of his duties or facilitated by his functions or duties; (2) expediting, delaying, hindering or preventing the performance of an act by himself or another public official in the execution of that public official's duties; and (3) expediting, delaying, hindering or preventing another person in the transaction of business with a public body. Further, Section 80B of the code makes it an offense for a person to directly or indirectly solicit, accept or obtain a gratification in consideration for concealing an offense, not proceeding against any other person, and obtaining or endeavoring to obtain the withdrawal of a prosecution against any other person.

## PROBABLE CAUSE

5. Beginning on or about October 16, 2021, a DEA confidential source ("CS") had several meetings with a group of self-proclaimed Lebanese Hezbollah operatives (the "Lebanese Group") who stated that they had business ties to South Florida and the Middle East. Those meetings occurred on the Island of Tortola in the British Virgin Islands ("BVI"). Through the course of those meetings, the CS requested assistance from the Lebanese Group to facilitate the use of Tortola as a temporary storage port for drugs (cocaine) transported from Colombia via boat, and destined for the United States. Those efforts would also include the subsequent laundering of drug proceeds. The Lebanese Group agreed to assist the CS by facilitating introductions to senior

members of the BVI government who could offer protection to the CS's activities, but would require payment for their assistance. A member of the Lebanese group told the CS that he would approach the head of security for Andrew Fahie ("Fahie") and try to set up a meeting. Fahie was, and is, the Premier of the BVI. A member of the Lebanese Group also told the CS that he "owned" Oleanvine Maynard ("Maynard"), the Managing Director of the BVI Ports Authority. Later, members of the Lebanese Group told the CS that they had contacted Maynard, and she agreed to meet with the CS, but she wanted an up-front payment.

6. On or about March 16, 2022, the CS met with Kadeem Maynard ("Kadeem"), who is the son of Oleanvine Maynard. They met on the Island of Tortola, and the meeting was audio recorded. During this initial meeting, Kadeem explained that he and his mother had been waiting for the meeting with the CS, and that they had previously been contacted by members of the Lebanese Group. According to Kadeem, he was glad to see the CS, because they had already started to put things in place, and make connections, based on their conversations with the Lebanese Group. The CS and Kadeem exchanged numbers to allow for future communications. During their discussion, the CS explained that the CS had been doing "this" (a reference to drug trafficking) for a long time. Kadeem responded that he had been doing it for twenty years. The CS explained to Kadeem that he was from Mexico, and that he needed to meet with Maynard. The CS told Kadeem that he was a "fixer" and he needed to reach an agreement with Maynard. Kadeem responded that he would set something up, and that he and Maynard had already been waiting on the CS. Following the meeting, the CS and Kadeem exchanged text messages via WhatsApp to arrange a meeting with Maynard and Kadeem on the Island of St. Thomas, in the U.S. Virgin Islands ("USVI").

7. On or about March 20, 2022, the CS met with Kadeem and Maynard in St. Thomas. That meeting was audio and video recorded. The CS told them that he was a member of the Sinaloa Cartel, and requested their help moving thousands of kilograms of cocaine from Colombia, through Tortola, to Puerto Rico, with a destination of Miami and then New York. The CS made it clear that the CS did not wish to import the drugs to Tortola for sale, and that no cocaine would leave the container while in port. The CS only required protection and safe passage for the container for a 24-48 hour period, until the window would open when it could be taken to Puerto Rico. Maynard asked, "you want it to be done legally so nobody will come around?" The CS responded that he needed the paperwork, and Maynard said, "that is where I can assist, we need different licenses, which I can get . . . so we can process your paperwork, so you can come into the territory for a couple days, and then move on . . . that is easy." The CS explained that his organizations had "kitchens" (cocaine laboratories) in Colombia, so they had a very cheap and sustainable product. He asked them the price of a kilogram on the island, and Kadeem responded $10,000. The CS explained that he could get the product to Tortola for roughly $4,000, but it would sell for $26,000 to $28,000 a kilogram in Miami, or $32,000 to $38,000 in New York. The CS offered them a percentage of everything sold in the United States, and asked how he could get the money back to them in the BVI. Maynard responded, "what we do is set up shell companies." During this portion of the conversation, Kadeem confirmed that they had already developed a plan to deal with customs, and that they had determined they had to set up a business as a shipping agent, then they would be good to go. Maynard explained that she had already started looking into different licenses, adding "you have to legitimize what you're doing."

