UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 22-cr-20191-KMW

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

ANDREW ALTURO FAHIE,

    Defendant.
    _____/

### DEFENDANT FAHIE'S RESPONSE TO GOVERNMENT'S BRIEF ON LACK OF UNANIMOUS VERDICTS

Defendant, Andrew Alturo Fahie ("Mr. Fahie" or "Defendant"), hereby files his response to the Government's Brief Regarding Application of Federal Rule of Evidence 606(b) Following Jury's Unanimous Verdict ("Brief"). Mr. Fahie has revised a previously provided, but not yet filed, document to remove now moot discussion as to the sealing of pleadings relating to this matter.[1] For the reasons stated below, Mr. Fahie submits that the Court should exercise its discretion to make inquiry of the jury, or at a minimum, certain members thereof, in the limited fashion set forth below.

### RELEVANT BACKGROUND

1. The trial in this cause began on January 29, 2024. Twelve primary jurors and two alternates were sworn to serve as jurors and were provided with the Court's standard preliminary instructions.[2] At issue were four charges brought by the Government which included a conspiracy

---

[1] Mr. Fahie does not thereby suggest that there grounds for sealing may not arise in the future and reserves on any such eventuality.

[2] Prior to commencement of the presentation of evidence, but after being sworn, one of the twelve primary jurors belatedly advised that the juror had a scheduled medical procedure that had not been disclosed during the jury selection process. The Court excused the juror and sat the first alternate as a primary juror.

to import a mixture and substance containing a detectable amount of cocaine into the United States from a place outside thereof (Count I); conspiracy to commit money laundering (Count II); attempted money laundering (Count III); and interstate travel in aid of racketeering (Count IV). A conviction on Count I carries a mandatory minimum sentence of ten (10) years to life.  None of the remaining Counts carry a mandatory minimum sentence.

2. In an accommodation to certain personal time constraints of the jury, the Court adjourned the proceedings each day at 2:30 p.m., save for one day when the jury heard evidence until 6:00 p.m.  The proceedings were recessed entirely on Friday, February 2, 2024.  Despite this accommodation, one juror (Juror A) sent a note to the Court on Monday, February 5, 2024, during the Government's examination of Mr. William Cortes.  (Court Exhibit 1).  That note complained of the length of time the "lawyers" were taking to present evidence, requested a "speedy trial" and complained of the imposition on the jurors' (collectively) time. The Court addressed Juror A individually in open court including cautioning that even discussion of the duration of the case was an impermissible discussion among the jurors of the case prior to it being presented to them by the Court for deliberation.  Thereafter the presentation of evidence continued.  The jury retired to begin its deliberations at approximately 2:00 p.m. on Thursday, February 8, 2024.

3. During its deliberations, the jury presented the Court with three additional notes. The parties were advised of the questions via electronic mail message from Chambers at 4:49 p.m. on Thursday, February 8, 2024.  Two questions were exclusively related to requiring assistance during deliberations to arrange for childcare and were answered by the Court, with the agreement by the parties, satisfying the requested assistance. The third note contained a question on the substance of the instructions on Count II and was answered by the Court, in writing, after agreement of the parties.

4.      The parties were advised that the jury had reached a verdict at 5:36 p.m. on Thursday, February 8, 2024.  The Court reconvened shortly thereafter with the jury and the parties present in the courtroom.  The Court examined the verdict and directed the Courtroom Deputy to publish the verdict.  The verdict as published in open court was that Mr. Fahie was guilty on all counts, with the listed amounts of controlled substances, conspiratorial objects, and specified unlawful activities listed in the verdict form being selected.

5.      The Court inquired whether either party wanted the jury polled as to its verdict. The Government immediately requested that the jury be polled. The polling of the jury, by juror number, was then conducted with each juror responding affirmatively that the verdicts as published were their verdicts.[3]  The Court then made its closing remarks thanking the jurors for their service and discharging them.

