UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.   22-20191-CR-WILLIAMS(s)

UNITED STATES OF AMERICA

vs.

ANDREW ALTURO FAHIE
    a/k/a "Head Coach,"
    a/k/a "Coach,"

       Defendant.
_____/

## GOVERNMENT'S OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT AND RESPONSE TO DEFENDANT'S OBJECTIONS TO THE PSI

The United States of America, through its undersigned counsel, hereby files its objections to Defendant Fahie's draft Presentence Investigation Report ("PSI") (DE 263).

Fahie's advisory guidelines calculation should include a 4-level aggravating role adjustment pursuant to U.S.S.G. § 3B1.1(a) based on Fahie's status as an organizer or leader in criminal activity that involved five or more participants.

    **I.**    **§ 3B1.1(a) – Leader/Organizer enhancement**

Pursuant to U.S.S.G., § 3B1.1(a), a 4-level enhancement is warranted when "the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G., § 3B1.1. The commentary to U.S.S.G., §3B1.1 explains that "a 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted. A person who is not criminally responsible for the commission of the offense (i.e., an undercover law enforcement officer) is not a participant." U.S.S.G., § 3B1.1, Commentary, Application Note 1. However, U.S.S.G., § 3B1.1(a) "does not require that five

1

people were convicted, or even charged, in connection with the conspiracy." United States v. Rendon, 354 F.3d 1320, 1333 (11th Cir. 2003). The defendant is also included in calculating the five-participant total. United States v. Holland, 22 F.3d 1040, 1045 (11th Cir. 1994) (defendant is included as one of the five participants).

Key factors that courts consider to assess a leadership or organizer role include: (1) exercise of decision-making authority; (2) nature of participation in the commission of the offense; (3) recruitment of accomplices; (4) claimed right to a larger share of the fruits of the crime; (5) degree of participation in planning or organizing the offense; (6) nature and scope of the illegal activity; and (7) degree of control and authority exercised over others. See U.S.S.G., § 3B1.1, Commentary, Application Note 4. "There is no requirement that all of the considerations have to be present in any one case." United States v. Ramirez, 426 F.3d 1344, 1356 (11th Cir. 2005). However, for the enhancement to apply, "there must be evidence that the defendant exerted some control, influence or decision-making authority over another participant in the criminal activity." United States v. Martinez, 584 F.3d 1022, 1026 (11th Cir. 2009) (citation omitted). The Government must establish that a defendant warrants the 4-level enhancement, under U.S.S.G., § 3B1.1(a), by a preponderance of the evidence. See United States v. Alred, 144 F.3d 1405, 1421 (11th Cir. 1998).

**(A) Leader/Organizer Factors § 3B1.1, Commentary, Application Note 4**

(1) *Exercise of decision-making authority*

The defendant exercised decision-making authority in the cocaine importation and money laundering scheme when he approved the CS's drug trafficking proposal at the March 7, 2022, meeting in Tortola, and later when he directed Oleanvine Maynard and Roxane Sylvester to travel to Miami to transport his $500k payment back to Tortola.

The defendant first met the CS on March 7, 2022, at a meeting on Tortola. The defendant selected the time and place of this meeting—which occurred at night at a vacant house—and did not share the meeting location with the CS or Oleanvine Maynard beforehand. Instead, the defendant and his driver picked up the CS and Oleanvine Maynard at a restaurant in Road Town before driving to the vacant house which was in a more secluded part of Tortola.

During this meeting, the CS presented the cocaine importation and money laundering scheme to the defendant. The defendant agreed to the proposal and accepted a $20k bribe to seal the agreement. As the CS explained, the defendant was essential to the scheme because he (the defendant) needed to bribe various BVI Customs officials to ensure the CS's cocaine laden vessels could port in Tortola without issue. Oleanvine Maynard, who at the time was the director of the BVI's ports, worked alongside the Customs department and had no authority over those government officials. On the other hand, the defendant, as the Premier of the BVI, oversaw the Customs department and he had the power and authority to bribe those Customs officials. He exercised his authority and agreed to pay the bribes.

The defendant requested $500k from the CS to pay the necessary bribes and allow the cocaine importation scheme to unfold.[1] He agreed to pick up this payment from the CS in Miami on April 27, 2022. According to the defendant, he directed Oleanvine Maynard and Roxane Sylvester to accompany his money from Miami to Tortola so that "no one sees me around the business" (GX 12b at 107). Roxane Sylvester, who was already scheduled to be in Miami on April 27, would not have been involved in the criminal activity were it not for the defendant

---

[1] As part of the plan, the CS would also pay Oleanvine Maynard $200k, for a total of $700k paid to the defendant and Oleanvine Maynard in furtherance of the cocaine importation scheme on this date.