8. While discussing the CS's membership in the Sinaloa Cartel, Kadeem again explained that he had previously been involved in drug trafficking, but did not use the product.

4

Kadeem stated that he would be interested in receiving product for his help, and the CS said he thought that his bosses would agree to that arrangement.

9. The parties also discussed the need to meet with Fahie and another BVI government official ("Government Official 1"). In describing Fahie, Maynard said "I know the man, if he sees an opportunity, he will take it . . . I know the type of person he is, so I know he will take the opportunity." As to herself, Maynard said "if you come to me and I don't want to do it, I say hey, I'm not interested . . . or if I'm interested, I will say I'm interested."

10. The CS then proposed a test run of 3,000 kilograms of cocaine on a big boat following the route described above. He said he would need a license, and after the test run they would do four months of shipments. The parties again discussed the need to involve Fahie and Government Official 1. With regard to Maynard, Kadeem said "she knows the Premier, he's down with her, so she can go to him at any time, and he would say ok." Maynard added: "you see with my Premier, he's a little crook sometimes . . . he's not always straight."

11. At the end of the meeting, the CS provided Maynard with a bag containing $10,000 in United States currency, saying it was a gesture of good faith. Maynard responded that she would start her "homework" tomorrow.

12. Following the meeting, Kadeem was established as the point of contact with Maynard and later Fahie. His contacts with the CS would primarily happen via WhatsApp. On March 21, 2022, Kadeem texted the CS that he would be meeting with the "head coach" (Fahie) the next day. On March 22, 2022, Kadeem texted the CS "meeting completed and successful, head coach wants to play with the team this season."

13. On or about March 22, 2022, the CS had a phone call with Maynard and Kadeem. That call was audio recorded. From the call it was apparent Maynard and Kadeem had discussed

5

the CS's proposal with Fahie. They said they had spoken with Fahie, and he was very interested in working with the CS. Fahie said he needed an up-front payment of $500,000, and that he would handle the ports and airports. Maynard further explained that Fahie would need some money to get Government Official 1 on their side. Maynard said she had dropped off the business license applications to aid their scheme, and that Fahie had agreed to help her with the ports aspect of the plan. Further, Maynard explained that Fahie gave her code words to use when she wanted to meet with him about this scheme. The parties then agreed to set up a meeting with Fahie for April 7, 2022. The CS thanked Maynard, and she responded: "you're my brother now, I'll be there with you every step of the way."

14. After that call, the CS continued to exchange text messages with Kadeem, where they discussed their side deal, by which the CS would provide Kadeem with his own kilos for distribution.

15. On or about March 31, 2022, the CS had a phone call with Kadeem and Maynard. That call was audio recorded. Maynard confirmed that Fahie wanted to work with the CS, but that he also wanted some more information about the CS so that he could make the deal appear legitimate and secure. Maynard and Kadeem explained that Fahie was skittish because his government had been subject to an audit.[1] Kadeem added, however, that he had incriminating information on Fahie. The CS asked if Fahie understood what the plan was, and if he knew what the CS wanted to bring. Kadeem responded "yes, yes, yes." They then confirmed a plan to arrange a phone call with Fahie prior to their April 7, 2022, meeting.

16. On or about April 1, 2022, the CS had a phone call with Kadeem, Maynard, and Fahie. That call was audio recorded. During the call, they discussed the information that Fahie

---

[1] The Government of the BVI is currently the subject of a "Commission of Inquiry" by the United Kingdom. That commission is examining allegations of corruption and other misconduct on the island.