6.      Immediately upon confirming that the jury was back in the jury room by the sound of the closing door, counsel for the defense advised the Court that Juror B looked at both defense had engaged in eye contact with her during or immediately after the polling and facially indicated concern[4], and that the same juror had done so for a second time moments later when exiting the jury box, with another heightened expression of concern.  Defense counsel noted that it appeared that the juror was indicating some issue with some part of the process that had just concluded, but could offer no more than counsel's impressions.

7.      The Court thanked counsel for raising the issue, but took no further action, noting its observation that Juror B had engaged in looking around the Courtroom during the proceedings

---

[3] Of course, the jury had been instructed in the final charge given by the Court that each of its verdicts was required to be unanimous consistent with the pattern jury instruction of the United States Court of Appeals for the Eleventh Circuit.
[4] In other words, Juror B was not physically shaking her head no, or mouthing any communication at that time.

3

on several occasions. Without more to provide a good faith basis for inquiry at that time, the parties and their respective counsel departed the Courtroom shortly before 6:00 p.m.

8. At 6:07 p.m., the parties were advised by Chambers to immediately return to the courtroom. Shortly thereafter, the Court advised that defense counsel's concern raised immediately after the jury return to the jury room was prescient. Specifically, the Court advised that two members of the jury, Juror B and Juror C, had stayed behind after the remaining ten had departed and advised the Court's staff that the verdicts as published had not, in fact, been their verdicts. The staff member immediately terminated the communications. The Court advised that it appeared that the lack of unanimity was limited to some, but not all the counts. There was no specificity provided at that time as to what counts the two jurors suggested were not, in fact, unanimous guilty verdicts.

9. The Court and counsel discussed the revelations and what should be said to Jurors B and C. Eventually, the Court brought Jurors B and C (each of whom had remained in the jury room) back into the Courtroom and advised them there would be some form of future contact relating to an investigation or inquiry regarding the information each had provided to the Court's staff. The two jurors were then again discharged.

10. Among the Government's suggestions on how to proceed was that the jury be brought back in to continue its deliberations, which was an apparent recognition or concession that it recognized that the expressed lack of unanimity as to at least some count even after the discharge was valid and problematic. The suggestion of continued deliberation was objected to by the defense and rejected by the Court owing to the fact that the jury had been discharged and moreover

4

had been advised that its members having been discharged could now discuss the case freely.[5]

11.     Counsel for the defense then preserved its intent to seek a mistrial once the facts were flushed out relating to which counts lack unanimity. The Court directed the defense to provide such motion in writing and asked the parties to confer with each other regarding the revelation of lack of unanimity by the two jurors.  Defense counsel indicated that she anticipated being able to provide the Court with some response to that request early in the week of February 12, 2024.

12.     The defense made two attempts to engage the Government in discussions regarding the issue.  The Government responded at 11:12 a.m. on Friday, February 9, 2024, that the Government was "working on the issue" and would "reach out" after deciding how it would like the Court to proceed.

13.     The Government forwarded its unfiled Brief to the Court, its staff, and defense counsel at 5:57 p.m. on Friday, February 9, 2024.

14.     Not included in the Government's Brief are additional instances of juror contact that unfolded after Jurors B and C were brought back into the Courtroom and dismissed for the second time on the evening of February 8, 2024. Shortly after being dismissed, Juror C initiated contact with one of the defense team by placing a call to counsel office at approximately 7:38 p.m. That call was forwarded via software used by counsel's firm to counsel's mobile phone. Counsel missed the call from the unknown number and no voice mail message was left. Juror C again initiated contact with defense counsel again on February 9, 2024, at 12:58 p.m. and left a voicemail. Counsel missed the call from the unidentified number again and did not listen to the voicemail. Believing the missed calls to be from a friend of the Defendant's, defense counsel

---

[5] Counsel for the parties agreed via electronic mail message at approximately 8:24 p.m. the evening of February 8, 2024, that they could not initiate inquiry of the jurors without leave of the Court.