3

directing her involvement. As for Oleanvine Maynard, she was not going to be in Miami on April 27 and protested the defendant directing her travel (GX 7b at 151) (Fahie: You're going to Miami. Oleanvine: No, nobody to sign documents if I leave). Here, again, the defendant wielded his authority and directed Oleanvine Maynard's international travel to Miami, Florida in furtherance of the cocaine importation scheme.

(2) *Nature of participation in the offense*

The defendant, through his own actions, positioned himself as the leader of the cocaine importation scheme in the BVI when he excluded Oleanvine Maynard from the meeting with the CS and Jose (the CS's "godson") on April 27 in Miami, Florida. Initially, the defendant, Oleanvine Maynard, Roxane Sylvester, the CS and Jose were all present for the meeting. But, approximately twenty minutes into it, the defendant told Oleanvine Maynard and Roxane Sylvester to wait outside while he continued the meeting alone with the CS and Jose (GX 12b at 23) (Fahie: Okay. Let me get just one minute with my friend alone…). After they left, the defendant discussed logistics of the cocaine importation scheme—including progress on licenses that would be necessary for the cocaine laden vessels ("Fahie: I knew that you were secure so I forward some payments to some of them to get these licenses out. Life is the same everywhere." GX 12b at 46-47), bribes that the defendant was going to pay ("Roberto: …you gonna pay him? Fahie: Yeah, we are fixing him." GX 12b at 49), how the defendant would receive his 12% share of the drug proceeds ("Fahie: … The first payment will by boat." GX 12b at 108), and when the first shipment of cocaine would arrive in Tortola ("Roberto: … We was thinking to do uh, the first week of July. Fahie: For the first shipment? Roberto: Yeah, for the first shipment. Yes." GX 12b at 46).

While the defendant distanced himself from criminal activity in the sense that he used Oleanvine Maynard and Roxane Sylvester to bring his $500k back to Tortola, and would use

4

Tattoo to pick up his future drug proceeds, he clearly positioned himself as the leader on the BVI side of the scheme and directly participated in the scheme's planning and logistics.

(3) *Recruitment of accomplices*

The defendant personally recruited at least two accomplices in the cocaine importation scheme—Roxane Sylvester and Wade Smith. As discussed above, the defendant recruited Roxane Sylvester to transport his $500k payment to Tortola that the defendant would use to pay bribes. Oleanvine Maynard had no hand in bringing Sylvester into the scheme. The CS and Jose did not even meet Sylvester until she was already in Miami. The defendant alone involved Sylvester in the scheme to advance his own personal interests—getting a $500k payment while keeping his distance from the cash.

The defendant also brought Wade Smith into the cocaine importation scheme. In 2022, Wade Smith was the head of the BVI's Customs department. The CS believed his cooperation with the plan would be necessary for its success. During the March 7 meeting, the defendant agreed and said that he would handle Wade Smith ("Roberto: What about him [Wade Smith]? Can he play or is not better to play? Fahie: He- well, he can play but remember he has a lot of people with him. Roberto: Yes. Fahie: Under him, so I'll have to see how we would handle that" GX 7b at 66). The morning after that meeting, the defendant and Wade Smith exchanged missed calls four times before speaking for roughly 10 minutes around 8:30 a.m. (GX 15c1 at 11-12). The timing of these calls corroborates the defendant's statements that he would handle Wade Smith.

(4) *Right to a larger share of the fruits of the crime*

The defendant stood to gain a larger share of the drug proceeds than any of the other involved parties. The defendant, Oleanvine Maynard, and Kadeem Maynard were the primary parties involved in the scheme. Of these three, the defendant stood to gain 12% of the drug

proceeds from each cocaine shipment, which, after subtracting 2% for paying bribes, would amount to approximately $7 million per shipment (GX 12b at 56-58). Oleanvine Maynard was to be paid just 5% of the drug proceeds from each shipment and Kadeem Maynard was not going to be paid any percentage of the drug proceeds (GX 7b at 272). Of all the participants in the cocaine importation scheme, the defendant stood to gain the greatest proportion of the drug proceeds.