6

had previously requested of the CS. Fahie explained that he had to be cautious to make sure the CS wasn't law enforcement. He told the CS, "it took me 20 years to get here, and I don't want to leave in 20 minutes." The CS then said he was a "fixer" from Mexico, and that he had a business proposition for Fahie. They agreed that they would go forward with the planned meeting on April 7, 2022.

17. After the April 1, 2022, call, the CS and Kadeem exchanged a series of WhatsApp messages. The CS asked, "any comment from HC about myself and the call." Kadeem responded: "He say he feel much comfortable now and we going forward he going make sure your safe and whatever you want try to make sure you have what you need…just want to make sure the funds is for real."

18. On April 7, 2022, the CS arrived in Tortola and met with Kadeem and Maynard. This meeting was audio recorded. They told the CS that they would be picked up and driven to a meeting with Fahie. A vehicle arrived at their location and picked up Maynard and the CS, Fahie was in the front passenger seat. Kadeem rode in a separate vehicle. The drive to the meeting location took over an hour. While driving, Fahie complained that the British didn't pay him much. The car eventually arrived at a large, very nice, stone house. Kadeem served as security outside of the meeting, along with others. Fahie, Maynard, and the CS entered the home and sat down to talk. This meeting was audio recorded.

19. During the meeting, the CS told Fahie that he was employed by people in Mexico, and requested use of the ports of Tortola for free passage of 3,000 kilograms of cocaine at a time. That cocaine would come from Colombia, to BVI, then to Puerto Rico, and then on to Miami and New York. The cocaine would be packaged in construction material, in five-kilogram buckets of

waterproofing paint. That material would not test positive for cocaine, but the cocaine would later be extracted over the course of about four days in either Puerto Rico or Miami.

20. The CS explained the cost of the kilos in Colombia, and that his organization worked with the FARC in Colombia to buy land for the cultivation of cocaine. The CS explained the production cost in Colombia ($350-400 a kilo), and the sale prices for a kilo of cocaine in Miami ($26,000-$28,000) and New York ($32,000-$38,000). The CS proposed paying Fahie and Maynard a percent of his cocaine sales in exchange for their help passing the cocaine through their ports. He asked Fahie what percent he'd want, and Fahie deferred to the CS regarding the appropriate percentage. The CS then offered 12% of the value of the cocaine sold in the United States to Fahie and Maynard. Fahie pulled out a calculator, and ran 3,000 (kilos) times $26,000 (Miami price per kilo). The total was $78 million. Fahie then calculated that 10% of $78 million would be $7.8 million. Fahie agreed to allow the CS to use the ports to ship his cocaine, and said that Maynard had the licenses for the companies the CS would need. Fahie added "so that path there is clear, the [UI] first one will be the shipping, she told me she was putting through the license to make sure they get through, one path, the other path to the license that I'm meeting with the location I'm going to get that, gonna get that started." In exchange for their efforts, Fahie requested a $500,000 upfront payment. The CS explained that he would provide additional money for them at a future meeting in Miami.

21. The CS also offered to help fund Fahie's re-election campaign, and asked that Fahie allow the CS to have a hand in choosing Fahie's eventual successor (to ensure the continuity of their drug operations). The CS asked to do a 3,000 kilo test run to Miami, which would be followed by four months of 3,000 kilo loads coming through the island two or three times a month. Then, they would take a break for a number of months before resuming again. Fahie agreed to that

proposal. When the parties were finished discussing the specifics of the cocaine transport plan, the CS said: "that part is good, right?" Fahie said "yes." The CS then provided Fahie with $20,000 in cash, saying "this is a good faith gift, to seal that we have an agreement."