5

returned the call, asked the individual who had called to identify themselves and briefly spoke to Juror C. A summary of this exchange was provided to the Government and the Court via e-mail on February 9, 2024, at 1:24 p.m. The e-mail is annexed hereto as Exhibit A.

15. The Court held a status conference in this matter on Monday, February 12, 2024, at 10:30 a.m. At the conclusion of the status conference the Court directed the parties to brief issues raised during the status conference by the end of the day Thursday, February 15, 2024.

### THE COURT SHOULD EXERCISE ITS DISCRETION TO CONDUCT A TARGETED AND LIMITED INQUIRY OF JURORS B AND C

16. When an issue such as that presently before the Court arises, the Court must determine whether the misconduct occurred and whether it was prejudicial. *United States v. Ifediba*, 46 F.4th 1225, 1238 (11th Cir. 2022), *cert. denied,* 143 S. Ct. 2586 (2023) (dismissing alternate juror where inquiry concluded juror had improperly discussed the case with others and googled the case). A district court has "broad discretion in deciding whether to interrogate jurors regarding alleged misconduct." *United States v. Barshov*, 733 F.2d 842, 850 (11th Cir. 1984). "[T]he investigative procedure to be used in checking for juror misconduct falls within the discretion of the district court." *United States v. Caldwell*, 776 F.2d 989, 997 (11th Cir. 1985).

17. Further, a court's discretion is at is broadest when the allegations involve internal, as opposed to external, juror misconduct. *United States v. Dominguez*, 226 F.3d 1235, 1246 (11th Cir. 2000) ("In a number of decisions we have held that when a jury problem involves the possibility of internal misconduct, the trial judge's "discretion extends even to the initial decision of whether to interrogate the jurors.") (citing *United States v. Harris,* 908 F.2d 728, 733–34 (11th Cir. 1990)).

18. The defense does not suggest some free-wheeling exchange with Jurors B and C. Rather, the defense proposes that the issue, a decidedly delicate one, should be inquired of

6

individually and in stages. In essence, Jurors B and C should be repolled as to whether the verdicts as published are their verdicts. We recommend that the verdicts be published anew prior to posing that question. If the answer to that repolling from one or both of the jurors is no, the Court should poll again as to each Count in order to determine which Count(s) lacks unanimity. If the answer from both jurors is yes, the matter should not be inquired into further of them absent some additional basis.

19. Thereafter the jurors should then be excused to the jury room so that counsel and the Court can address how to move forward.

20. There can be no suggestion that the above referenced inquiry delves into matters prohibited by FRE 606. We ask only that the same questions be put to the jurors that would be asked in any polling, which inquiries are clearly permitted and take place in courtrooms on a regular basis, and which are expressly provided for in the law.

21. Whether further inquiry should be made into the original pre-discharge answers given by Jurors B and C during the jury poll, later disavowed, as well as into Juror C's initiation of contacts to defense counsel following the verdict are larger questions that should be left to after a limited re-polling of Jurors B and C which will ensure clarity and avoid potential issues relating to Federal Rule of Criminal Procedure 606.

22. In making its request for limited repolling the defense relies on the procedure employed by Judge Middlebrooks in *United States v. Wilcher*, No. 16-CR-20257-MIDDLEBROOKS, 2017 BL 297842 (S.D. Fla. Aug. 24, 2017). In *Wilcher*, the Government made a post-trial request that Judge Middlebrooks clarify the trial record. *See Wilcher* docket at DE 63. This request was made during the pendency of Wilcher's appeal and well post discharge of the jury. Wilcher had been convicted by a jury of possession of ammunition by a convicted

felon. After receipt of the jury's verdict form, indicating all guilty verdicts, Judge Middlebrooks had the jury polled after which they were discharged. *See Wilcher* at *1. The transcript of the polling reflected that one juror answered "no" when asked by the courtroom deputy whether the verdict was the juror's verdict. *Id.* Judge Middlebrooks then reviewed the audio of the polling and advised the parties that based on his review he determined that Juror 7's answered affirmatively to the polling question, but that another, Juror 6, gave an answer that was unintelligible or inaudible. *Wilcher* at *2.