(5) *Degree of participation in planning or organizing the offense*

As discussed in (1) and (2) above, the defendant maintained and exercised final approval authority over the importation scheme. The CS presented the opportunity, but the defendant's approval was necessary. The defendant participated in the planning and organizing the importation scheme during a meeting with the CS on March 7 and with the CS and Jose on April 27. During these meetings, the CS presented the scheme to the defendant. The defendant was not an idle participant in these conversations. For example, during the April 27 meeting, the CS asked if the defendant could receive his drug proceed payments through bank accounts. The defendant vetoed this possibility and said that the bank accounts would not work because they were traceable (GX 12b at 72-73). The CS also presented the possibility of paying the defendant with crypto currency, which the defendant disapproved of this as well because the BVI did not have crypto currency on the island (GX 12b at 73). Ultimately, the defendant and CS agreed on making payments via at-sea transfer. The defendant said that he would use his accomplice, Tattoo, to pick up his (the defendant's) payments (GX 12b at 108).

The defendant also participated in planning how his $500k payment would be packaged so that it would not be detected. He wanted to ensure that his payment would not be found if the bags carrying the cash were searched. Accordingly, he confirmed with the CS that the money

would be in a false compartment or dummy section of the suitcase.

(6) *Nature and scope of the illegal activity*

The nature and scope of the cocaine importation scheme were significant. The scheme the defendant participated in called for the shipment of 3,000 kilograms of cocaine to be shipped from the "kitchen" in Colombia to the BVI, before being transferred to Puerto Rico and then on to Miami, and New York City. The 3,000-kilogram shipments would be made twice per month for four months (GX 12b at 59). Each shipment of cocaine would generate $78 million in revenue, and roughly $7 million of that would be paid to the defendant. In the eight shipments that would be made over four months, the defendant expected to be paid roughly $56 million and 24,000 kilograms of cocaine would have been shipped to the United States.

In furtherance of the scheme, the defendant agreed to abuse his authority as the elected Premier of the BVI to bribe government officials within the territory. The bribes paid to corrupt the high-ranking Customs officials would inevitably trickle down to the common Customs employees who would be tasked with searching vessels carrying goods into the BVI. The defendant's participation in the scheme further undermined the public's trust in the BVI government.[2]

(7) *Degree of control and authority over others*

The defendant's degree of control and authority over others cannot be overstated. He was the Premier and Minister of Finance of the BVI. As Oleanvine Maynard explained, her position

---

[2] Less than a year prior to the offense the United Kingdom held a Commission of Inquiry into the BVI's government. The purpose of the COI was to address widespread concerns of corruption among government officials and misappropriation of public funds. The defendant was an outspoken critic of the COI, denouncing the inquiry as an attempt for the UK to assert direct rule over the overseas territory.

as the Director of the BVI Ports Authority fell under the defendant's purview as Premier of the BVI. Had he desired, the defendant could have influenced the Board of Directors of the BVI Ports Authority to remove her as Director. Maynard also explained that the Customs department fell under the defendant's supervision as Premier. This relationship gave the defendant broad authority over Wade Smith, who at the time led the BVI's Customs department. Cooperation from the Customs department was a crucial piece of the cocaine importation scheme, and the defendant made clear to the CS that he would handle Wade Smith by paying him a bribe.

### (B) Participants in the criminal activity

The criminal activity in this case involved five or more participants. The defendant, Oleanvine Maynard, and Kadeem Maynard were undoubtedly participants in the crime. Beyond these three participants, Roxane Sylvester also participated in the criminal activity. At the defendant's request, she agreed to accompany the defendant's $500k payment that he would use to pay bribes in the BVI in furtherance of the cocaine importation scheme. The defendant told the CS that he (the defendant) told Sylvester she would see some cash but not to worry. The defendant described Sylvester as 110% his and that she could be trusted (GX 12b at 43-44).

A fifth participant in the criminal activity was Wade Smith. As discussed above, the defendant agreed to bribe Wade Smith so that the cocaine laden vessels would pass through the BVI without being searched. After the defendant discussed the plan to bribe Wade Smith, one of the first calls he made the following morning was to Wade Smith (GX 15c1 at 11-12).

A sixth participant in the criminal activity was the defendant's Senegalese friend Baye Cisse. The defendant's voice messages with Baye Cisse show that he (the defendant) consulted with Baye Cisse about whether to join the CS's importation scheme. Cisse's voice messages back to the defendant show he approved of the defendant participating in the scheme, especially

considering the amount of money that was involved (GX 15c13). The defendant and Cisse planned to meet in St. Martin so that the defendant could pay him $133,000 (GX 15c13).