22. In addition to the drug transports, the CS proposed they could organize "seizures" of bad drugs and money by Fahie in the BVI, so that they could avoid suspicion, and make it look like Fahie was fighting drug trafficking. Fahie laughed and said the CS had thought of everything.

23. Fahie asked if the CS was an undercover, and the CS responded in a way that reassured Fahie he was not. As part of that response, the CS explained to Fahie: "well, first of all, you're not touching anything." Fahie replied, "I will touch one thing, the money." In explaining why he was concerned with law enforcement, Fahie told the CS that the British had been trying for years to get him out of office. He said: "I have plenty of people, and I don't sell them out to the British with their plans, their plans are to catch all the people like what you said . . . they always want to capture people, but me I see what they are doing and I protect the people." Fahie then added that the CS had responded perfectly to his question about law enforcement. The CS responded, "I understand, and I have no problem with your question, and thank you that you understand, it's just trust, we can do it, or we can not, and we'll be friends . . . so we good on that matter?" Fahie responded "yes."

24. The CS asked Fahie about Government Official 1, and Fahie said that Government Official 1 had many employers. This is believed to be a reference to drug traffickers who pay (or "employ") Government Official 1 to do their bidding. So, Fahie explained that the best approach was just pay Government Official 1.

25. Towards the end of the meeting, Fahie asked Maynard to leave the room, which she did. FAHIE told the CS he also needed $83,000 in cash (hundreds) to pay back a debt he owed to

9

someone in Senegal. The CS agreed to help with that issue, and they arranged the following: (1) the CS, Maynard and Fahie would meet in Miami on April 27, 2022; (2) the CS would leave the $700,000 cash in a private jet at Opa Locka airport, that would be retrieved by Maynard and an unknown individual on April 28, 2022, to be flown back to BVI; and (3) Fahie would fly to join the CS in St. Martin on May 2, 2022, where they would meet the man from Senegal and pay back the debt on behalf of Fahie.

26. Following the meeting, the CS continued to communicate with Kadeem regarding their side deal, through which Kadeem would plan to receive 60 kilograms of cocaine a week. Further, they coordinated the arrival of the private jet with the $700,000 from Miami to the BVI. Kadeem had control of officials at the airport, and confirmed that they would allow the plane to land.

27. On April 27, 2022, the CS and a DEA undercover officer ("UC") met with Maynard in Miami, Florida, to discuss their arrangement and the side deal that her son Kadeem had planned with the CS. They discussed the cocaine for Kadeem, and how 20 of every 60 kilograms belonged to the CS. The CS explained that the cocaine would start coming from St. Thomas, USVI, to the BVI, on April 30, 2022. The CS explained that the UC would be the point of contact in Tortola for that operation.

28. Maynard then called Kadeem, and put him on speaker phone with the CS and UC. On the phone, Kadeem asked Maynard to give the CS a paper that contained three coordinates (drop points) for the delivery of the cocaine to Kadeem. Maynard complied, and provided that paper to the CS. The CS asked Kadeem what he felt was a good price for Kadeem to pay for the cocaine. Kadeem eventually agreed on $11K per kilogram for a total of $220,000. The CS told

Kadeem to keep that money for the payment to law enforcement officers on Tortola. Kadeem responded by stating that he already had two (officers on his payroll).

29.   The parties next discussed how to arrange for the delivery of the drugs from St. Thomas to Tortola. The CS asked Kadeem to meet the CS's sister in St. Thomas on April 28, 2022. She would have a satellite phone, and $30,000 dollars to provide for payment to those in Tortola that would help with their scheme. Kadeem agreed, and stated that he would take his boat over that morning. Then they hung up the phone with Kadeem, and the CS, UC, and Maynard continued speaking.

30.   The CS asked Maynard if she had companies set up yet for the drugs and money they would be receiving as part of their plan with Fahie. This was a reference to the large amount of money the CS had agreed to provide Maynard and Fahie. Maynard responded "yes," and told the CS they would not need to remove anything from the drug boat, and that they would not need to enter the port. She would have the boat outside the port where she could see it from her office. The CS then asked about Government Official 1, and Maynard stated that Fahie would clear it with him.