23. Judge Middlebrooks asked the Government and defense for their respective positions on how to proceed and "both believed an evidentiary hearing was appropriate. The Parties also believed that Jurors 6 and 7 should be subpoenaed to testify." *Id.* Judge Middlebrooks then held an evidentiary hearing and the Court made inquiry of Jurors 6 and 7 after administering an oath to each.[6] Judge Middlebrooks expressly held that, "[a]lthough juror testimony is limited by Rule 606(b), I find that jurors may testify about the answer they provided during the jury poll."[7]

24. Alternatively, pursuant to Rule 606(b) exception (C), Jurors B and C should be allowed to testify about their answers given during the jury poll without intruding into why the Jurors provided such answers and without intruding into jury deliberations. The limited purpose of such testimony is to determine whether a mistake was made in entering the jury form pursuant to Rule 606(b)(2)(C).

25. "When a juror states that he has doubt, the trial judge should be alert to the probability that there may not be unanimity in the verdict." *U.S. v. Edwards*, 469 F.2d 1362, 1366-

---

[6] Prior to and during the evidentiary hearing Wilcher's counsel raised FRE 606 and objected to any testimony from the jurors in question, backtracking on what he had agreed to during the Court's status conference on the matter. *Wilcher* at *3.

[7] At the evidentiary hearing each juror advised that the verdict as published was that juror's verdict.

67 (5th Cir. 1972) (juror responded, "It's my verdict, but I'm still in doubt.") (citing *United States v. McCoy*, 429 F.2d 739 (D.C. Cir. 1970) (juror responded, "Yes, with a question mark.")). Here, Juror B raised doubt as to the unanimity of the verdict by her visible conduct before exiting the jury box. Less than 10 minutes later she and Juror C confirmed the lack of unanimity by alerting Courtroom staff. Accordingly, this Court should exercise its broad discretion to make a limited and focused repolling inquiry of each juror to ensure the validity of the verdicts and to preserve the Defendant's Sixth Amendment rights.

26.    There can be no dispute that the Sixth Amendment encompasses the right to a unanimous verdict of guilty. *Ramos v. Louisiana*, 140 S.Ct. 1390 (2020).

> The text and structure of the Constitution clearly suggest that the term 'trial by jury' carried with it *some* meaning about the content and requirements of a jury trial.
>
> One of these requirements was unanimity. Wherever we might look to determine what the term "trial by an impartial jury trial" meant at the time of the Sixth Amendment's adoption – whether it's the common law, state practices in the founding era, or opinions and treatises written soon afterward – the answer is unmistakable. A jury must reach a unanimous verdict in order to convict.

*Id.* at 1395.

27.    At issue, of course, in *Ramos*, was Louisiana's acceptance of non-unanimous verdicts for purposes of conviction. As Justice Gorsuch noted, "instead of the mistrial he would have received almost anywhere else, Mr. Ramos was sentenced to life in prison without possibility of parole." *Id.* at 1394.

28.    Clearly, we do not suggest that the Government is suggesting that a verdict lacking in unanimity be accepted. Rather it urges that in the face of clear evidence that the verdict was not unanimous as to at least some counts, that such evidence be put aside in favor of considerations in FRE 606(b). Where there is a method of ensuring unanimity **without** intrusion into the jury's

deliberative process, by simply limiting the inquiry to the polling itself, the balance should favor protecting the Defendant's constitutional rights.

29. Nor can it be argued that Defendant will not be prejudiced by a failure to do so. If, for example, the lack of unanimity relates to Count I and the Jurors are not presented with the targeted and limited inquiry regarding polling, the Defendant will be sentenced to a ten-year mandatory minimum sentence instead of the mistrial with no possibility under the law of avoiding that result.[8]

## CONCLUSION

For the reasons set forth above and at the Court's status conference on Monday, February 12, 2024, Mr. Fahie further requests that the Court exercise its wide discretion to determine from Jurors B and C whether the verdicts as published were their verdicts in the manner suggested above.