A seventh participant in the criminal activity was Kadeem Maynard's "handler" at the BVI airport. Kadeem Maynard had consulted this contact to see how he could arrange the CS's plane to land. The contact gave Kadeem a list of information that the CS would need to provide in order for his plane to be cleared to land (GX 20c4 at 125-26). Additionally, on April 27, Kadeem Maynard told the CS and Oleanvine Maynard that he had tower control and ground control at the airport (GX 11b at 46). The plan was for Kadeem to pay these people with $30k that he would pick up from the CS's sister on April 28 in St. Thomas (GX 11b at 45). In addition to arranging ground control and tower control, Kadeem arranged for his "people" to come and collect the suitcases carrying the defendant's $500k and Oleanvine's $200k (GX 11b at 47).

### (C) Defendant's offense level calculation

Paragraph 23 of the draft PSI correctly lists the defendant's base offense level at 38. See §§ 2D1.1(a)(5), (C)(1). Paragraph 26 should include a 4-level aggravating role increase pursuant to § 3B1.1(a) in addition to the 2-level abuse of trust increase already reflected in this paragraph. Paragraph 29 should remove the 2-level zero-point offender reduction because an aggravating role adjustment under § 3B1.1 makes the defendant ineligible for a zero-point offender reduction. See § 4C1.1(10). The defendant's total offense level should be 43. See § 5A, cmt. n. 2.

## II. Response to the Defendant's PSI Objections

### (A) Objection to the Offense Involving Importation of Cocaine

The defendant's objection to the PSI's description of the offense as involving the importation of cocaine into the United States should be overruled. The fact that this case was the result of a law enforcement sting, and that the government did not present any laboratory tests or

seize any cocaine does not change the fact that the defendant *conspired* to commit the charged offenses. Similarly, the fact that the CS and UC told the defendant that the cocaine would not test positive while it was in the BVI does not change the fact that the defendant knew that cocaine would ultimately be imported and sold in the United States and that he would share in the profit. Regardless of whether the drugs would test positive while they were in the BVI, the defendant knew that the plan was to import cocaine into the United States, and he knowingly participated in that plan.

The court correctly denied the defendant relief when the defendant advanced this same argument at the Rule 29 stage of the trial. In line with that correct ruling, the court should overrule this defense objection to the PSI.

**(B) Objection to the PSI including Lebanese Hezbollah operatives in the offense conduct**

The government does not oppose the defendant's PSI objection to remove the reference to the Lebanese Hezbollah operatives in paragraph 6 of the draft PSI. The defendant correctly points out that at no point during the defendant's trial did the government suggest that the defendant conspired with or was otherwise involved with any purported Lebanese Hezbollah operatives.

**(C) Objection relating to the PSI discussion of the "side deal"**

The government does not oppose the defendant's PSI objection to paragraph 12 of the draft PSI and request for that paragraph to reflect that the defendant was unaware of the side deal between the CS and K. Maynard. The defendant correctly points out that at the defendant's trial the government made it clear to the jury that the defendant did not know of the side deal. Accordingly, paragraph 12 of the draft PSI should be modified to clarify that the defendant was unaware of the side deal between the CS and K. Maynard.

**(D) Objection to the PSI withholding a 2-level minor role reduction pursuant to § 3B1.2(b)**

The defendant's PSI objection requesting a minor role reduction should be denied and in fact, for the reasons set forth above in Part I, the defendant should be assigned a 4-level *aggravating* role adjustment. As discussed above, the defendant exercised decision making authority, directly participated in the scheme's planning and logistics, recruited accomplices, claimed a larger share of the fruits of the crime, and exercised control over others.

The draft PSI correctly identifies §§ 2D1.1(a)(5), (c)(1) as the proper sections for calculating the defendant's base offense level. Paragraph 23 of the draft PSI correctly identifies a base offense level of 38 based on the offense involving more than 450 kilograms of cocaine. As discussed in Part I(C) above, the defendant should also be assessed a 4-level aggravating role increase, a 2-level abuse of trust increase, and the 2-level zero-point offender reduction should be removed, resulting in a total offense level of 43.

[This space intentionally left blank.]

**III.     Conclusion**

For the reasons set forth above, the defendant acted as a leader and organizer in a criminal activity that involved five or more participants. Accordingly, the defendant's offense level should be increased by four levels pursuant to U.S.S.G. § 3B1.1(a). The government further requests that the Court enter an order on the defendant's PSI objections consistent with Part II above.

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By:    */s/Kevin D. Gerarde*
Kevin D. Gerarde
Assistant United States Attorney
United States Attorney's Office
Southern District of Florida
Fla Bar No. 113844
11200 NW 20th Street, Suite 101
Miami, Florida 33172
Tel: (305) 715-7648
Email: Kevin.Gerarde@usdoj.gov

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on June 28, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF

                                                    */s/Kevin D. Gerarde*
                                                    Kevin D. Gerarde
                                                    Assistant United States Attorney