31.   The CS then asked Maynard if she had accounts available in the U.S. that she could use to receive her money from their plan. She answered that Kadeem owned a real estate company in Florida with accounts that could be used. The parties then discussed Government Official 1, how that official was good friends with Fahie, and how that official was close friends with a well-known drug trafficker on the island.

32.   Maynard then provided paperwork to the CS about a plane company they used from the U.S. to bring drug money in to the BVI (secreted in the plane). She said that the company

11

wanted to do business with the CS. The CS replied that he was looking forward to meeting them. The meeting concluded shortly thereafter.

33. On the evening of April 27, 2022, the CS and the UC met with Fahie at the same hotel where they met Maynard earlier. This meeting was audio recorded. Upon arrival, Fahie was located in the lobby along with R.S. They exchanged introductions, and then Maynard arrived and took them to the conference room that she had rented.

34. Once in the conference room, Fahie asked the ladies to leave so that only Fahie, the CS, and UC were present. Fahie asked the CS to start with a prayer, and then immediately began to speak about the money that he needed to pay the man from Senegal, during their upcoming meeting in St. Martin. Fahie said that they needed to make that payment on May 3, 2022, and provided the CS with the hotel information for the meeting. He instructed the CS to bring the money into the hotel room to provide to the man. The CS asked Fahie about the man, and why Fahie owed him money. Fahie replied that he had known him for years, and that the man had "fixed" some political issues for him. The money was payment for "fixing" those political issues.

35. The CS then asked Fahie about the Commission of Inquiry on the island, and the problems that the Commission would create for the plan. The CS also asked Fahie about Government Official 1, because he (the CS) had heard that Government Official 1 could cause problems. Fahie explained that he would handle Government Official 1.

36. The CS then asked Fahie how he wanted his money delivered in the future. Fahie stated that there is no crypto on the island, and then asked about delivery by sea. He told the CS that if it was by sea, he had to make sure that it was within BVI waters. The CS replied that he would make sure. Fahie further inquired whether the CS had the airport "fixed," and the CS said

12

he was working on it. Fahie added that he would begin to build companies and bank accounts, including a line of credit around $300,000.

37. Fahie asked the CS if he was still selling the kilos for $26,000 apiece, like they had previously discussed. The CS affirmed that he was. The parties then began to discuss the money and its breakdown. The CS stated that the first shipment should arrive on the 7th of July, and that the UC would be on the island as his contact to manage the movement of the money. The CS explained that he would only return if things needed to be fixed. Fahie then mentioned that he had a friend who managed a lot of things, including moving guns and cocaine. Fahie said that "he" (meaning the friend) would handle this for him.

38. Fahie then brought up leaving Miami the following day, and asked how the money ($700k) would come. The UC stated that New York had paid $1,000,000 from the last shipment of kilos, and that it would arrive later that night in Miami. The CS stated that $700,000 was for Fahie and Maynard, while the remaining $300,000 would be taken back to his people in Mexico. The two then briefly exchanged small talk, with Fahie explaining that he believed in magic and witches, and how to read lies in people.

39. After that brief diversion, the CS explained that his first shipment would be a test run of 3,000 kilograms, which would be followed by eight vessels of 3,000 kilos each over the course of four months. After four months, there would be an eight-month rest in which the CS would send shipments of low purity "brown" cocaine for Fahie to seize. The CS would provide all the information to Fahie to allow him to conduct those seizures. Fahie loved the idea, and explained that in the past he never got paid at the end of his involvement in schemes like this.