    Respectfully submitted,

    **VENABLE LLP**
    Theresa M.B. Van Vliet, Esq.
    Fla. Bar No. 374040
    Email: tmvanvliet@venable.com
    Joyce A. Delgado, Esq.
    Fla. Bar No. 1002228
    Email: jadelgado@venable.com
    *Counsel for Defendant Andrew A. Fahie*
    200 East Broward Blvd., Suite 1110
    Fort Lauderdale, FL  33301
    Telephone: 954-453-8000
    Telefax: 954-453-8010

    By: /s/  Theresa M.B. Van Vliet
        Theresa M.B. Van Vliet, Esq.

---

[8] The only means available to escape imposition of a mandatory minimum sentence in that instance would be application of the "safety valve" which would require a proffer to the Government and as a general rule, its satisfaction with such a proffer. That would effectively require that Defendant potentially undermine any appeal he might opt to mount as to any verdict ultimately deemed to be unanimous.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been served upon all parties registered to receive electronic notice via CM/ECF Notification on this 13th day of February, 2024.

By: /s/ Theresa M.B. Van Vliet

# **EXHIBIT "A"**

| | |
|---|---|
| **From:** | Van Vliet, Theresa M. |
| **To:** | FLSDdb_efile Williams; Michael Santorufo; Kevin.Gerarde@usdoj.gov; sean.mclaughlin@usdoj.gov; Delgado, Joyce A. |
| **Subject:** | READ ASAP FW: Juror Call |
| **Date:** | Friday, February 9, 2024 1:34:26 PM |

All,

Joyce describes below the attempts of the male juror who reported a lack of unanimity in the verdicts last night. I asked her to note his number so that others may be aware and recognize it. The call came through to Joyce's mobile phone through Jabber (which is software utilized by our firm for calls to the office and which will forward the call to the attorney's mobile when out of office).

I have had no direct calls from Jabber or otherwise from a ▉▉▉ area code other than from one I recognized and was not the juror. I did have a Jabber call this morning from our reception, but I did not answer it as I was thankfully otherwise engaged.

As noted below, apparently the juror left Joyce a voicemail. The voicemail has been retained, but I have instructed Joyce NOT to listen to it in the event there is more substantive information in it. We will make it available to all Monday, or sooner at request (I honestly do not know how to do that so we will have to find out from IT if sooner than Monday's Zoom).

Happy to provide any further information on these unsolicited calls either before Monday or during the Zoom hearing.

Theresa

**From:** Delgado, Joyce A. <JADelgado@Venable.com>
**Sent:** Friday, February 9, 2024 1:22 PM
**To:** Van Vliet, Theresa M. <TMVanVliet@Venable.com>
**Subject:** Juror Call

The male juror that was called back into court last night ▉▉▉▉▉▉▉▉ (sp?), called my office last night around 7:30 p.m. but I missed the call. The number is ▉▉▉▉▉▉▉▉. He called my office again today around 1pm and I missed it again. He left a voicemail but I did not listen to it before returning the call so I did not know who I was contacting. Frankly, I thought it was ▉▉▉▉▉▉▉▉ because they have a similar number and he contacted me yesterday and this morning as well. When ▉▉▉▉▉▉ answered, I asked him to identify himself because I had missed calls from his number. He told me who he was and I said I remembered him. He then blurted out that he wanted to know what was happening with the case because he's worried that if all the jurors are asked to return that they will "never come to an agreement" so he wants to know what the process is. I said I didn't know and that it was inappropriate that we were speaking and that I had to let him go. We then hung up.

Joyce A. Delgado, Esq. | Venable LLP
t 954.453.8031 | f 954.453.8010 | m 954.397.0918
200 East Broward Boulevard, Suite 1110, Fort Lauderdale, FL 33301