40. The CS then asked FAHIE about the possibility of having breakfast in the morning. Fahie replied that he couldn't because he had an early flight to Philadelphia. The CS offered him

a flight to Philadelphia on a private plane, and Fahie agreed. At this point, Fahie called Maynard back into the conference room. Maynard asked the CS if he had everything set up at the airport, and the CS replied that he did. They then spoke about the time that each of them (Fahie and Maynard) should be picked up in the morning.

41. On April 28, 2022, the CS and UC arrived at Fahie's residence in South Florida to pick him up and transport him to the airport. These interactions were audio and video recorded. Upon arrival at the airport, the CS stated that he had something to show Fahie. He took him to the plane destined for the BVI that they had spoken about the night before. They exited the CS's car, and entered the aircraft. In the back of the plane, the CS showed Fahie designer shopping bags containing the $700,000 for Fahie and Maynard.[2] The UC explained that the money would be packaged in a suitcase like Fahie had requested, but they wanted him to see it first in person to confirm it was paid. Shortly thereafter, the parties exited the plane, and Fahie was subsequently arrested. Fahie confirmed that he was in fact "Andrew Fahie," and asked, "why am I getting arrested, I don't have any money or drugs."

42. Later that same morning, April 28, 2022, the CS and UC picked up Maynard and R.S. from the same hotel in Miami. These interactions were audio and video recorded. The parties drove together from the hotel to the Opa Locka Executive airport. Upon arrival, the parties walked onto the tarmac, and towards the CS's private jet. The parties entered the jet, where Maynard and R.S. sat down. The CS showed them the money, said this is the whole $700,000. The CS provided Maynard her $200,000, and said that it was her payment. He then explained that the rest of the money was for Fahie, and that it was very important to the CS's organization that the money be

---

[2] This was "sham," or fake, currency.

14

kept secure. The CS told Maynard and R.S. that the money would be further packaged and hidden prior to the flight. As Maynard exited the plane, she was arrested by law enforcement.

## CONCLUSION

43. Based on information contained in this Affidavit, I respectfully submit there is probable cause for the issuance of a criminal complaint charging Fahie, Maynard, and Kadeem as follows:

   a. Conspiracy to import five kilograms or more of a mixture and substance containing a detectable amount of cocaine, in violation of 21 U.S.C. §§ 963, 952, and 960(b)(1)(A);

   b. Conspiracy to launder money, in violation of 18 U.S.C. §§ 1956(a)(2)(A), 1956(a)(2)(B)(i), 1956(c)(7)(A), and 1956(c)(7)(B)(iv); all in violation of 18 U.S.C. § 1956(h).

**FURTHER YOUR AFFIANT SAYETH NAUGHT.**

Special Agent Shad Aschleman
Drug Enforcement Administration

Attested to by the applicant in accordance with the requirements of Federal Rule of Criminal Procedure 4.1 by  Face Time  this  28th  day of April 2022.

Hon. Jonathan Goodman
U.S. Magistrate Judge
Southern District of Florida

15

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NUMBER: 22mj02719 Goodman

### BOND RECOMMENDATION

DEFENDANT: Kadeem Stephan Maynard, a/k/a "Blacka"

Pre-Trial Detention
(Personal Surety) (Corporate Surety) (Cash) (Pre-Trial Detention)

By: _____
AUSA: Frederic C. Shadley

Last Known Address: _____

What Facility: _____

Agent(s): S/A Shad Aschleman
(FBI) (SECRET SERVICE) (DEA) (IRS) (ICE) (**OTHER**)
DEA

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NUMBER: 22mj02719 Goodman

## BOND RECOMMENDATION

DEFENDANT: Oleanvine Pickering Maynard, a/k/a "Rose," a/k/a "P"

Pre-Trial Detention

(Personal Surety) (Corporate Surety) (Cash) (Pre-Trial Detention)

By: _____

AUSA: Frederic C. Shadley

Last Known Address: _____

What Facility: _____

Agent(s): S/A Shad Aschleman
(FBI) (SECRET SERVICE) (DEA) (IRS) (ICE) (**OTHER**)
DEA