```
 1                    UNITED STATES DISTRICT COURT
 2                    SOUTHERN DISTRICT OF FLORIDA
                            MIAMI DIVISION
 3                   CASE NUMBER 22-CR-2019-KMW

 4    UNITED STATES OF AMERICA

 5              vs.

 6    ANDREW ALTURO FAHIE

 7
```

```
 8    ─────────────────────────────────────────────────────────

 9              TRIAL PROCEEDINGS HELD HELD 2-7-2024
             BEFORE THE HONORABLE KATHLEEN M. WILLIAMS
10               UNITED STATES DISTRICT COURT JUDGE

11    ─────────────────────────────────────────────────────────
      ─

12    APPEARANCES:

13    FOR THE UNITED STATES:      Kevin Gerarde, A.U.S.A.
                                  Sean McLaughlin, A.U.S.A.
14

15    FOR THE defendant:         Theresa M. Van Vliet, ESQ.
                                 Joyce Delgado, ESQ.
16

17    REPORTED BY:               PATRICIA SANDERS, RPR
                                 United States Court Reporter
18                               400 North Miami Avenue, Suite 11-3
                                 Miami, FL  33128
19                               T: 305.523.5528
                                  patricia_sanders@flsd.uscourts.gov.
20

21

22

23

24

25
```

```
 1              THE COURT:  Good morning.  You all may be seated.

 2              All right. Let's begin our charge conference. And we

 3   are starting at page two -- page one being the cover page --

 4   so as to pages 2 through 11; any objections by the Government?

 5              MR. GERARDE:  No, Judge.

 6              THE COURT:  By the defense?

 7              MS. VAN VLIET:  So, Judge, I don't really have an

 8   objection up until page 12; which is the summary.

 9              THE COURT:  That's what we're going to talk about next.

10   As to pages 2 through 11 any objection?

11              MS. VAN VLIET:  My apologies; no objection to pages 2

12   through 11.

13              THE COURT:  All right. Turning to page 12 -- I thought

14   the parties had submitted agreed to language from both parties'

15   initial drafts -- or am I wrong?

16              Let me hear from the defense as to their position.

17              MS. VAN VLIET:  It was my understanding, Judge, that

18   the description of Count 1 as to -- you are going to track the

19   statutory language that is a mixture and substance containing a

20   detectable amount of the Schedule II controlled substance.

21              THE COURT:  Keep your voice up so that Ms. Sanders can

22   hear what you are reading.

23              MS. VAN VLIET:  My apologies.  Let me take a look at

24   the language for a moment.

25              THE COURT:  Yes.
```

| | |
|---|---|
| 1 | MS. VAN VLIET: It's always been my experience that |
| 2 | the statutory language in connection with a Title 21 count is |
| 3 | to be included -- and that is as to all the controlled |
| 4 | substances -- that is a mixture and substance containing a |
| 5 | detectable amount of; in this specific case cocaine. |
| 6 | THE COURT:  Mr. Gerarde. |
| 7 | MR. GERARDE:  Judge, we're trying to keep the jury |
| 8 | instructions as simple and clear and concise for the jury as we |
| 9 | can. |
| 10 | MS. VAN VLIET:  Judge, while I understand that; it |
| 11 | still has to be according to statute. |
| 12 | THE COURT:  I don't know why we have detectable in this |
| 13 | instance since, one, there was no cocaine -- and also there |
| 14 | were discussions about cocaine in the thousands of kilos -- so |
| 15 | why not five kilograms or more of cocaine, a Schedule II |
| 16 | controlled substance into the United States from a place |
| 17 | outside of the United States. |
| 18 | MR. GERARDE:  That's fine with the Government, Judge. |
| 19 | MS. VAN VLIET:  Well, Judge, it is important because |
| 20 | the entirety of the evidence from the CI -- at least when Mr. |
| 21 | Fahie was there -- was that it was this "magic" waterproof |
| 22 | construction material that if he tested it, it would test |
| 23 | negative for cocaine. |
| 24 | He is being charged with conspiring to import a |
| 25 | mixture or substance containing a detectable amount of cocaine. |

1              And in an analogous situation dealing with the

2    sentencing guidelines -- when it is talking about the "weight"

3    of it -- the Supreme Court in United States versus Chapman,

4    which was an LSD case, and the question was whether the paper

5    upon which the blots were affixed were to be included for

6    sentencing purposes in the weight.

7              And the Supreme Court said, yes, as long as there is a

8    detectable amount; so detectable is actually relevant, Judge,

9    and so the jury needs to be instructed.

10             THE COURT:  I don't think the fact that the parties

11   were talking about "magic" cocaine that couldn't be detected. I

12   don't think that's a defense.

13             You know, it would be like saying, well, it was sham

14   cocaine that they used in a sting, therefore there could have

15   been no intent.

16             I think the Supreme Court's focus was on guideline

17   penalties -- which were predicated on weight -- and which had

18   been challenged for many years as an unreliable metric of

19   liability.

20             But I don't think that stands for the proposition that

21   those discussions were about importing thousands of kilograms,

22   which would evade detection -- because it was a special new

23   magic cocaine -- allows you to say, well, now my client is not

24   not guilty of this crime.

25

1          MS. VAN VLIET:  Respectfully, Your Honor, we would

2     disagree.  And the distinction between having a discussion

3     about "sham" cocaine -- obviously during that kind of a

4     discussion the defendant is not privy to the part that it is

5     sham -- he is just told it is cocaine.

6          THE COURT:  Right.

7          MS. VAN VLIET:  Here, the defendant is told that there

8     is construction material which will not test positive for

9     cocaine, and then it is going to go to Puerto Rico and then be

10    extracted; Puerto Rico being, of course, a place in the United

11    States.

12          THE COURT:  Right.

13          MS. VAN VLIET:  And it is going to be extracted into

14    cocaine.  And then those 3000 kilos are going to be brought to

15    Miami.

16          And so it is akin to the Chapman case where the paper

17    itself is not illegal until the blot of LSD is put on it.

18          And here in this case it is the same thing; until it

19    is put through this "mystical" or "magical" process -- which of

20    course we don't know anything about since there has been no DEA

21    chemist or expert that talked about whether it's even possible

22    to do this or not -- or if something is even added in Puerto

23    Rico.

24          THE COURT:  I understand your position, but I do not

25    agree, Ms. Van Vliet.

1          I am going to stick with a summary -- where I will

2    summarize the charges for the jury -- and then they will have

3    the indictment along with their jury instruction packet.

4          Ms. Van Vliet, is there anything else; any other

5    objections?

6          MS. VAN VLIET:  No, Your Honor.

7          THE COURT:  Government.

8          MR. GERARDE:  No, Your Honor.

9          THE COURT:  All right. Let's go next to -- the aiding

10   and abetting -- that is on 28 going through to page 33.  That

11   is taken from the standard pattern instructions.

12         Is there any objection from the Government?

13         MR. GERARDE:  No, Judge.

14         THE COURT:  And from Mr. Fahie?

15         MS. VAN VLIET:  No, Judge.

16         THE COURT:  Let's turn next to the substantive

17   instructions.  Did you and Mr. Gerarde have an opportunity to

18   talk about the proposed instructions you each submitted to the

19   Court to see if you could reach some agreement?

20         MS. VAN VLIET:  We didn't actually speak, Judge.

21         THE COURT:  Okay.

22         MS. VAN VLIET:  Mr. Gerard sent me an e-mail telling me

23   that the Government intended to stick with the jury

24   instructions they had proposed originally.

25

1          THE COURT:  Oh, okay.

2          MS. VAN VLIET: And that they believe that their

3  definition of foreign law was succinct and accurate, which I

4  disagree with.

5          And as a matter of fact,, Judge, I told Mr. Gerarde

6  this morning there are two objects in both -- in the

7  conspiracies that are charged -- promotional money laundering

8  and the concealment money laundering.

9          Promotional money laundering does not require per the

10  statute -- per everything -- does not require that the proceeds

11  involved be from any form of unlawful activity.

12          THE COURT:  Into the microphone, Ms. Van Vliet.

13          MS. VAN VLIET:  Let me pull it up right here.  Is that

14  better?

15          THE COURT:  Much.

16          MS. VAN VLIET:  The Concealment money laundering --

17  which is the second object of the conspiracy charged by the

18  Government in the the conspiracy count -- Count 2 requires that

19  the defendant knew, or in this case believed, that the proceeds

20  involved were from an unlawful activity.

21          That's in the statute.

22          The Government's instruction on the promotional object

23  is wrong; it says that it does not have to be from unlawful

24  activity.

25

1          I think what they meant to say is that -- in terms of

2     a sting -- is that in order to show unlawful activity for the

3     purposes of concealment in a sting, it is sufficient that

4     either a law enforcement officer or someone working at his or

5     her direction represented the proceeds to be from unlawful

6     activity.

7          That's the law -- that's not how it is described.

8          Now, does it tremendously help the defense?  No. But

9     the jury needs to be given the accurate instruction; so I do

10    object to that.

11         THE COURT:  Let me make sure that I have the most

12    recent version -- I want to make sure that we are on the same

13    page -- I think I may have the previous packet.

14         MR. GERARDE:  Your Honor, the Government's most recent

15    proposed jury instructions were filed under docket entry 186.

16         THE COURT:  All right. I want to make sure we are all

17    working off the same set; so I am going to go back and have

18    three copies printed out of the most recent instructions.

19         THE COURT SECURITY OFFICER:  All rise.

20            BRIEF RECESS TAKEN

21         THE COURT:  Please be seated.  All right. Now that we

22    are literally on the same page let's start on page 15, which is

23    the first substantive instruction.

24         Is there any objection to page 15?

25

1        MS. VAN VLIET:  Yes, Your Honor.  The defense contends

2   it needs to track the statutory language, which is a mixture or

3   substance containing a detectable amount of cocaine.

4        THE COURT:  Mr. Gerarde.

5        MR. GERARDE:  Your Honor, we're standing by the

6   proposed instruction that we have provided.  There is a

7   representation that this is cocaine -- whether it tested

8   positive or not is a separate issue.

9        THE COURT: I don't necessarily have an issue with

10   tracking the statutory language, Ms. Van Vliet -- my issue is

11   whether or not that's an appropriate argument to be made to the

12   jury -- and so I will put a place holder there for now.

13        I don't want to keep the jury waiting -- we are still

14   waiting for two to arrive -- but I want to try to get through

15   as much as we can.

16        I will make a note that Mr. Fahie wishes to include the

17   statutory language.

18        MS. VAN VLIET:  Understood.

19        THE COURT:  Page 16, which is a continuation of

20   discussing what conspiracy is.

21        Any objection by the defense?

22        MS. VAN VLIET: None other than previously stated.

23        THE COURT:  Government.

24        MR. GERARDE: No objection.

25

```
 1              THE COURT:  Page 17 would be the first page of the
 2   instruction on the money laundering.
 3              Anything further from the Government since this is your
 4   proposed instruction?
 5              MR. GERARDE: Ms. Van Vliet and I were speaking and I
 6   think that we have resolved some of the issues with respect to
 7   object two, the concealment, money laundering.
 8              THE COURT:  That's not on page 17 -- or is it?
 9              MR. GERARDE:  Oh, I'm sorry, Judge, we're going page by
10   page.
11              THE COURT:  Yes.
12              MR. GERARDE:  Oh, okay.
13              THE COURT:  So, page 17, any objection by the defense?
14              MS. VAN VLIET: No objection.
15              MR. GERARDE:  Government has no objection.
16              THE COURT:  All right.  Page 18 starts the discussion
17   of the two objects.  Is there any objection as to the language
18   on page 18?
19              MS. VAN VLIET:  No, ma'am.
20              MR. GERARDE:  Not from the Government.
21              THE COURT:  All right.  Any objection to the language
22   on page 19?
23              MS. VAN VLIET:  Not from defense.
24              MR. GERARDE:  Not from the Government.
25              THE COURT:  Page 20.
```

1          MR. GERARDE:  No objection from the Government.

2          MS. VAN VLIET:  No objection from the defense.

3          THE COURT:  Page 21.

4          MR. GERARDE:  I think there's an issue with the first

5     definition; the third line. It is at odds with the requirement

6     in element two.  So the Government is proposing striking that

7     third sentence in that definition.

8          And then Ms. Van Vliet had discussed a separate

9     sentence that could be included.

10          MS. VAN VLIET:  Actually, Judge, we agree the third

11     sentence needs to be removed; and I think that sentence four

12     needs to be out as well.

13          THE COURT:  All right.

14          MS. VAN VLIET:  They've charged a sting provision --

15     and so under the sting provision in the statute a defendant's

16     knowledge can be established by a representation from law

17     enforcement or a CI that the money involved was the proceeds of

18     some unlawful activity.

19          So, I think if you take out three and four, and put in

20     some language that the Government is comfortable with -- and

21     here I go tracking the statutory language again -- that deals

22     with the statutory language about the sting provision..

23          THE COURT:  Right.  And it could even be money provided

24     by a Government agent in the course of an undercover operation.

25

```
 1              The legitimately earned I think is the one that was a

 2    problem for the Government.

 3              MR. GERARDE:  Judge, we agree with respect to the

 4    first part -- the first clause saying legitimately earned

 5    income -- that is at odds with concealment money laundering.

 6              THE COURT:  So, the third is out and the fourth

 7    sentence could read; it could be money provided by a Government

 8    agent in the course of an undercover operation.

 9              MS. VAN VLIET:  Judge, the only thing I would add is

10    that -- and, frankly, this doesn't exactly benefit me but it is

11    what the law is.

12              THE COURT:  Okay.

13              MS. VAN VLIET:  It could be -- money represented to be

14    from unlawful activity provided by the Government agent because

15    it has got to be represented as money; the proceeds of unlawful

16    activity.

17              THE COURT:  All right. Any objection?

18              MR. GERARDE:  None, Your Honor.

19              THE COURT:  All right.  So, we've taken out the third

20    sentence and the fourth sentence will now read; it could be

21    money represented to be the proceeds of unlawful activity

22    provided by a Government agent in the course of an undercover

23    operation.

24              MR. GERARDE:  No objection, Judge.

25              MS. VAN VLIET:  No objection, Judge.
```

```
 1              THE COURT:  And is the rest of page 21 satisfactory?
 2              MR. GERARDE:  Judge, I think there are two other
 3    issues.
 4              THE COURT:  Okay.
 5              MR. GERARDE:  So the first small issue is the
 6    definition of proceeds -- there's a bracket at the end of the
 7    sentence -- and the second is the paragraph below that which is
 8    intent to promote.
 9              THE COURT:  Right.
10              MR. GERARDE:  I think that entire paragraph can be
11    removed because that references object one.
12              MS. VAN VLIET:  Agreed.
13              THE COURT:  All right. Going to page 22.
14         I know, Ms. Van Vliet, you have some objection.
15               MS. VAN VLIET:  I would object to not tracking the
16    statutory language for input for specified unlawful activity
17    number one.
18              THE COURT:  All right.  And what about anything else on
19    that page?
20              MR. GERARDE:  Your Honor, with reference to SUA number
21    one, I think there's a typo in the reference to the statute.
22              THE COURT:  So the record is clear, that is not my
23    typo.
24               MR. GERARDE:  For the record, Your Honor, it is the
25    Government's typo.
```

1          **THE COURT:  Yes; because I have to own up to enough of**

2     **my own.**

3          **All right.  I have been advised we have all of our**

4     **jurors so we will bring in our jury, continue with the**

5     **testimony and resume our charge conference a little later.**

6          **If you would bring in our jury.**

7          **COURT SECURITY OFFICER:**  Please rise for the jury.

8          **THE COURT:**  Everyone may be seated.

9          You may continue, Mr. Gerarde.

10         MR. GERARDE:  Thank you, Your Honor.

11    Q.  Good morning, Ms. Maynard.

12    A.  Good morning.

13    Q.  When we left off yesterday, we were talking about the

14    meeting at the house in Tortola on April 7th; do you remember

15    that?

16    A.  Yes, sir.

17    Q.  We were talking about the Premier.  And I want to ask you,

18    in addition to being the Premier of Tortola in the British

19    Virgin Islands, what was the Premier's relationship to the

20    House of Assembly?

21    A.  He was the leader of Government business in the House of

22    Assembly.

23    Q.  Alright, and what was his connection to the Minister of

24    Finance position?

25    A.  He was also the Minister of Finance at the time.

1  Q.   Okay.  When you say, "at the time" when are you referring

2  to?

3  A.   March 2022.

4  Q.   Okay, thank you.  I will continue to publish Government's

5  Exhibit 7A.  I will hand you the binder that has the

6  transcripts for that recording.

7       (AUDIOTAPE PLAYED FOR THE RECORD)

8       I would direct you in the binder to page 187 of 7B?

9       Do you see where Mr. Fahie, the Premier says, so we don't

10  need a phone.  We don't need a phone for the hotel?

11  A.   Yes.

12  Q.   And then, at lines seven and eight, Roberto says, better,

13  better; no messages, no messages; it's better.

14       What did you understand that to mean?

15  A.   To make sure no one could track you by phone.  Not to use

16  the phone so no one can be traceable.

17       (AUDIOTAPE PLAYED FOR THE RECORD)

18  Q.   So, we are stopping at page 191. If you would go there in

19  your binder.

20  A.   Yes.

21  Q.   Ms. Maynard, what is your understanding of why the

22  defendant was asking Roberto about whether he does tiles,

23  windows and doors?

24  A.   It is my understanding during the conversation he asked

25  that question because he was in the process of building.

1    Q.   Building what?

2    A.   Building his home.

3    Q.   Where?

4    A.   British Virgin Islands.

5          MR. GERARDE:   For the record, I will skip ahead to

6    two hours, 35 seconds; page 209 of the transcript.

7          (AUDIOTAPE PLAYED FOR THE RECORD)

8    Q.   Ms. Maynard, at the end of the meeting, did anyone say a

9    prayer?

10   A.   Yes, sir.

11   Q.   Who?

12   A.   I think it was Mr. Fahie who said the prayer at the end of

13   the meeting, if I am not mistaken.

14         MR. GERARDE:   Publishing Exhibit 7 at two hours,

15   59 minutes and 21 seconds; page 209 of the transcript.

16         (AUDIOTAPE PLAYED FOR THE RECORD)

17   Q.   All right. Do you see where Mr. Fahie says, Oh, God, in

18   your hand, we commit it all?

19   A.   Yes.

20   Q.   What was your understanding of what he was referring to

21   when he said; we commit it all?

22   A.   My understanding be the friendship and the business that

23   was about to be between the three of us, he commits all of us.

24   Q.   And when you say "business" what business are you referring

25   to?

1    A.   That would have been the business concerning the shipment

2    of the cocaine and whatever other businesses he was going to do

3    within the British Virgin Islands.

4    Q.   Was that going to involve payments in return?

5    A.   Yes, sir.

6    Q.   And page 212, line 16, the defendant says, yeah, we are

7    together.

8         What did you understand him to mean when he said that?

9    A.   Together in one common agreement, meaning a bond.

10   Q.   After this meeting ended, where did, Roberto, the Premier

11   and the driver go?

12   A.   We got back into the vehicle together and went back to Road

13   Town.   We drove back to Road Town.

14   Q.   Where did you go once you were in Road Town?

15   A.   Myself and Roberto, we got out of the vehicle at Maria's

16   Restaurant and before I left with the driver.

17   Q.   What did you do with Roberto at Maria's?

18   A.   Maria's was closed.   We are intending to go there and get

19   something to eat but it was closed so we went to another area

20   called the Pier so we could get some drinks and discuss the

21   meeting with myself Kadeem and Roberto.

22   Q.   Is that what you did?

23   A.   Yes, sir.

24   Q.   I am referring you to page 236 of Government's Exhibit 7B.

25   Are you there?

1  A.   Okay, yes.

2  Q.   Look at line 12.  Do you see where you say, you give it to

3  him and then Roberto says, 500.

4      And you say, you gave him his money and Roberto says, huh

5  and you said, did you give him anything else?  Did you give the

6  500 yet?  Did you give him any papers tonight?

7      When you said "papers" what were you referring to?

8  A.   Monies.

9  Q.   And when Roberto responded $20,000, what did you understand

10  him to be referring to?

11  A.   He was referring to the $20,000 he had given Mr. Fahie that

12  evening at the meeting.

13  Q.   Do you see where Roberto said, yeah, it is just a gift.

14  Then something unintelligible.

15      $20,000, you saw it, yeah?

16      And then you respond, yeah, yeah?

17      Why did you respond, yeah?

18  A.   Because I did see him give him the money that evening.

19  Q.   During this discussion with Kadeem and Roberto, what

20  changes to the plan were made or was it the same as you

21  discussed earlier with the Premier?

22  A.   The same.

23  Q.   Approximately what time did the meeting end?

24  A.   I am not quite sure of the time but I know that we were

25  there for a while.

1    Q.   Evening --

2    A.   I would say it was around 10:30 because the restaurant had

3    closed the kitchen when we got there.

4    Q.   Showing you what is admitted as Government's Exhibit 15C-6,

5    on page 16.  This is the text message chat between you and the

6    Premier, from the Premier's phone.

7         Can you identify what you sent to the Premier, on

8    April 8th, at 12:09 a.m.?

9    A.   Checking to make sure all was well.

10   Q.   What was the Premier's response at 12:30 a.m.?

11   A.   I am trying to see it there.

12   Q.   Do you know what an emoji is?

13   A.   I am not familiar with that.

14   Q.   What does it look like?

15   A.   A circle with an I -- oh, okay. It looks like an okay sign.

16        MR. GERARDE: Going to Government's Exhibit 15C-1 at page

17   11. We will go first to page ten.

18   A.   Ms. Maynard, can you see the screen or should I make it

19   bigger?

20   A.   Please.

21   Q.   Directing you to line eight, from Mr. Fahie's phone, what

22   is the time of the meeting?

23   A.   6:12 on 4/7.

24   Q.   Would that have before, after or during your meeting on

25   April the 7th?

1    A.   That would have been before.

2    Q.   At the bottom of page ten, what is the time of the missed

3    call at line 18?

4    A.   9:44.

5    Q.   Going to page 11, who was that call made to?

6    A.   That call was made to 1-284-541-0993.

7    Q.   What is the name associated with that number?  The letter?

8    A.   R.

9    Q.   Do you recall the contact letter for R?

10   A.   Yes, Roy Garaway.

11   Q.   If you would remind the jury again who Roy Garaway is.

12   A.   Mr. Garaway is a contractor in the British Virgin Islands

13   and also was building Mr. Fahie's home.

14   Q.   Going now to item two, can you tell the jury who Mr. Fahie

15   called and at what time?

16   A.   Mr. Fahie called Roy Garaway. He called him at 9:40 on

17   April 7th.

18   Q.   What was the duration of that call?

19   A.   The duration of the call was seven minutes.

20   Q.   Going now to six and eight of 15C-1, page 11.  Who were

21   these calls made to?

22   A.   Both calls were made to R, Roy Garaway.

23   Q.   What is the date and time of the calls?

24   A.   Number eight was on 4/8/22 and the duration was six

25   minutes.

1           Call number eight was 6:47 on 4/8/22.

2  Q.   Moving down the list, who did the Premier call at items 10,

3  11 and 15?

4  A.   Call 10 was made to a W.

5  Q.   Do you remember looking at W's contact yesterday?

6  A.   I don't remember.  You would have to refresh my memory.

7  Q.   Showing you Government's Exhibit 15C-2, page 35.  What's

8  the name associated with W?

9  A.   Wade Smith. Wade Smith.

10  Q.   Who did the Premier call on items 10, 11 and 15, on April

11  8?

12  A.   They were made to Wade Smith.

13  Q.   Were any of these calls answered?

14  A.   Rejected, rejected, missed.

15  Q.   So, no?

16  A.   No, sir.

17  Q.   Turning to page 12 of Government's Exhibit 15C-1, who did

18  the Premier call on 4/8 at 8:21?

19  A.   Wade Smith and it was a missed call.

20  Q.   Highlighting items 7 and 10 for you.  Who did the Premier

21  call at items 7 and 10?

22  A.   Both calls at 7 and 10 were made to Kye M. Rymer.

23  Q.   What were the dates and times of those calls?

24  A.   Call number seven was made at 8:32.

25  Q.   What was the duration of that call?

1   A.   Three minutes.

2   Q.   Call number ten?

3   A.   Call number ten was made on April 8 at 8:36. The duration

4   of the call was one minute.

5   Q.   Who is Kye M. Rymer?

6   A.   Kye M. Rymer was one of the Ministers of Communications and

7   Works.

8   Q.   Of works?

9   A.   Of public Utilities.

10   Q.   Highlighting item 12, who is this call made to?

11   A.   Wade Smith.

12   Q.   What time?

13   A.   8:38.

14   Q.   What date?

15   A.   April 8.

16   Q.   What was the duration of that call?

17   A.   Ten minutes.

18   Q.   I am highlighting items four and five.  Do you recognize

19   the name underlined?

20   A.   No, sir.

21   Q.   Were those called answered or missed?

22   A.   Number four was rejected.  Number five was missed.

23   Q.   Do you recall, during the April 7th meeting, a discussion

24   about money that was to be paid to a man in St. Martin, and

25   that man was from Senegal?

```
 1   A.   Yes, sir.

 2   Q.   And was the amount of money to be paid $83,000?

 3   A.   Yes, sir.

 4   Q.   After this April 7 meeting, what did the Premier say to you

 5   about the $83,000, and did it stay at $83,000?

 6   A.   The $83,000 was supposed to be in all hundred dollar bills.

 7   Q.   At some point did the total sum, $83,000 increase.

 8   A.   Yes, sir.  The sum did increase to about $133,000, if I'm

 9   not mistaken. But it was increased.

10   Q.   Who asked to increase that sum?

11   A.   Mr. Fahie asked me to have Mr. Roberto to increase the

12   amount for him to cover some expenses.

13   Q.   Okay, did you reach out to Roberto directly?

14   A.   That call was made from Kadeem's phone to tell him that Mr.

15   Fahie wanted the additional funding.

16   Q.   I'm showing you Government's Exhibit 20C-4, page 101, the

17   messages between Kadeem and Roberto.  What is the date of this

18   text message?

19   A.   April 12, 2022.

20   Q.   Who sent the message?

21   A.   That message came from Kadeem's phone.

22   Q.   Can you read the number of the recipient of the message.

23   A.   It is a long number; 5213384212563.

24   Q.   Can you read the message that Kadeem sent to Roberto.

25   A.   HC, he made an error on the favor you was going to do.
```

1      He say the score is 133, if you can manage that score

2   change.

3   Q.   Going to page 102.  What did Roberto write back?

4   A.   I just came down. I understand now. So the score measures,

5   in brackets, is not 83 now is 133.  Glad that you told me, in

6   brackets, because I already made arrangements for all the green

7   yard for the land.

8   Q.   Okay.  What's the date of that message?

9   A.   April 13.

10  Q.   Showing you Government's Exhibit 18C-2 at page 54 -- I'm

11  sorry, page 49 -- do you see that?

12  A.   Yes.

13  Q.   Ms. Maynard, what is the date of this text message?

14  A.   April 13, 2022.

15  Q.   Who sent the text message?

16  A.   It came from my phone number.

17  Q.   Who did you send it to?

18  A.   I sent it to Mr. Fahie.

19  Q.   What is the substance of this message?

20  A.   Good morning.  Can we discuss RTW this afternoon? New info.

21  Q.   Okay.  What did Mr. Fahie say to you?

22  A.   Where are you now?  That was at 8:45.

23  Q.   Did you meet with Mr. Fahie on this day?

24  A.   Yes, sir.

25  Q.   Where did you meet?

1   A.   The meeting took place at his office.

2   Q.   What did you discuss when you met with him?

3   A.   It has been a long time since this meeting but, more

4   likely, we discussed it in relation to the transactions that

5   should have been taken place for the money.  That's why we

6   could bring him up to date that everything was okay.

7   Q.   At any point during this meeting -- now five days,

8   six days, after the meeting on April 7th, what, if any,

9   indication did the defendant give that he no longer wanted to

10  go forward with this?

11  A.   I received no information from Mr. Fahie that he did not

12  want to go ahead with the transaction, at any point in time.

13  Q.   When you say the transaction, what are you referring to?

14  A.   I am referring to the monies transaction and also the

15  shipment of the cocaine transactions.  Everything was according

16  to plan from the meeting of 7th.

17  Q.   Let's fast forward to April 19, 2022.

18      Ms. Maynard, do you recall an incident on that day

19  involving a British Virgin Islands Youth Soccer Team?

20  A.   Yes, sir.

21  Q.   In sum, what was the issue?

22  A.   The team was abroad playing soccer and, on the way back,

23  the Premier was trying to assist the children in getting them

24  back to the British Virgin Islands safely.

25

1       I think it was during the COVID period and there was

2   difficulty in getting a flight in and out of the country.

3   Q.   Showing you Exhibit 18C-2, page 55.  This is a message from

4   Mr. Fahie to you on what date?

5   A.   April 19, 2022.

6   Q.   What is the content of the message?

7   A.   Just a friendly reminder as it is now urgent for our

8   athletes.

9   Q.   What did you understand him to be referring to when he said

10  our athletes?

11  A.   Referring to the children that were stranded abroad.

12  Q.   What did Mr. Fahie ask you to do in connection with these

13  athletes?

14  A.   He invited me into his office and so, when I got there, he

15  told me he wanted me to find out from Roberto if he was in a

16  position to assist the British Virgin Islands to get the

17  athletes back and a call was placed to Roberto.

18  Q.   Did you ask Kadeem to make the call?

19  A.   Yes, because I never had a number for Mr. Roberto.

20  Q.   Can you read what you sent to Kadeem, on April 19, 2022, at

21  12:45 p.m.

22  A.   I said, call him; let's do a three-way.

23       Him referring to Roberto Quintero.

24  Q.   Can you turn to tab 9B of the binder.

25  A.   Yes.

```
 1              MR. GERARDE:  I am going to publish Exhibit 9A.

 2   Q.   What is the date on page one?

 3   A.   The date is April 19, 2022.

 4   Q.   What is written underneath the date?

 5   A.   Phone call.

 6   Q.   What was the duration of that call?

 7   A.   Eight minutes.

 8   Q.   Who are the participants?

 9   A.   Andrew Fahie, Olivine Maynard, Kadeem Stephan Maynard and

10   Roberto Quintero.

11              MR. GERARDE:  The Government will now begin

12   publishing.

13              (AUDIOTAPE PLAYED FOR THE RECORD)

14   Q.   I paused on page three. You said, I will put you on

15   speaker.  What did you mean by that?

16   A.   I was with Mr. Fahie and myself was in the office, and we

17   placed a call to Roberto Quintero with the phone I was using,

18   and I put it on speaker so everyone in the room could hear.

19   Q.   Who was in the room?

20   A.   Myself and Mr. Fahie.

21              (AUDIOTAPE PLAYED FOR THE RECORD)

22   Q.   Starting at page 11 of 9B.  At the top of the page, do you

23   see where Mr. Fahie says, I totally apologize for the little

24   adjustments for the second, because it was my error I

25   misunderstood what it was for the fellow.
```

1       Where was Mr. Fahie going on May 2nd?

2  A.   He was going to St. Martin.

3  Q.   What did you understand his reference to the "little

4  adjustment" to be?

5  A.   That was the additional monies he had asked for to go to

6  St. Martin with.

7  Q.   Continuing to publish.

8             (AUDIOTAPE PLAYED FOR THE RECORD)

9  Q.   Ms. Maynard, after this phone call, did Roberto end up

10  arranging a flight to get these athletes home?

11  A.   No, sir.  They did not have a flight available.

12  Q.   What, if anything, did Mr. Fahie say given that Roberto

13  didn't come through with this flight.

14  A.   No mention was made of any changes.

15  Q.   Okay.  Directing you to Exhibit 15C-2, page 58, directing

16  you to the top of the page.

17       Ms. Maynard, what did Mr. Fahie write to you on April 22nd

18  of 2022?

19  A.   Good meeting with RTW manager.  Is everything still good

20  with them on every front?

21  Q.   When the Premier said, is everything still good with them

22  on every front what did you understand that to mean?

23  A.   If everything was going according to plans.

24  Q.   What were those plans?

25  A.   Those plans was for us to meet, to meet here in Miami.

1       The funds were to be available at that time for

2  transportation and everything was according to what was

3  discussed.

4  Q.   You are talking about the meeting in Miami on April 27th?

5  A.   Yes.

6  Q.   You are talking about the funding available; what are you

7  referring to?

8  A.   The $500,000 and the $200,000.

9  Q.   Right, to take back to Tortola?

10 A.   Yes.

11 Q.   Now he says, good meeting with the RTW manager. Let's be

12 clear, was there any in-person meeting with Roberto at this

13 time?

14 A.   The only meeting he had with Roberto was on April the 7th.

15 Q.   Up to this point?

16 A.   Up to that point, yes.

17 Q.   When was the Premier scheduled to fly to Miami?

18 A.   He was leaving on the 24th.

19 Q.   What was your response?

20 A.   Things are going well.  Looking forward to the meeting with

21 good results.

22 Q.   Did you have any reason to believe that anything had

23 changed with Roberto?

24 A.   No.

25

1   Q.   Did Mr. Fahie give you any reason to believe anything had

2   changed?

3   A.   No, sir.

4   Q.   What date did you travel to Miami?

5   A.   It may have been around the 27th. I think the Wednesday I

6   traveled to St. Martin -- I mean to Miami.

7   Q.   Now, you said that you had traveled to Miami, is that

8   right?

9   A.   Yes.

10  Q.   You previously testified that the defendant went to Miami

11  for Sea Trade?

12  A.   Yes.

13  Q.   What is Sea Trade?

14  A.   Sea Trade is a conference that is held by the sea port

15  every year doing business you can attend the sea trade shows

16  and conferences.

17  Q.   How long does Sea Trade go?

18  A.   It is for three or four days.

19  Q.   Was the Premier in Miami for all of Sea Trade.

20  A.   Yes, he was.

21  Q.   Did you get to Miami the same day that the Premier did?

22  A.   No, sir.

23  Q.   Why not?

24  A.   I was not scheduled to go to Sea Trade originally.

25

1       I could not go, but I opted to go, and the Premier wanted

2  me to be in Miami so I decided to come in on the Wednesday,

3  which was the 27th.  I traveled to Miami on the Wednesday.

4  Q.  Why did the Premier want you to come?

5  A.  The main reason was to facilitate the meeting between him,

6  Roberto Quintero, and myself while we were in Miami, and to

7  travel back with Roxanne back on the flight to Tortola.

8  Q.  What responsibilities did you have at Sea Trade on behalf

9  of the Virgin Islands?

10 A.  I was scheduled to attend some of the meetings. I was

11 registered to some of the meetings as the Master when I got in.

12 Q.  Did you do so?

13 A.  No, I was not able to do so.

14 Q.  Besides flying in, meeting with Roberto for lunch and

15 meeting with the Premier, what did you do in the evening?

16 A.  I went to one of the shops.

17 Q.  Was that related to Sea Trade?

18 A.  No, sir.

19 Q.  Let's talk about the meeting that you had with Roberto on

20 the 27th.  Where did that meeting take place?

21 A.  That took place at The Embassy Suites.

22 Q.  Showing you Government's Exhibit 26.  Do you recognize

23 this?

24 A.  Yes.

25 Q.  What is this?

1   A.   The Embassy Suites that I stayed in.

2   Q.   Did the defendant stay at the Embassy Suites?

3   A.   No, sir.

4   Q.   Where was he staying?

5   A.   I am not sure where he stayed.  If it was in a hotel or at

6   his home, I am not sure.

7   Q.   Why were you having a meeting with Roberto on the 27th?

8   A.   In the evening?

9   Q.   No, in the morning.

10  A.   Oh, in the morning.  We just wanted to discuss some

11  preliminaries before the meeting in the evening. I wanted to

12  meet with him and discuss things, some preliminaries.

13  Q.   What type of preliminaries?

14  A.   I had two pieces of correspondence I was given to give to

15  Roberto and then we wanted to -- there were other business that

16  we wanted to set up outside of Mr. Fahie.

17  Q.   You said you had some correspondence.  What did that

18  correspondence relate to?

19  A.   It was like a business plan that was given to Roberto that

20  we were going to do in the British Virgin Islands.

21  Q.   What was the purpose of this business plan?

22  A.   To facilitate business in the British Virgin Islands.

23  Q.   Was it your intention to accept the payments through those

24  businesses?

25

1    A.   Our intention is in doing business, of course, doing

2    business, you would get payments.

3    Q.   Why else were you meeting with Roberto in the morning of

4    the 27th?

5    A.   As I mentioned, it was to discuss the businesses that we

6    were going to do and the meeting that we were going to hold in

7    the evening.

8    Q.   Okay, what did you discuss about the meeting in the

9    evening?

10   A.   We picked the location where the meeting was going to be in

11   the evening.  We rented a conference room so the meeting could

12   be held in privacy.

13   Q.   Okay, so who was at the meeting in the morning of the 27th

14   along with you, at the lunch?

15   A.   At the lunch, let me think.  It was Roberto Quintero,

16   myself and the gentleman, Jose, if I'm correct in the name.

17   Q.   Okay.  What was Jose's relationship to Roberto?

18   A.   He said he was his Godson.

19   Q.   What was Jose's purpose in the importation plan?

20   A.   Jose was supposed to be the main person in the British

21   Virgin Islands with us to get the businesses done.  I think

22   Roberto said he would not be too much involved after everything

23   was set up.  He would not be the contact person.

24   Q.   When you say that, you are referring to Roberto --

25   A.   -- he would not be directly involved.

1       After his contact person was introduced, he would take over

2   once the business was started within the British Virgin

3   Islands.

4   Q.  You have the lunch on April 27th and you rent the room for

5   the evening meeting.  What did you do until then?

6   A.  I went to shop to do something for myself.

7   Q.  Did you tell the Premier that you were having this meeting

8   with Roberto on April 27th?

9   A.  No, sir.

10  Q.  Why not?

11  A.  It did not have anything to do with him directly.

12  Q.  Well, what do you mean by that?

13  A.  Roberto and I were getting together to chat -- actually, he

14  had promised me, as soon as he was done with lunch, we were

15  going to do the lunch and I wanted to go to the mall or

16  something and he had promised to take me, but he was late in

17  getting there.  So we never got to go to the mall.

18  Q.  Why do you say that this meeting with Roberto had nothing

19  to do with the Premier?

20  A.  It was just about us getting together to discuss and chat a

21  bit and then he was going to take me to the mall.

22  Q.  But when you say to get together to discuss and chat?

23  A.  I told him I brought him a business plan with some

24  businesses that we wanted to set up.

25

1      They were related to real estate and some other things we

2  wanted to do within the British Virgin Islands.

3  Q.   Right but was this all in connection with the cocaine

4  importation shipment?

5  A.   That was something separate.

6  Q.   Still discussed at lunch on April 27th?

7  A.   We did not really, to my recollection, discuss anything

8  with movement of the ships passing back and forth during the

9  lunch hour.  We never discussed that part of it.

10 Q.   Was there any other reason you were in Miami besides the

11 fact that Mr. Fahie asked you?

12 A.   No.

13 Q.   Why did Mr. Fahie ask you to come to Miami?

14 A.   He asked me to accompany Roxanne Sylvester back to the

15 British Virgin Islands on the flight the following day.

16 Q.   With the cash?

17 A.   Yes, sir.

18 Q.   Let's move to the meeting you had that night. Where did

19 this meeting end up taking place?

20 A.   It ended taking place at the Embassy Suites that I was

21 staying in.

22 Q.   Who was there at the meeting?

23 A.   The meeting involved Mr. Fahie, Roxanne Sylvester, Jose,

24 Roberto Quintero and myself.

25 Q.   Were you present for the entire meeting?

A.   No, sir.

Q.   Was Roxanne present for the entire meeting?

A.   No.

Q.   Why not?

A.   When we got into the meeting room, we made some small talk and what have you.  I introduced Roxanne Sylvester to Roberto Quintero and, after that, Mr. Fahie asked if we could be excused he wanted to speak with Roberto.

Q.   Why did ask you that?

A.   I would not know.  He just asked me to excuse myself. So I did that out of respect for my Premier.

Q.   So when you and Roxanne left the room, who was left in the room?

A.   Three persons remained.  That was Mr. Fahie, Roberto Quintero and Jose.

Q.   How did you feel when you were kicked out of the meeting that you arranged?

        **MS. VAN VILET:**  Objection; Relevance.

        **MR. GERARDE:**  Your Honor, she's a member of a conspiracy.

        **THE COURT:** What was your reaction to being kicked out of the room?

        THE WITNESS:  I did not, at first, have a reaction because I just left the room.

1          But then the meeting took a little longer than I

2    expected -- with me being outside of the room, so I was a

3    little uneasy as to what the discussion was about, especially

4    when I returned to the room and nobody filled me in on what the

5    discussion was about while I was out.

6    Q.   So why didn't Roxanne know everything that you and the

7    defendant knew?

8    A.   It was not my story to tell her because she was there

9    representing the Premier, so I let him deal with that part of

10   it.

11   Q.   Well, to your knowledge what did she know?

12   A.   She knew that we were traveling back on the charter with

13   some cash and some of it belonged to Mr. Fahie. He asked me to

14   accompany Roxanne to go on the flight with the pilots.

15   Q.   Did you tell Roxanne where the money was coming from?

16   A.   No, sir.

17   Q.   Why not?

18   A.   Originally, it was -- this information was going to be

19   shared between Roberto Quintero, myself and Mr. Fahie, so

20   nobody else knew where the money was coming from.

21   Q.   Did you tell her how much money it was?

22   A.   I did not go into any discussion with Roxanne concerning

23   money.  Mr. Fahie was the one dealing with Roxanne. She knew

24   the amount when she reached the flight that day. Quintero told

25   her how much it was.

1    Q.   What day are you referring to?

2    A.   The day that we were flying out.

3    Q.   Was that the day after the meeting?

4    A.   Yes, sir.

5    Q.   You said, at first, you did not have a reaction but then

6    later you --

7    A.   I felt a little --

8         **THE COURT:**  Wait, wait until Mr. Gerarde finishes his

9    question.

10        THE WITNESS:  Yes, Your Honor.

11   Q.   You did not have a reaction but then later you went into

12   the meeting, wondering what was taking so long, and they did

13   not fill you in?

14   A.   No, sir.

15   Q.   Did you stay for the remainder of the meeting or did you

16   step back out?

17   A.   I came in at one point and they were not finished, so they

18   asked me to step back outside of the room and I went back

19   outside.  I remained there until it was finished.

20   Q.   After the meeting was finished, what discussions did you

21   have, if any, with Roberto?

22   A.   I did not speak with Roberto after the meeting -- directly

23   after the meeting.

24   Q.   In person?

25   A.   No, sir.  Everybody went their separate ways.

```
1    Q.   Okay.

2    A.   I went back upstairs.

3    Q.   Later on, did you speak with him over the phone?

4    A.   Yes, I did.

5    Q.   Why did you do that?

6    A.   I mentioned before, I was a little uneasy with the meeting

7    taking place and I didn't know what was going.  So I wanted to

8    know what was going on in terms of me being involved in the

9    discussion.

10       So I wanted to find out from Roberto myself what the

11   discussion was all about while I was out.

12   Q.   Was the plan still for you to leave on April 28th?

13   A.   Nothing changed.  I followed directions -- I was given a

14   direction -- and I was not comfortable with the flight but I

15   was going.

16   Q.   So, showing you Government's Exhibit 15C-1. Let me start at

17   page 15.  Approximately what time did this meeting end on

18   April 27th?

19   A.   It could have been around 10:00 I would say.  No, I am not

20   sure of the exact time.

21   Q.   Who did the Premier call at 10:02?

22   A.   5429325 to 5410993.

23   Q.   Roy Garaway?

24   A.   Yes, to Roy Garaway.

25   Q.   What was the duration of that call?
```

1    A.   Fourteen minutes.

2    Q.   The next call, who was that to?

3    A.   Devon Osborn.

4    Q.   Who was that?

5    A.   He was a consultant and a very good friend of Mr. Fahie's.

6    Q.   What is the final call in Government Exhibit 15C-1?

7    A.   That name is Iris Foley.

8    Q.   Who is that?

9    A.   Iris Foley, that is his mother.

10   Q.   If you would explain what happened the morning of

11   April 28th.

12   A.   That is the day of the flight now?

13   Q.   That's right.

14   A.   It was agreed that Roberto would come and pick Roxanne and

15   myself up from the hotel, The Embassy Suites. He said how we

16   were going to have breakfast and do some other things and he

17   would take us to the flight so we could leave around 2 o'clock

18   that afternoon.

19        Before, when he got there, he said he wanted to take us

20   to the plane to make sure that everything was according as was

21   discussed in terms of the money being on the flight, to check

22   it, and after we checked, then we would do the breakfast and

23   the other things that he promised.

24   Q.   What did you see when you got on the plane?

25

1    A.   When we got to the airport, we were taken on the plane

2    which I didn't want to go, and to see for myself so I did that.

3    When I got on the flight, she was sitting to the front seat

4    and she had a briefcase, a briefcase with some packages.

5         I sat in the back and I looked over and I saw there

6    was some money in these packages.  I was uncomfortable. I did

7    see money on the plane.  I did not check or count it. I just

8    looked at it.

9    Q.   All right. And what was your understanding of what that

10   money represented?

11   A.   I can't remember who said but one person said the $500,000

12   was for Mr. Fahie and the $200,000 he said would have been for

13   me, which was for the startup of the business.

14   Q.   What happened when you got off the plane?

15   A.   We got off the plane and, on the way close to the terminal,

16   we were arrested at that point. Someone came and said -- we

17   were driving on one of the trolleys and they arrested us and

18   told me that I was under arrest for the different charges for

19   conspiracy, money laundering and these different things.

20        **MR. GERARDE:**  No further questions, Your Honor.

21        **THE COURT:**  Cross examination.

22        MS. VAN VLIET:  Thank you, Your Honor.

23   Q.   Good morning, Ms. Maynard.

24   A.   Good morning, ma'am.

25   Q.   My name is Theresa Van Vilet.  I represent Mr. Fahie.

```
 1        I am going to ask you a few questions based on your
 2   testimony with Mr. Gerarde.
 3   A.   Okay.
 4   Q.   Let me just start with the questions that Mr. Gerarde was
 5   just asking you about, the April 27th and April 28 meetings and
 6   events in Miami.
 7        As I understand it, you had this concern that you had been
 8   excluded, for lack of a better word, from the meeting on the
 9   evening of April 27th, correct?
10   A.   Yes, ma'am.
11   Q.   And some time later that evening, on April 27th, you and
12   Mr. Quintero spoke by telephone, is that right?
13   A.   Yes.
14   Q.   Was your son, Kadeem, also involved in that call, if you
15   remember?
16   A.   Yes, I did not have Roberto's number directly.
17   Q.   Your son was not in Miami at the time, during this trip in
18   late April, is that right?
19   A.   No, ma'am, he was not.
20   Q.   All right.
21   A.   He was in the British Virgin Islands.
22   Q.   Do I understand it correctly that you called your son and
23   your son brought in Mr. Quintero and then the three of you had
24   a three-way call?
25   A.   Yes, ma'am.
```

1   Q.   During that call, not going into great detail, did Mr.

2   Quintero, who was the confidential informant, did he summarize

3   for you what was said during the meeting, in the April 27th,

4   that you did not attend the majority?

5   A.   Yes, ma'am.

6   Q.   And am I correct that, among the things that he told you,

7   was that Mr. Fahie was asking an awful lot of questions during

8   the meeting?

9   A.   I do not recall that particular statement. I could stand to

10  be corrected.

11  He did go over what was discussed within the meeting and what

12  the arrangements were to be.  I don't recall him saying to me

13  that he asked a lot of questions.

14  Q.   Do you remember the phone call that you had with Mr.

15  Quintero right after that list of meeting requirements was

16  initially set, I think it was on March 31st?

17  A.   That was the earlier one, yes.

18  Q.   Do you recall, in the telephone conversation on April 27th,

19  whether he used the word questions or not, that the CS was

20  concerned about Mr. Fahie's level of inquiry?

21  A.   The only time I had a discussion with Roberto Quintero in

22  terms of Mr. Fahie being uncomfortable is when Mr. Fahie gave

23  the listing for him to send his name, his picture and all of

24  those different things.

25  Q.   All right.

```
 1    A.   That was the only discussion that I had with Mr. Quintero

 2    with him being uncomfortable.

 3    Q.   When you say, with him being uncomfortable...

 4    A.   Yes, because Mr. Fahie was uncomfortable at the beginning,

 5    before the meeting in Miami, when he asked him to provide the

 6    list of his credentials.

 7    Q.   Okay, my question is slightly different.

 8    A.   Say it again please.

 9    Q.   Did Mr. Quintero express to you his, Mr. Quintero's,

10    concern about Mr. Fahie asking questions?

11    A.   In April you mean?  The night of the meeting in April?

12    Q.   Any time.

13    A.   In the beginning, yes, when he gave him the listing, he

14    said he did not like that Mr. Fahie was asking for his

15    credentials, that was the beginning.

16    Q.   Never at any other time?

17    A.   Not to my recollection.

18    Q.   Not that you remember --

19    A.   Yes --

20         THE COURT:  Don't talk over each other.  Wait until the

21    question is finished before you begin answering; and wait until

22    the witness has finished answering before you ask your next

23    question.

24         MS. VAN VILET:  My apologies, Your Honor.

25         THE COURT: Please continue.
```

1   Q.   Ms. Maynard, as I understand it, there were three main

2   plans involved in the discussions with Mr. Quintero -- I take

3   that back -- there were four.

4   A.   Yes.

5   Q.   All right. First, there was what you talked about as the

6   3,000 kilograms test-run that was then going to continue onto

7   Colombia to the Virgin Islands, and from the Virgin Islands to

8   Puerto Rico, and then from Puerto Rico to either Miami or New

9   York; is that right?

10  A.   Yes, ma'am.

11  Q.   Okay.  And the second of the plans that were being

12  specifically discussed was the $700,000 of money that was going

13  to be flown back from Miami, on April 28th, in your company and

14  that of Ms. Sylvester's, right?

15  A.   Yes, ma'am.

16  Q.   So, that's two.

17  A.   Yes.

18  Q.   The third was a plan that was talked about on the tapes,

19  including the tapes yesterday, talking about something called

20  garbage and how it could be seized by the authorities in the

21  BVI to get quote, unquote points, that it was low quality

22  cocaine; do you recall that?

23  A.   Yes, ma'am.

24  Q.   And then the fourth one.

25  A.   Yes.

```
 1    Q.   One of the main ones, I would say, was a side deal that

 2    you, your son, and the confidential informant were engaged in

 3    and that you attended meetings for, where the confidential

 4    informant were to provide up to 60 kilograms of cocaine that

 5    could be sold in the BVI right away, correct?

 6         In other words, it did not have to go to Puerto Rico or

 7    anything like that?

 8    A.   Yes, ma'am.

 9    Q.   Okay.  I will call that the side deal.

10    A.   Uh-hum.

11    Q.   Now, that side deal, Mr. Fahie did not have anything to do

12    with or didn't have any knowledge of, correct?

13    A.   Correct.

14    Q.   To be clear there was also this discussion of the fellow

15    from Senegal that there was supposed to be payment of 83 and

16    then $133,000 on the Island of St. Martin, correct?

17    A.   Yes.

18    Q.   Other than relaying messages, as we've seen in the text

19    messages, did you have any personal involvement in the

20    underlying obligations that caused the need for a payment of

21    $133,000?

22    A.   I'm sorry -- if you could please rephrase that question for

23    me.

24    Q.   I think I should.

25    A.   Yes.
```

```
 1   Q.   Other than relaying some messages, other than doing that,

 2   you did not have anything to do with that whole transaction,

 3   did you?

 4   A.   With that transaction, I did not have anything to do with

 5   the $133,000.

 6   Q.   Okay.

 7   A.   Mr. Quintero, at some point in time, he promised me

 8   $200,000.  I had a bill to pay, personally, so I said I would

 9   use that to pay my bill.

10        I mentioned that to Mr. Fahie and Mr. Fahie said he could

11   have given it to me and he would do the transaction on my

12   behalf that I owed the money to.

13   Q.   If I understood your testimony correctly, are you talking

14   about the $100,000 that you owed to, I think it was, a cousin

15   of Mr. Fahie's?

16   A.   Yes, ma'am.

17   Q.   That is not the person from Senegal, right?

18   A.   No, ma'am.

19   Q.   I think you testified you knew Mr. Fahie approximately ten

20   years?

21   A.   Or more.

22   Q.   You were not very close to him.  You were not close

23   personal friends?

24   A.   No, ma'am.

25
```

1  Q.  As I understand it, the reason you became involved in this

2  whole deal was to pay off the mortgage on your residence in the

3  BVI.  I see you shaking your head.  So tell me why you became

4  involved in all of this?

5  A.  My original intention was just to pay off the money the

6  $100,000 that I owed that is belated because the job I had, I

7  could have managed the other bills. That was what was on my

8  mind.

9  Q.  Am I correct that you were financially struggling a bit at

10 the time, in terms of the mortgage on the house, this $100,000

11 debt, and your ultimate dream of owning a mortgage-free house

12 in Miami as well?

13 A.  Owning a home in Miami or anyplace else was not number one

14 on my list. I had some financial difficulties, yes. That did

15 not include owning a house.

16      Dreams can always wait. My main thing was to pay back the

17 person I owed.

18 Q.  Had your son, Kadeem, been involved in drug trafficking

19 prior to this incident with Mr. Quintero?

20 A.  Not to my knowledge, no.

21 Q.  Had you ever been involved in drug trafficking prior to

22 this incident with Mr. Quintero?

23 A.  No, ma'am.

24 Q.  Now at certain times during the discussions with Mr.

25 Quintero, you described your son as your right-hand man; do you

1    recall that?

2    A.   Yes.

3    Q.   Can you tell me what you meant by that when you said that.

4    Do you have the transcript book up there in front of you?

5    A.   Yes, ma'am.

6    Q.   If you will flip to Exhibit 2B.  Do you have tab 2 there?

7    A.   Yes, ma'am.

8    Q.   If you look at page 11 and look at line eight and nine,

9    that is where you say to Mr. Quintero that -- in reference to

10   your son, Kadeem, "That is my right hand.  That is my oldest."

11   A.   Yes.

12   Q.   What were you referring to as far as your son being your

13   right hand?

14   A.   That I was making reference to him doing things around the

15   house because he was the oldest one.  That was the reference.

16   Q.   So it did not have anything to do with your business in the

17   construction or cleaning business or anything like that it was

18   doing things around the house?

19   A.   If I ask him to do anything for me, he was always willing

20   to do it while I was busy doing my work.

21   Q.   There was some discussion yesterday about three Arab

22   gentlemen; do you recall your testimony regarding that?

23   A.   Yes, ma'am.

24   Q.   Do I understand your testimony correctly that Mr. Fahie did

25   not have anything to do with the early conversations you may

1    have been having with the Arabs or anything else like that; is

2    that right?

3    A.   Yes, ma'am.

4    Q.   Okay. Now, eventually your son introduced you to Mr.

5    Quintero in the way you described it yesterday; is that right?

6    A.   Yes, ma'am.

7    Q.   You and Mr. Quintero and your son eventually agreed to have

8    a meeting on March 20th, in St. Thomas; is that right?

9    A.   Yes, ma'am.

10   Q.   Is St. Thomas in the U.S. Virgin Islands as opposed to the

11   British Virgin Islands?

12   A.   It is the U.S. Virgin Islands.

13   Q.   Whose idea was it to go to the U.S. Virgin Islands?

14   A.   Mr. Quintero said he did not want to come back to the

15   British Virgin Islands right away and he asked me could he meet

16   me and St. Thomas was the closest place I could have gone to.

17   Q.   Is it at that meeting that, for the first time, you hear

18   what Mr. Quintero's plan regarding the test deal, the

19   multi-thousand kilograms of a substance deal; is that right?

20   A.   Yes, ma'am.

21   Q.   If you will turn to page 31 of the exhibit B, the same one,

22   if you start down at line 15, 16, where you say, I figure

23   something to do with my line of work but he didn't go into

24   details.

25

1          Mr.  Quintero answers, yes, So well what we want over

2    there is a free -- a free pass, a safe pass not a free pass, a

3    safe pass, that is what we need a safe pass, and let me assure

4    you that the things that are there are never going to test

5    positive?  Did I read that correctly?

6    A.   Yes.

7    Q.   Now, Mr. Quintero talked about wanting a safe pass.  Was it

8    your understanding that, in effect, he wanted safe passage for

9    the materials that he was going to be keeping from the British

10   Virgin Islands to where ever it was going?

11   A.   Yes, ma'am.

12   Q.   And that is all, that's all he wanted in this test plan,

13   correct?

14   A.   A safe plan, yes.

15   Q.   Okay.  And he described to you on at least a couple

16   occasions that this material he would be storing out on the

17   boat was construction material; is that right?

18   A.   The words construction material was used.

19   Q.   Did he always say it was some kind of a construction

20   material in some sort of a liquid form?

21   A.   Yes.

22   Q.   He first assures you -- let me just read it.  I assure you

23   that the things that are there are never going to test

24   positive.  Did I read that correctly?

25   A.   Yes.

1  Q.   Did you understand that to mean the things that were there

2  were these liquid construction materials, or whatever they

3  were, and they were not going to test positive for cocaine?

4  A.   At the beginning, I was naive as to what he was speaking

5  about. I did not realize that it was cocaine he was speaking

6  about when he was speaking about being positive and everything

7  else, at that first meeting.

8  Q.   Okay.  So at the first meeting, what did you understand him

9  to be telling you when he was saying that the materials he

10 wanted safe passage for were not going to test positive?  What

11 did you think he meant?

12 A.   When we first started talking, I thought that it was

13 construction material that he was speaking about. But when he

14 talked about testing positive, I thought that it was some type

15 of drugs speaking about testing and being positive but I didn't

16 know it was cocaine until we sat down.

17 Q.   He talked about this not testing positive a couple of times

18 in that first meeting you have on St. Thomas, right?

19 A.   Yes, ma'am.

20 Q.   As a matter of fact, if you go to page 33, line 13, still

21 on Government Exhibit 2B, as in bravo, he says -- he Roberto

22 says, yes, yes, just three.

23     So in order to conduct all this business, like I said, all

24 this number three never test positive, never, never, never.

25 You can do any test because it is a process of four days to get

out ten.  Ten number three.  To get out ten number three, it is

a process of four days. It is a chemical process, so really,

when the piece comes that you can test it, it's never going to

test positive.

Never, never, never.  It is a process of four days.

So we need a chemical process -- turning to the top of 34 -- to

do that right now.  It is construction material, a liquid

construction material?

This is where he is, again, assuring you, repeatedly,

that it is never, never, never, never going to test positive

for cocaine, correct?

A.  Yes, ma'am.

Q.  When he was telling you it is going to take four days to

process, did you have an understanding what he meant by that at

that time?

A.  No, ma'am.

Actually, I was there sitting at the table but he was not

really speaking directly to me because I was like a novice in

the conversation.

I was sitting there as he was speaking.  I was more

interested in terms of what he wanted to do in terms of the

safe passage of getting his business done.

Q.  All right.  So, when you say he wasn't really talking to

you --

A.  My son was there also at the meeting.

1    Q.   When you say he was not really talking to you, you are

2    referring to Mr. Quintero; is that right?

3    A.   Yes, ma'am.

4    Q.   And I believe you just said that you felt like you were the

5    novice there, is that right?

6    A.   Yes, ma'am.

7    Q.   Am I to understand that Mr. Quintero was directing these

8    comments primarily to your son, Kadeem?

9    A.   He was talking in general. I don't know if Kadeem

10   understood what he was saying. Personally, I did not understand

11   what he was saying until later down.

12   Q.   When you say later down you mean later in time, correct?

13   A.   Yes.  Even the word garbage that he was using, I did not

14   understand what it means.  What remain was -- they call it

15   garbage because that is not my line of work.

16   Q.   Understood.  In the statements that he was talking about on

17   33; where he was talking about one number three and the rest of

18   it, you understood, did you not, that when Mr. Quintero was

19   making a reference to a quote, unquote number three, he was

20   referring to a kilogram?

21   A.   No, ma'am.  I did not understand it to be -- that he was

22   referring to kilograms of cocaine.

23   Q.   My question is whether you understood it had to do with a

24   kilogram weight which is 2.2 pounds. Did you understand that

25   much?

1   A.   No, ma'am.  Can I say something?

2            **THE COURT:**  No, no; there is no question.

3            THE WITNESS:  Yes, Your Honor.

4            THE COURT:  Ask your next question.

5            MS. VAN VLIET: Yes, Your Honor.

6   Q.   Am I correct that, at the end of the meeting in St. Thomas,

7   you had agreed to do your role in connection with the things

8   you could do as the Manager of the Port Authority to assist in

9   this plan of Mr. Quintero's boats waiting for a few days in the

10  British Virgin Islands before going on to St. Thomas; is that

11  right?

12  A.   Yes, ma'am.

13  Q.   As I understand it, you were going to facilitate the hiring

14  or the appointment of a shipping agent; is that right?

15  A.   Yes, ma'am.

16  Q.   And correct me if I'm wrong, but the shipping agent idea

17  was not something that was abnormal in the every day course of

18  business at the port at BVI, right?

19  A.   That is a part of the commerce for ships to come through.

20  Q.   So, a perfectly legitimate way of doing things?

21  A.   Yes, ma'am.

22  Q.   In this case, the shipping agent was going to be -- for Mr.

23  Quintero's vessels and the cargo on it, was going to be your

24  son Kadeem, right?

25  A.   Yes, ma'am.

1    Q.   That is why there is some communication between Kadeem and

2    Mr. Quintero, Wade Smith for the involvement of going through

3    that process of becoming the shipping agent; is that right?

4    A.   Yes, ma'am.

5    Q.   Now originally, your meeting on the 20th, you were not sure

6    how to approach Mr. Fahie about Mr. Quintero's plan; is that

7    right?

8    A.   Yes, ma'am.

9    Q.   And you all talk about it and you determine the way to

10   quote, unquote to sell the Premier is to present Mr. Quintero

11   as an investor who wants to do make some investments in the BVI

12   and maybe some political projects like building schools and

13   things of that nature, right?

14   A.   Yes, ma'am.

15   Q.   And you do make a presentation to Mr. Fahie a couple days

16   later; is that right?

17   A.   Yes, ma'am.

18   Q.   That would be on March 22nd; right?

19   A.   Yes, ma'am.

20       **THE COURT:  All right.** Ladies and gentlemen, this seems

21   like a good place to break; so we will recess now for lunch.

22   Please be back at 20 minutes of 1.

23       I believe we are on track for today.  Again, do not

24   talk about the case, and I will see you all back at 20 of 1.

25       **LUNCH RECESS TAKEN**

THE COURT:  All right.  Everyone is present and accounted for.

So, if you would please bring the jury in.

COURT SECURITY OFFICER:   All rise for the jury.

THE COURT:  Everyone may be seated.  Ms. Van Vliet, you may continue your cross-examination.

MS. VAN VLIET:  Thank you, Judge.

Q.   Ms. Maynard, when we broke for lunch, we were just at the point where you were going to meet with the -- with Mr. Fahie for the first time regarding Mr. Quintero and the discussions that you had had with him; do you remember that?

A.   Yes, ma'am.

Q.   Okay.  Now as I understand your testimony yesterday, you all met on the 22nd.  You explained to Mr. Fahie that Mr. Quintero was a potential investor, correct?

A.   Correct.

Q.   And that he had some business involving bringing vessels into the BVI waters, correct?

A.   Correct.

Q.   And that whatever was on the vessels that Mr. Quintero wants to bring into the BVI -- the waters -- would not actually be brought onto the island?

A.   Correct.

Q.   And you mentioned that Mr. Quintero had given you a gift or a present.

A.   Yes.

Q.   I can't remember which word you used, but you didn't go into a lot of detail about that, correct?

A.   Yes -- he gave me $10,000, yes.

Q.   Okay.  So you told Mr. Fahie that?

A.   I mentioned to him he gave me -- I didn't know -- I cannot remember a specific amount.

Q.   Okay.  But you also told Mr. Fahie that in addition to Mr. Quintero being an investor and the vessels and the rest of that, you also told him that Mr. Quintero appeared to be a wealthy man and was interested in making these investments, correct?

A.   Correct.

Q.   Okay.  I take it that you also said that he, Mr. Quintero, wanted to meet with Mr. Fahie, correct?

A.   Correct.

Q.   Okay.  And at the conclusion of that meeting, there was an agreement on Mr. Fahie's part to meet with Mr. Quintero, correct?

A.   Correct.

Q.   All right. And as I understand it, at the time of that March 22nd meeting, you did not give Mr. Fahie the name of the CS, you didn't say that his name was Roberto Quintero; is that right?

A.   I didn't have the name -- yes.

Q.   All right.   And so you didn't tell him that day for any reason -- just because you didn't remember what it was, right?

A.   Yes, ma'am.

Q.   And as I understand it, at some point during that meeting on the 22nd, between you and Mr. Fahie, the subject of $500,000 came up; is that right?

A.   It wasn't $500 originally -- we started out with $53,000 -- we started out with a smaller amount; so that was the case.

Q.   Okay; whatever that amount was.

A.   Yes.

Q.   It was in the hundreds of thousands of dollars though, right, not just $300, right?

A.   Yes, ma'am.

Q.   All right.   So it was someplace below, or south of, the $500,000, but nonetheless to be used to pay prior bills of the political party that both you and Mr. Fahie belonged to, right?

A.   Yes.

Q.   All right.   And that's the VIP, the Virgin Island Party, right?

A.   Yes, ma'am.

Q.   And as I understand it -- your testimony yesterday -- those bills and those debts had been generated by Mr. Fahie's predecessor a member of the VIP party as well?

A.   Yes, ma'am.

Q.   Okay.

A.   Yes.

Q.   And as I understand it also at that meeting, this whole concept of RTW, the Road Town Warehouse, is that the name of it, the real name?

A.   Wholesale.

Q.   I'm sorry, wholesale, that Road Town Wholesale was going to be used as a code or shorthand name -- a code name for future discussions about Mr. Quintero; is that right?

A.   Yes, ma'am.

Q.   Okay.  And Road Town Wholesale is like a real business, a legitimate business down in the BVI, right?

A.   Yes, ma'am.

Q.   And it was -- as I understand your testimony yesterday -- some business that you had been having issues with in your capacity as the manager of the port, correct?

     And there was some contentiousness between you and your job as the port director and Road Town Wholesale about some surcharge that you had put on some cargo, right?

A.   Correct.

Q.   Okay.  So in any event, RTW, those initials were the ones selected to use to reference Mr. Quintero, right?

A.   Correct.

Q.   After your meeting with Mr. Fahie concluded, did you and your son brief Mr. Quintero on what had happened in the meeting with Mr. Fahie?

A.   Yes, ma'am.

Q.   Okay.  And you did that by phone; is that right?

A.   Yes, ma'am.

Q.   And I think we've heard the recording of that; is that correct?

A.   Yes, ma'am.

Q.   Yesterday, right?

A.   Correct.

Q.   At some point after the meeting with Mr. Fahie on the 22nd, this list of requirements, for lack of a better term, is sent initially from Mr. Fahie to you; is that correct?

A.   Correct.

Q.   And we've seen those a number of times; it's the demand that Mr. Fahie is making that the name of the CI be provided, the photograph, whether there is a criminal record, what his business plan is, all of those items on the list, right?

A.   Correct.

Q.   And, you know, the name we know you just forgot to list -- the photographs, whether Mr. Quintero had a criminal record, what his business plan was, the other items, none of those had ever been brought up prior to that text message request from Mr. Fahie to you, correct?

A.   Correct.

Q.   So as I understand your testimony, you then take that list that Mr. Fahie has sent you and you forwarded it to your son,

correct?

A.   Correct.

Q.   Who then in turn is going to forward it to Mr. Quintero, correct?

A.   Correct.

Q.   Because, again, you don't have Mr. Quintero's number?

A.   Correct.

Q.   All right.  So that happens, and by the time we come to March 31st in the morning, Mr. Quintero knows about this list of demands --

A.   I don't think he allowed me to; you're correct.

Q.   And you and your son and Mr. Fahie get on the phone on March 31st; is that right?

A.   Yes.

Q.   And you discussed this whole list of demands that Mr. Fahie wants before meeting with Mr. Quintero..

                (COUNSEL AND WITNESS SPEAK SIMULTANEOUSLY)

Q.   Not by phone, correct?

A.   Correct.

Q.   Not in person?

A.   Correct.

Q.   I'd ask you to turn to tab 5B as in Bravo in that binder if you still have it.  Are you there, ma'am?

A.   Yes.

Q.   Okay.  If you look at the first page of Exhibit 5B as in
Bravo, do you have that, ma'am?

A.   Yes.

Q.   All right. This conversation took place on March 31st; is
that correct?

A.   Yes.

Q.   And the participants on the phone call were Mr. Quintero,
the CS, your son Kadeem and yourself, right?

A.   Correct.

Q.   Okay.  And this phone call takes place after Mr. Fahie's
list of requirements for a meeting has been relayed to the
confidential informant by your son, correct?

A.   Correct.

Q.   Okay.  And fair to say that the confidential informant
expresses his displeasure at these requests?

A.   Correct.

Q.   Am I right that he's upset, he being the CI Mr. Quintero,
is upset because he views these demands, these requests as
being indicative of -- or indicating that Mr. Fahie perhaps
does not trust him?

A.   To tell you what he said to me was that -- why is he asking
these questions, no.

Q.   Okay..

A.   At this point where we are that is what his concern was,
where all of these questions are coming from.

Q.   And he also tells you, did he not, that he was concerned that these questions indicated that Mr. Fahie thought he was a law enforcement officer; although he used a more pejorative term?

A.   Correct.

Q.   All right.  And he goes on to tell both you and your son that it is not -- that Mr. Fahie is treating this plan or this negotiation with him like it was some sort of normal business, correct?

A.   Correct.

Q.   And he does not -- he, the CI, does not like that; is that correct?

A.   Correct.

Q.   All right. And the CI expresses his concern to you and your son that he thinks that Mr. Fahie may be trying to get the CS arrested, right?

A.   Correct.

Q.   That Mr. Fahie -- that there has been this Commission of Inquiry that's been established by the United Kingdom looking into things in the British Virgin Islands, correct?

A.   Correct.

Q.   And that's true?

A.   Correct.

Q.   And as I understand it from the comments that you made and others made on all the tapes -- well, first, the Commission of

Inquiry was also known as the COI, right?

A.   Correct.

Q.   And the COI was looking into allegations -- or the affairs or the politics or whatever -- of Mr. Fahie's predecessor, right?

A.   Correct.

Q.   And you and Kadeem assured Mr. Quintero that the COI didn't have anything particularly to do with Mr. Fahie, right?

A.   Correct.

Q.   Fair to say, again, based on all the tapes and stuff we heard, that Mr. Fahie had a concern that the British didn't like him too much; is that right?

A.   Correct.

Q.   (INAUDIBLE QUESTION)

A.   Could you repeat that?

        THE COURT REPORTER:  If you would please keep your voice up, counsel.

Q.   I will ask another question. At one point in the -- or a couple of points in the conversation on the 31st -- do you remember that Mr. Quintero started talking about people jumping or being grasshoppers; do you remember that?

A.   Yes, ma'am.

Q.   What did you understand that to mean?

A.   I think it was just rambling and then hate speech. That's what I understood that to mean.

Q.   All right.   Do you remember a part of the conversation on the 31st where the CI is talking about, you know, again, how this is so outrageous?

        Can you imagine if I met with him when he was under investigation and someone took a picture of me?   Do you remember that?

A.   I don't remember that part, no.

Q.   Again, Exhibit 5B as in Bravo.   Turn to page 35 if you would, ma'am.   Are you there?

A.   Yes.

Q.   Roberto was talking.

    Yes.   Because really, really, really, you know, I didn't know about this thing.   When someone is in investigated and let's say, you know what, it's big -- it's a big country, it's a small one, it's very small one, and they can have people over there.   And look at this guy, he wants to take me to his office?

        Anyway, I know it's secure and everything, someone -- someone take a picture of me or whatever because they're -- they're investigating, oh man, that that's going to be a problem.

        Does that refresh your recollection about whether Mr. Quintero was rambling; to use your words?

A.   Yes.   When he said those words, I thought -- and he said that people do not like Mexicans and they are always on their

neck -- so I thought he meant that he didn't want anyone taking his picture for that reason.

Q.   Well, in any event, he was talking about being worried about someone taking his photographs in connection to this whole thing, right?

A.   Yes, ma'am.

Q.   By the way, in that portion of what Mr. Quintero was talking about he says that Mr. Fahie wanted him -- the meeting to take place at his office -- Do you recall that?

A.   Yes, ma'am.

Q.   Okay.  And did Mr. Fahie want it to happen at the official Governor -- not Governor -- Government Premier Office?

A.   It was what office I know Mr. Fahie to have.

Q.   Oh, so when your son said it was not the Government Office that wasn't right, it was the Government Office that Mr. Fahie wanted it to be at?

A.   It would have been, yes.

Q.   And the conditions that Mr. Fahie had sent to you that eventually got passed on to Mr. Quintero, right, that the meeting would take place at the office --

A.   Yes, ma'am.

Q.   All right. And did you ever tell Mr. Fahie about the fact that Mr. Quintero was so upset about these requests that he'd made?

A.   Yes -- I told him he wasn't pleased.

Q.   Did you tell him, for example, that he was worried about somebody taking a picture of him?

A.   I didn't go into all those details.

Q.   Okay.  To try to kind of fast forward things a little bit, after that call, then you and your son arrange a call among Mr. Quintero, Mr. Fahie and yourself, correct?

A.   Yes.

Q.   To kind of iron out this -- this issue with the request; is that fair?

A.   Correct.

Q.   Okay.  And that's the call that we heard -- eventually at the end of the call there's an agreement that the meeting, the first face-to- face meeting between Quintero on the one hand and Mr. Fahie on the other, is going to take place on April 7th, 2022, in Ms. Sylvester's house, right?

        Let me strike that.  That is going to take place on April 7th, 2022; is that correct?

A.   Yes.  The location was not determined at this point.

Q.   Eventually the location is determined and it in fact takes place at Ms. Sylvester's house, but you and your son and Mr. Quintero don't find that out until the day of the meeting; am I correct?

A.   Correct.

Q.   Forgive me for that.

A.   Yes.

Q.   Now putting aside the drive up to the house and the pre --
at Maria's -- eventually you, the informant, Mr. Fahie and the
driver of the car arrived at Ms. Sylvester's house, correct?

A.   Correct.

Q.   Could you give me the name of the area that your house is
located in again?

A.   It is located in Tarham Town, Eastman.

Q.   Tarham Town.  Is that T-A-R-H-A-M?

A.   Yes, ma'am.

Q.   Thank you.  And if I recall your testimony when -- when we
were listening to the tape of the -- the meeting, at some point
Mr. Fahie asked somebody to leave and you testified that it was
the driver of the car, correct?

A.   Correct.

Q.   So after that point in time, it was just you, Mr. Quintero
and Mr. Fahie in the room for the bulk of the meeting; is that
right?

A.   Correct.

Q.   There was a time where you excused yourself for a few
moments.  There was a time when you may have been out of the
meeting, right?

A.   Yes, ma'am.

Q.   Okay.  Now were you aware that Mr. Fahie, in fact, did take
photographs of the confidential informant during that meeting?

A.   No, ma'am.

        MS. VAN VLIET:  May I approach, Judge?

        THE COURT:  Yes.

Q.  Ms. Maynard, I've put before you Defendant's Exhibit 1 and Defendant's Exhibit 2.  I'm showing on the Elmo Defendant's Exhibit 2.  Do you see that right there?

A.  Yeah.

Q.  Okay.  In Defendant's Exhibit 2, there is a figure sitting on it with a kind of a royal blue, French blue shirt.  Is that you?

A.  Yes.

Q.  Okay -- at least your elbow -- and sitting next to you is a gentleman whose face has been blocked out; is that right?

A.  Yes, ma'am.

Q.  And you've had an opportunity to see a version of this picture that doesn't have the face blocked out; is that right?

A.  Yes.

Q.  And can you confirm that when you saw the one without the black square; that it was the person you knew to be Mr. Quintero, correct?

A.  Correct.

Q.  Okay.  During the meeting on April 7th, Mr. Quintero was sitting across from Mr. Fahie; is that right?

A.  I think they were sitting more on the side -- I think they were on the same side.

Q.  Okay.

A.   Yes.

Q.   But in any event, there's only three people in the room?

A.   Yes, yes; correct.

Q.   So, you, Mr. Quintero -- who you just identified with the blockout over his face -- and Mr. Fahie; is that right?

A.   Correct.

Q.   Defendant's Exhibit Number 1.  Again, that shows more of your blue shirt and just another photograph of Mr. Quintero as he's talking; is that right?

A.   Correct.

Q.   Or as he's gesturing, correct?

A.   Correct.

Q.   And, again, at the time period of Defendant's Exhibit 1 only three people were in the room?

A.   To the best of my knowledge, only three of us, yes.

Q.   Well, certainly you didn't see anybody else lurking around, did you?

A.   No, ma'am.

Q.   Okay.  Now during the meeting on the 7th, again, not going to go through the entire meeting again, there's more talk about what the plan is in terms of the test and there's going to be this concrete, liquid, waterproof material, correct?

A.   Correct.

Q.   And the CS is explaining it to Mr. Fahie; is that right?

A.   Correct.

Q.   Could you please turn to tab 7B as in Bravo in your

transcript book there, and then just let me know when you're

there.

A.   Okay.

Q.   Okay.  The first page of transcript 70 indicates that this

is a transcript of a recording that was made on April 7th,

2022; is that right?

A.   Correct.

Q.   And this is the transcript of the meeting that took place

up in -- excuse me -- in Ms. Sylvester's House, right?

A.   Yes.

Q.   Where Mr. Quintero starts kind of going into details about

what the plan is for the test, right?

A.   Yes, ma'am.

Q.   And correct me if I'm wrong, prior to this you had not gone

into these great details about what the plan was with Mr.

Fahie, correct -- other than what you said on the 22nd --

correct?

A.   No.  It was the intention for the gentleman to explain --

for Mr. Quintero explain to Mr. Fahie on April 22nd.

Q.   Right.  In fact, you got, I think -- I believe there's

reference to Mr. Quintero going into the details in your

meeting with him on the 20th and not you and -- and waiting

until this first meeting, right?

A.   Correct.

Q.  So on April 7th, Mr. Quintero here -- as we see starting on page 53 -- starts to go into these details.

And if you turn your attention to line 10 where it indicates that Roberto, meaning Mr. Quintero, is talking, he says, okay, thank you.  The first proposition that we have is that we need safe passage from your island.

Pardon me.  We are going to come sometimes from Columbia, sometimes from Trinidad and Tobago and sometimes from the Dominican Republic.  So what we bring over there is not testing positive.  You understand or not?

Mr. Fahie responds, no, explain it.

Roberto says, can you -- you're free to talk -- and then something that is unintelligible.

And then you turn the page and Roberto says, okay, thank you. Again, something unintelligible, not picked up on the recording; and Roberto says it's a cocaine.

Mr. Fahie says uh-huh.

And Roberto says, it's not testing positive.  See how we -- we don't call it like that. We just call it number two or number three, whatever number.

I'm not too comfortable to say that.  Just have to tell you upfront.  So it comes in some kind of bucket.  You can test it, but it is not going to test positive.

Mr. Fahie responds, okay.

Roberto continues; the process is four day process.

After that you get it out.  So each bucket has ten pieces, it's five gallon buckets, it's a construction material, so you want specific for what material it is

And then it goes on to the next page talking about waterproofing and the rest of it.

Now as I understood it, the safe passage that was supposed to happen in the BVI was going to be somewhere in the vicinity of 48 to 72 hours, right?

A.   Correct.

Q.   Okay.  So we're talking a couple of days, maybe three; is that right?

A.   Correct.

Q.   As I understand your testimony -- this four day process where Roberto says you get it out of the liquid material, is what's going to happen in Puerto Rico, correct?

A.   Yes.

Q.   Okay.  And then it's going to go either to Miami or New York, right?

A.   Correct.

Q.   There's more talk about the money and there's pages of mathematical calculations; yesterday?

A.   Yes.

Q.   The bottom line is that the calculation that Mr. Fahie was doing on some electronic device, I think you said, was the whole kit and caboodle after the four day processing in Puerto

Rico and sale in Miami would be worth in the vicinity of $78
million, correct?

A.   Correct.

Q.   Obviously, you know now that there was never any real
cocaine, never any real money, never any real construction
materials that aren't going to test positive -- none of it
actually existed, right, you know that now?

A.   Yes, ma'am.

Q.   Let's talk about the money that eventually you got -- that
you and Roxanne would be accompanying back from Miami to
Tortola, right?

A.   Say it again.

Q.   That money was to be a total of $500,000 as you understood
it, for Mr. Fahie and $200,000 for you, right?

A.   Yes, ma'am.

Q.   Total of 700,000, correct?

A.   Correct.

Q.   In I think it was $100 bill denominations -- or smaller
bills, right?

A.   Right.

Q.   Now that money -- at least on the part of Mr. Fahie -- was
the original money that had been talked about since the very
beginning to pay back some of these expenses from the prior
administration, right?

A.   Some of it, yes.

Q.   And you've already testified about what you were planning to do with yours and the $100,000 debt that you had?

A.   Yes.

Q.   And that was part of this 700,000, right?

A.   Yes, ma'am.

Q.   As I understand it, the test run of the liquid construction material that's not going to test positive for anything -- that isn't going to physically happen in terms of the discussion until the summer months, June or July, right?

A.   Correct.

Q.   The transfer back of the $700,000, right -- because that's supposed to happen April 28th, correct?

A.   Can you rephrase that question?

Q.   Let me clarify it a little bit.  I'm asking about the -- on April 28th you and Roxanne are supposed to accompany the money, the 700,000, from Miami to Tortola, right?

A.   Correct.

Q.   You testified earlier about the garbage that the CI had talked about, and he talked about that more in the meeting with Mr. Fahie on April 7th, right?

A.   Correct.

Q.   And he gave the same spiel about how the garbage is like the leftovers when they cook the cocaine down in Columbia and it's at 30 percent or 40 percent and it's not good for anything but smoking it, right?

A.    Correct.

Q.    And then he says that you -- and you meaning Mr. Fahie and the Government -- can get points for it by using it, correct?

A.    Correct.

Q.    Meaning taking it while it's in the British Virgin Island, right?

A.    Correct.

Q.    Now I think you mentioned that Ms. Sylvester was a friend of yours, was a good friend of yours, right?

A.    Correct.

Q.    As well she was a close friend of Mr. Fahie's, correct?

A.    Correct.

Q.    Now you testified -- and it's clear on the face that Roxanne didn't know the full details of any of these plans, either the tests or the side deals that your son had going with the CS or all of the details of the money or the whole thing about the garbage.

      She didn't know about any of that, right?

A.    Correct.

Q.    All she knew, as you understood it, was that there was going to be money on the plane that you and she were supposed to take back from Miami to Tortola on April 28th, and that some of that money belonged to Mr. Fahie.

A.    Correct.

Q.   Okay.  Now you and Roxanne -- Ms. Sylvester -- did she arrive in Miami the same time you did on the 27th or was she already here?

A.   She was here attending the Sea Trade Conference.

Q.   And I think you testified that Mr. Fahie had attended the Sea Trade Conference as well, right?

A.   Correct.

Q.   By the way, the Sea Trade Conference is a longstanding thing, it happens every year, doesn't it?

A.   Correct.

Q.   It is a legitimate, official BVI kind of tourism -- for commerce and business, right?

A.   Correct.

Q.   Now you have this earlier meeting on the day of the 27th, an earlier meeting in the day with Mr. Quintero and a gentleman that turns out to be Detective Dominguez, correct?

A.   Who is that?

Q.   Let me ask you this, did you later come to learn that the individual that you knew as Jose was in fact a law enforcement officer?

A.   Oh, yes, okay.

Q.   In any event, Jose didn't say a lot at this meeting; is that correct?

A.   Yes.

Q.   And you and Mr. Quintero talk and there's some discussion

of these other businesses that you want to -- you've mentioned and that you're looking to get into with him -- none of which has anything to do with these other businesses with Mr. Fahie, right?

A.   Correct.

Q.   There may have been some incidental discussion about the test or the movement of the money back, but the main purpose of your meeting with him was to discuss these other businesses that you were hoping to go into with him; is that right?

A.   Correct.

Q.   The lunch meeting adjourns -- you end up going shopping or something, right?

A.   Correct.

Q.   What time was the meeting that was to happen that night supposed to take place?

A.   7:00 p.m.

Q.   Again, suites where you had secured a private room for a conference room or a business room -- or whatever -- for the meeting to take place, right?

A.   Correct.

Q.   All right. And at this meeting is you, Jose, Roberto's godson or nephew -- however he represented himself to be -- correct?

A.   Correct.

Q.   Ms. Sylvester?

A.   Yes.

Q.   And Mr. Fahie, correct?

A.   Correct.

Q.   And the confidential informant was there, correct?

A.   Correct.

Q.   And obviously you.

A.   Yes.

Q.   As I understand it, shortly after the meeting started and after pleasantries were exchanged, you and Roxanne were asked to excuse yourselves from the meeting?

A.   Yes.

Q.   And, again, we're talking about the one on the night of April 27th, right?

A.   Correct.

Q.   You mentioned that you were kind of waiting around the hotel; is that right?

A.   Roxanne and I were waiting in the waiting area there at the hotel.

Q.   Did Roxanne stay with you the whole time waiting while you guys were out of the meeting?

A.   Yes, she did.

Q.   Okay.  And so obviously other than perhaps reviewing the tapes of that meeting, you weren't in the majority of that evening meeting personally, right?

A.   Correct.

Q.   And at some point in time you return into the meeting; is that correct?

A.   Correct.

Q.   And I may have this wrong, but you -- you return in at one point and then were asked to go back out and then come back in; do I have that right?

A.   They weren't quite ready for me to come in, so I had to go back out and wait out there.

Q.   And then you come back in and you stay till the end for however long it was, right?

A.   Correct.

Q.   And did Roxanne ever go back into the meeting?

A.   Yes -- she came back into the meeting because we needed her.

Q.   There was some question about who had her passport, right?

A.   I think I was looking for my passport --

Q.   Looking for somebody's passport, right?

A.   I was looking for mine; I was wondering if she had it.

Q.   When you say you were wondering if she had it, you mean Roxanne?

A.   Yes.

Q.   Now you testified this morning that as you were out of the meeting for a longer period of time you began to be a little concerned.

I didn't actually catch precisely what you said.  Could you tell me us what you meant?

A.   I was wondering if things had changed in terms of me being left out of the meeting for so long.

If perhaps Mr. Fahie was the one who was going to be spearheading whatever was going to be happening -- something had changed in that respect.

Q.   And when you came back in, you found out that was not what had happened, correct?

A.   No; no.

Q.   Okay.

A.   Because nobody never said to me what happened while I was out.

Q.   Okay.

A.   But I had a conversation with Quintero in the evening and he briefly went over what they discussed inside the meeting while I was out.

Q.   All right. When the meeting concluded on the night of the 27th, about what time did it end?.

A.   I would say around 10:00.

Q.   Okay.

A.   Approximately.

Q.   And did you go out after the meeting or did you go upstairs to your room?

A.   I went back upstairs to my room.

Q.   And how about Ms. Sylvester, do you know whether she went out or whether she went to her room or not?

A.   Ms. Sylvester was the one driving Mr. Fahie so she took him back to his home.

Q.   Okay.

A.   She was the driver for Mr. Fahie that evening.

Q.   All right. And did you see Ms. Sylvester again that night or not?

A.   No, ma'am.

Q.   So the next time you see Ms. Sylvester is the morning of April 28th?

A.   Correct.

Q.   All right. On April 28th, after you have arrived at the airport -- Roxanne goes in and sees the box -- you reluctantly get onto the airplane?

A.   Correct.

Q.   And we're not talking about a big commercial airplane, we're talking about a small charter plane; is that right?

A.   A rickety small plane.

Q.   A rickety small plane?

A,   Small plane, yes.

Q.   Okay.  And so you get into the plane with some hesitancy and you see some money in boxes.  As I understand it, you testified you didn't go in and count it and stuff like that, right?

A.   I didn't count it.

Q.   Okay.

A.   I didn't go near it -- I looked from -- I was away...

     (WITNESS AND COUNSEL SPEAK SIMULTANEOUSLY)

     THE COURT REPORTER:  Judge...

     THE COURT:  Again, one at a time.

Q.   As I understand it, you looked at it from some space away in -- at least in terms of the small plane -- and you saw that it was money; is that right?

A.   Yes, ma'am; it looked like money.

Q.   Okay.  And do you know whether Roxanne counted it?

A.   She was inside before me.  When I came she had it in her lap, but it was still inside the boxes.

Q.   Okay.

A.   I'm not too sure if she physically counted it or anything like that.  I didn't see her do it.

Q.   It was in her lap, so obviously she was seated; is that right?

A.   Yes, ma'am.

Q.   And then when you depart the plane -- shortly thereafter you are placed under arrest; is that right?

A.   Yes, ma'am.

Q.   Was Roxanne arrested?

A.   They handcuffed her, yes.

Q.   Okay.

A.  She was handcuffed along with me.

Q.  Okay.

A.  But I think they told her she wasn't being charged or arrested or something.

Q.  All right. And at some point in time between April 27th -- strike that -- at some point in time when you are in Miami and you and Roxane are close enough to talk to each other Roxane told you that Mr. Fahie had told her that he was going to call and have the CS arrested and the money seized when the airplane landed back in Tortola on April 28th, correct?

A.  She said to me that Mr. Fahie said to tell me when we reached the island not to touch anything on the plane to just walk off and leave it there -- and she would call him and tell him that -- it was his intention to call the authorities there and find out what was going on with the CI because he had gotten suspicious of him and that the story was not adding up.

Q.  Okay.

A.  That is what she said to me.

Q.  And when you say that he was going to call the authorities there, you are talking about the authorities or law enforcement in the BVI, right?

A.  Correct.

Q.  Thank you, Ms. Maynard. I have no further questions.

A.  Thank you, ma'am.

THE COURT:  Redirect.

MR. GERARDE:  Thank you, Judge.

Q.  So Ms. Maynard, when is the first time that Roxanne Sylvester made the statement to you that Ms. Van Vliet had just asked you about?

A.  At the time we were arrested.

Q.  And at that time, were you aware of whether the defendant had been arrested?

A.  I saw him when I came in the room and when I got arrested, and the gentleman said that the other party is over there in the office.  Then I realized that Mr. Fahie was arrested.

Q.  Do you know whether the defendant or Roxanne were ever in the same room at this DEA office?

A.  When we got to the DEA office, Roxanne and I were together, then they called her, she left the room and she went into the area where Mr. Fahie was....

THE COURT:  Speak into the microphone.

THE WITNESS:  Yes, Your Honor.

Q.  And about how -- approximately how long was she in that room?

A.  I would say about 10, 15 minutes before she came back to me.

Q.  And then at what point did Roxanne make this statement to you -- was it before she went into the room where Mr. Fahie was or after?

A.  It was after.

Q.  Showing you Government's Exhibit 15C1 on page 15.  Who did Mr. Fahie call at item six on page 15?

        THE COURT REPORTER:  Judge....

        THE COURT:  Speak directly into the microphone, Ms. Maynard, so that we can all hear you.

Q.  On item seven, Ms. Maynard, when was that call made?

A.  That was made on 4/28/2022.

Q.  Who was that call made to?

A.  Andrew Fahie.

Q.  What time?

A.  That was like 7 -- 7 o'clock.

Q.  Do you see any other phone calls?

A.  No, sir.

Q.  Ms. Maynard, when you first met with Mr. Fahie on March 22nd to bring up Roberto Quintero to him -- let me ask you this; if you never brought up drugs why was he asking you to ask Roberto for $500,000?

        MS. VAN VLIET:  Objection.

        THE COURT:  Rephrase the question, Mr. Gerarde.

        MR. GERARDE: Yes, Your Honor.**

Q.  Ms. Maynard, why do you think you were asked to see if Roberto would pay $500,000 to meet with the defendant?

A.  There was a discussion that day about -- when I told Mr. Fahie that he was a wealthy investor.

And he said that if the Government or if he needed anything, he can assist him with that, and so at that time Mr. Fahie said that he wanted to get his bills paid for the party and different things like that.

So that is how the money came up to -- the initial amount -- and then it started to climb up after that until we got to the $500,000.

Q.   At whose request did the money climb?

A.   Mr. Fahie.

Q.   And so then why use code words?

A.   The code words were used because he, Mr. Fahie, said to me that when we are going to be discussing this particular matter we must have use code words.

And because both of us were dealing with a particular matter that involved RTW, that was the most appropriate code word that we could have used.

Q.   What did you perceive was the need to disguise what you were talking about with Mr. Fahie?

A.   It would be so -- I guess anyone listening to the conversation wouldn't pick up exactly what we are talking about.

Q.   And so was it your impression that both you and Mr. Fahie could get in trouble if people knew what you were talking about?

A.   Yes, sir.

Q.   Now, I want to ask you about the Commission of Inquiry or the COI as it is known.

A.   Yes.

Q.   Throughout these couple months, can you describe what you perceived Mr. Fahie's concern to be regarding the Commission of Inquiry?

A.   Mr. Fahie and I never discussed the topic. It was a big concern on the island -- where everyone on the island was concerned -- about the outcome of the Government of the British Virgin Island after the rulings, but I never had any particular discussion concerning the COI in particular.

Q.   Did he appear concerned about it to you?

A.   The COI?

Q.   Yeah.

A.   He was concerned, but we never discussed it.

Q.   If you would take a look at Government's Exhibit 6B at page 18.

A.   Okay.

Q.   Can you read what Roberto asked Mr. Fahie beginning at line 17?

A.   (WITNESS READS TO HERSELF)

Q.   What was your understanding, Ms. Maynard, relating to Mr. Fahie's concern about the COI?

A.   Based on the response that I'm reading and what I heard, he was not concerned about it.

Q.   Directing you to Exhibit 12B at page 47, lines 14 through

16.   Roberto; so what about this Commission, do you think

they're going to be on your head or something like that; your

position is in danger or no?

          Fahie; no, no, no.  I don't go to them.  I'm not the

one who go to them.  I never go to them.

          Ms. Maynard, does that change your perception of

whether you believed Mr. Fahie was concerned about the COI?

A.   No, sir; it doesn't change my perception.

Q.   Thank you, Ms. Maynard.

A.   You're welcome.

          MR. GERARDE:  No further questions, Judge.

          THE COURT:  Call your next witness.

          MR. GERARDE:  Your Honor, at this time the Government

rests its case.

          THE COURT:  All right.  Ladies and gentlemen, the

Government has announced that they have rested their case,

meaning it has presented to you all the evidence it intends to

in what's known as its case-in-chief.

          I must now speak to the parties about a legal matter

before we continue, so I am going to ask you to step into the

jury room briefly.

          Please do not discuss the case, since we are still not

finished, and I will call you back in, in a few minutes.

          COURT SECURITY OFFICER:   All rise.

THE COURT:  Everyone may be seated.

The Government has rested, Ms. Van Vliet, and so do you intend to call any witnesses on behalf of Mr. Fahie?

MS. VAN VLIET:  We do not, Your Honor.  I have discussed that with my client in detail, he understands and has decided that we will not put on a case.  He understands he has a right to testify, and has decided he will not be testifying, and so we are going to rest.

THE COURT:  All right. I am going to have the jury come back out so that you can formally rest, tell them that they have been presented all the evidence in the case, that I am going to excuse them for the day, and have them come back at 9:00 o'clock tomorrow morning for closing arguments.

MS. VAN VLIET:  For the record, Judge, I have two motions I would like to reserve on -- until the jury has been dismissed for the day -- if that is acceptable.

THE COURT:  Yes, of course.

MR. GERARDE:  Your Honor, prior to bringing the jury back in, the Government is requesting that you colloquy the defendant about his right to testify and that his decision not to testify is knowing and voluntary.

THE COURT:  I do not make that inquiry.  Once an attorney makes a representation that they have spoken to their client about that issue, I accept that representation as an Officer of the Court.

MS. VAN VLIET:  So the record is clear, Judge, I have had a series of conversations from literally the beginning; and I also brought in separate counsel to have that conversation with my client -- along with other matters I might add.

So he has knowingly, and with complete understanding, voluntarily waived his right to testify in his own defense; and he has been fully and thoroughly advised of that.

THE COURT:  Thank you, Ms. Van Vliet.

Let's bring them back in.

COURT SECURITY OFFICER:  All rise for the jury.

THE COURT:  Everyone may be seated.

Ms. Van Vliet, on behalf of Mr. Fahie.

MS. VAN VLIET:  The defense rests.

THE COURT:  Ladies and gentlemen, both the Government and the defense have announced they have rested; meaning you have heard all the evidence you are going to receive in this case.

We need to finalize the instructions that I will give you tomorrow before you begin your deliberations in the case, which will take close to an hour, and so I am going to dismiss you for the afternoon.

So, the case is almost concluded, but not yet, ladies and gentlemen.  And so it is imperative, critical and more important now than ever that you have no discussions with anyone at all about the case.

You could say this in your sleep by now, ladies and gentlemen, but you are not to have any discussions with anyone, either in person, online or any other way.

So, go home and avoid the horrible traffic that is starting because of the boat show.  Have a good meal, relax, don't even think about the case, and I will see you back here at 9:00 to conclude the case.

COURT SECURITY OFFICER:  All rise.

JURY EXCUSED

THE COURT:  All right. I will hear from you now, Ms. Van Vliet.

MS. VAN VLIET: Thank you, Your Honor.

THE COURT:  And I will hear your Rule 29 motion first.

MS. VAN VLIET:  And, Judge, I am focusing on Count I, which is the importation charge.  While, obviously I am going to be arguing tomorrow that the verdict should be not guilty, I cannot in good conscience look at you and say that they have not, you know, reached the bare minimum that they need to -- they being the Government -- to survive a Rule 29 on the money laundering and the travel counts.

THE COURT:  Okay.

MS. VAN VLIET:  I think that's actually going to, at the end of the day, be a question of the defendant's intent; and so I do not think that that's an appropriate one to argue to you right now.

However, based on the evidence that has been presented of the Government's undercover scenario by the undercover agent and the CI -- and I will refer you to one of the most succinct descriptions by the confidential informant since he tended to go on and on.

THE COURT:  Right.

MS. VAN VLIET:  If the Court refers to 7B as in Bravo, which is the transcript of the meeting on April 7th, which is the first time that Mr. Fahie was present with the CS -- and if you go to page 53 of the transcript -- it is the first time the confidential informant is discussing the test plan to bring in the 3,000 kilograms of something that will eventually be sold in -- in the terms of the test plan -- in Miami.

There is no place at all in any of these transcripts, Judge, where the confidential informant says anything but the materials that will be on the vessel -- that is to be placed in safe harbor or given safe passage in the BVI -- will test anything but negative.

Which we all know means testing negative for the presence of cocaine hydrochloride, a controlled substance, which is what this defendant is charged with conspiring to import.

What Roberto discusses and lays out pretty succinctly for once in this case -- this is at page 53 of the transcript -- to Mr. Fahie is, okay, thank you.

The first proposition that we have is that we need safe passage from your island.  We are going to come sometimes from Colombia, sometimes from Trinidad and Tobago, sometimes from the Dominican Republic.

So what we're bringing over there is not testing positive, "stand" or no?

Mr. Fahie says, no, explain it.

Roberto goes on, on the next page -- after he's been told he can explain it by Ms. Maynard -- it is cocaine.

Mr. Fahie says, um-hum.

And the next two paragraphs from Mr. Quintero are what make it clear that the processing and the extraction of whatever is in the "magic" construction materials is going to happen in Puerto Rico, which is a place in the United States.

And that is, it's not testing positive how we -- how we -- we don't call it like that, referring to cocaine -- which is what he just said -- we call it number two or number three, whatever, in his words.

I'm not too comfortable to say that...

Roberto, I just have to tell you upfront.

So it comes in kind of buckets.  You can test it, but it's not going to test positive.

Mr. Fahie; okay.

The process is a four day process.  After that, you get it out.  It's a four day process to get it out.

The cocaine, remember, there's no testimony about the "stuff" staying in the BVI longer than 48 or 72 hours when they get the clean window into Puerto Rico.

So what the CI is describing -- and I'm not saying this is a real thing -- but if they wanted to prove how you could really do this, they should have brought a DEA chemist in.

But the scenario these guys came up with is bring some construction material that's going to test negative for the presence of cocaine -- in other words, it doesn't have a detectable amount of cocaine -- that's in a foreign country and then it's going to be sent to Puerto Rico, the United States, where it will be extracted for a period of four days, and that's when you get it out, the cocaine, and then it's going to go to Miami.

The problem then with the importation charge -- as opposed to if they had charged possession with intent to distribute, Judge, is the way their scenario is constructed.

That is, it's going from a place inside of the United States -- which Puerto Rico is the United States -- when it's cocaine to Miami.  That's not importation.

So, Judge, they have charged importation of Cocaine Hydrochloride, a Schedule II controlled substance where -- and giving their scenario the best marks for creativity, the best they could have done is try to come up with some importation of

a precursor. For example, if they had tried to say it was cocoa plants -- which of course as we all know is the base of Cocaine Hydrochloride -- and so it is illegal to import cocoa plants into the United States; even to make tea.

But it has to be specifically charged that way -- which they did not -- which if they had then I might not be up here making this argument.

But this is not a case -- the facts of this case do not support importation of Cocaine Hydrochloride from outside the United States to a place inside the United States.

And the reason that I cited to the Chapman case earlier -- not only for the detectable amount in the jury instructions -- is because the language "mixture and substance containing a detectable amount of cocaine" is in the statute for a reason.

There has to be some -- however scant -- portion of cocaine.  Having been in cases down here since, you know, the beginning of the "drug war" that's either field tested or, you know, subjected to testing in a DEA lab.

THE COURT:  Well, I'm not sure that -- and I made a note of this earlier -- so let me ask you about it now.

He starts out by telling them he is from the Sinaloa cartel -- it's cocaine -- then he goes on to explain how it is packaged, that it is not going to be detectable.

So, he not saying that it's not cocaine, he is just saying that it is just not detectable.

Do I have that right or...

MS. VAN VLIET:  No, Your Honor.  Because if you read what he says on pages 53 and 54 -- in the order in which he says it -- he is saying that there is a four day process to get it out.  Meaning the cocaine -- or making the cocaine out of this liquid "stuff".

Is he representing it is a precursor?  Yes, I guess.  But a precursor is not Cocaine Hydrochloride. Just like, you know, Pseudoephedrine is not Methamphetamine.

It is "controlled" in certain circumstances because it's a precursor to Methamphetamine, but that is not what they charged.

More importantly, Judge, if the cocaine that Roberto is referring to on pages 53 and 54 of the transcript takes a four day process to get it out, then the only place that could have happened was in Puerto Rico -- that is based upon what Roberto represented his plan to be -- and so as a matter of law Count I has failed as it is charged.

THE COURT:  Thank you, Ms. Van Vliet.

Let me hear from the Government.

MR. GERARDE:  First, Your Honor, I think what is important here with Count I is that -- it is charged as a conspiracy.

And the conspiracy is more than just a boat coming from Columbia and then passing through the British Virgin Islands and then going to Puerto Rico.

The whole part of the conspiracy that continues after that is what is important.  And that is where Roberto in no certain terms tells the defendant that there is going to be a kilo there -- or sometimes going up to New York -- and sold for, you know, 32, 38,000 there.

And then those drug proceeds are going to come back to Mr. Fahie because of his participation in this entire conspiracy; which is getting the product from South America through the British Virgin Islands and then to the United States where it is sold as cocaine.

THE COURT:  What do you say to Ms. Van Vliet's argument that the conspiracy to import -- conspiracy to possess might have passed muster because of the argument that it's ultimately cocaine but according to this very loquacious CI it was not cocaine until it got to the United States; so that the importation from a place outside thereof is not part of the conspiracy?

MR. GERARDE:  Your Honor, Puerto Rico and the mainland of the -- in the United States -- they are very far apart.  And in order to transport anything via boat from Puerto Rico to the mainland United States you have to travel in international waters.

And the way that we charged -- the way that the statute reads is; importation from a place outside the United States. It doesn't say a country or a territory.

So it's in international waters, which is a place outside of the United States, to a place within the United States.

But again, circling back to where I started, Mr. Fahie was aware of the entire conspiracy which did involve importing cocaine into the United States.

And so for that reason the motion should be denied.

THE COURT:  First, this is an issue created by the Government's CI -- presumably with the imprimatur of the handlers and the undercover.

MS. VAN VLIET: One assumes.

THE COURT:  But it is something that he was agreeing to where -- in the light most favorable to the Government -- where he conspired to imported to the United States a substance that would eventually turn out to be cocaine.

And so I think the record is such that it precludes me from granting a Rule 29; and so I am going to deny the Rule 29 at this time.

MS. VAN VLIET:  And for the record, Your Honor, my Rule 29 motion would be, you know, at the close of the Government's evidence and just -- I just renewed it -- so that the record is perfectly clear.

THE COURT:  Yes, yes; of course.

MS. VAN VLIET:  Thank you, Your Honor.

THE COURT:  And we will take up your other motion at this time.

I am going to seal the courtroom at this time and ask anyone other than the lawyers to step out until we conclude this particular part of the proceedings.

(COURTROOM SEALED FOR THE RECORD)

THE COURT:  All right. Ms. Van Vliet, I will hear from you now.

MS. VAN VLIET: Thank you, Your Honor.  At this time on behalf of Mr. Fahie I would renew our previously filed motion to dismiss, docket entry 137, filed under seal.

The Court no doubt will recall that the basis for our motion was the defendant's contention that the agents had been less than truthful over the years in terms of their leaving out a prior judicial finding.

Not that the finding was correct or that the finding was not correct; but that they never addressed it over the period -- or course of the years.

The Court denied our motion, I believe, in early January.  Thereafter -- and right before trial -- there were certain facts that came to light in terms of representations that had been made to Your Honor ex parte.

During the last sealed hearing that we had in this courtroom, everybody agreed that we would talk about things generally without, you know, specifically identifying the CI's name.

And then you gave kind of a recitation of what the Government's ex parte presentation had been; at least as to these certain aspects of knowledge on the part of the case agent.

And you announced, as I recall, that among the things that you had been informed of by the Government was that the agent didn't learn that there had been these findings until recently in connection with this case.

And that became important because Agent Witek had testified to the contrary on May fourth, 2022 in the detention hearing that he had never been made aware of any questioning of any information sourced to the CI.

At that point in time, I advised Your Honor that these agents had, in fact, been the case agents in the case of the United States versus Lampeck -- and there were others I am quite sure -- but specifically that one.

And so in the context of the sentencing hearing -- in that case the defense attorney had filed publically a document which was either a response to a sentencing memorandum by the United States or his own sentencing memorandum -- I cannot remember which -- but it was a sentencing document.

I provided that document to the Court; as well as to the Government.  In that case, the defense attorney in the Lampeck case outs the CI's name and says that he is somewhat notorious and has been found to have a lack of credibility in a foreign judicial proceeding.

That became important in the context of what had been represented to Your Honor because that transpired in November of 2018.

The transcript of the sentencing before Judge Huck then makes it very clear that Agent Aschleman is in the room during that; and it makes it clear that -- from the context of things -- about the prior allegation.

And more importantly, Judge, we were advised after the fact that Agent Aschleman had notes of a meeting that had been attended by himself, Agent Witek and the confidential informant, in or about November 2018 where the discussion was had about what was going on about this allegation of -- that a Foreign Judge had found that he lacked credibility.

So when Agent Witek took the stand in this case, you thereafter said at a minimum you were going to permit me to inquire into the agent's comments at the pretrial detention hearing in this case in May of 2022.

So when I did the cross-examination of Agent Witek, I asked the question -- no huge surprise to anybody -- where I asked him the question about the pretrial detention hearing.

Frankly, expecting him to say what he eventually said, and that is, you know, I forgot, I didn't understand the question -- or whatever -- but what I did not expect is what we were treated to in this courtroom, which were just bald face lies from the witness stand to this jury.

THE COURT:  Right.

MS. VAN VLIET:  To the extent that that Federal agent got up there, took an oath and then did what he did in front of the jury in this case -- and I have a rough transcript of his testimony -- at what point does it become misconduct?

How many times can you get up in front of a Court and a jury and just lie?

I would note for purposes of the record -- although I did not say it at the time -- Special Agent Aschleman was in the courtroom during that testimony.  That was the only time that he came to these proceedings was when Agent Witek was up on the stand.

And I will note again for the record, Your Honor, that I have absolutely no quarrel against these two lawyers or believe that they have anything at all to do with this.

Frankly, I think these two lawyers have been exemplary in terms of their professionalism throughout this case.  And I think that they've done all they possibly can to reign in these two "cowboys" I guess is a nice way of saying it.

To the extent that A.U.S.A Gerarde had to come up and impeach his own witness with his lies on his redirect.

I know that the Supreme Court and other Courts have counseled what should happen is that the conduct of agents within a case, or Government personnel, should be handled through OPR and the administrative process.

And that there may at some point be a case to be made for outrageous Government conduct -- where it is grounds for dismissal.

If perjury in front of a jury and a Federal District Court Judge in the very case that -- it is the case that is the substance of the matter we are dealing with -- if that is not enough then I don't know what is.

I mean, do they have to tamper with the jury or bribe some of the members of a jury?  I certainly hope not.

When is enough, enough?  I think we're there, Judge, or at least I hope we are; because what happened here should not have happened.

And so based upon the repeated misconduct of, at least this one agent, we would renew our motion to dismiss.

Thank you, Judge.

THE COURT:  Thank you, Ms. Van Vliet.

All right. Mr. Gerarde, I am going to ask you to answer the question posed, which is how many times do agents get to thumb their nose at the Judicial System?

And I am not being glib; I am honestly asking.

MR. GERARDE:  Judge, first, I don't think anyone should be able to thumb their nose at the Judicial System.

THE COURT:  Well, then why did Agent Witek continue with this behavior -- including his testimony here at trial -- where he was, again, less than forthcoming?

MR. GERARDE:  Judge, I sat here at counsel's table thinking the exact same thing as Ms. Van Vliet.  I'm not sure why -- I don't know why he was answering the way that he did. I'm trying to look through the transcript right now to look at the exact question posed to see if he thought he was being asked something slightly different.

THE COURT:  I don't know what the answer is either quite frankly.

I will reiterate what I've said before as to the motion to dismiss with regard to the failure to include information on the affidavit; I could find no case law that required the Government to list within an affidavit every issue there may have been with their CI or cooperating witness.

Ultimately, while I don't think Agent Witek comported himself the way one expects a Federal law enforcement agent should in front of a jury, after I intervened on pages 20 and 21 he ultimately acknowledged that he knew of the general information about the CI's credibility.

But, again, that was only after I intervened because I was concerned about his demeanor and his conduct in front of this jury.  But in any event, he finally acknowledged it.

And as you noted, yourself, Mr. Gerarde got up and impeached or corrected his own witness.

So, Ms. Van Vliet, I do not believe that there is a sufficient basis for which to grant you renewed motion.

I have been assured by these prosecutors that the Department is reviewing this matter and that it will be addressed in whatever way, I guess, is deemed appropriate.

Again, I do not believe it rises to the level of -- or where the Court would dismiss the indictment.  I don't believe the case law would support that.

Officer Sanders, if you would open the courtroom for the public.

THE COURT SECURITY OFFICER:  Yes, Your Honor.

THE COURT:  All right.  Let's continue with our charge conference.  I think we left off on page 22.

MR. GERARDE:  That is correct.

THE COURT:  I believe we had addressed SUA number one. I corrected a Government typo in the second line.

MS. VAN VLIET:  Yes.

THE COURT:  In the subsequent instructions, I am not going to repeat again the language of the statute.

MS. VAN VLIET:  That's fine with us, Judge.

          MR. GERARDE:  That's fine with the Government.

          THE COURT:  All right.  We have taken care of SUA one.
We're now on SUA two; is that right?

          MS. VAN VLIET:  I think we're on object two.

          THE COURT:  Object two, we had redefined the last
sentence.  It could be money represented to be the proceeds of
unlawful activity provided by a Government agent in the course
of an undercover operation.

          On page 21 we took out the last full paragraph with the
intent to promote carrying on of specified unlawful activity.

           The next page we were on SUA one, we put in sub A and
now we're on SUA two about the law.

          So any objection as to SUA two?

          MS. VAN VLIET:  Other than the fact that it is the
incomplete law -- and we have given a complete statement of the
law in our proposed instructions that you had yesterday. While
it may not be succinct, the law is what it is.

          THE COURT:  What is your docket entry number, Ms. Van
Vliet?

          MS. VAN VLIET:  The one I'm referring to, Judge, is the
one that I combined and sent over the other day; so it was not
docketed.

          THE COURT:   I know I had it at one point.

          MS. VAN VLIET:  I can e-mail it again to Chambers if
you would like.

THE COURT:  Wait, I have it here.

All right. So the one thing I noticed is that the three elements that you list, Mr. Gerarde, and the three elements that -- I'm confused -- because specified unlawful activity two, as the Government has described it, is a violation of Section 79 of the BVI Criminal Code.

MR. GERARDE:  Your Honor.

THE COURT:  Yes.

MR. GERARDE:  Section 79 is a definition; Section 80, subsection one, subsection B is the offense.

THE COURT:  Oh, okay.

MR. GERARDE:  That's just three lines down in that paragraph.

THE COURT:  And Ms. Van Vliet references Section 375.

MR. GERARDE:  Your Honor, I think the disconnect there is that the defense's instructions -- SUA two deals with foreign drug laws, which the Government is not pursuing.

THE COURT:  Okay.

MS. VAN VLIET:  I just found that out.

THE COURT:  So, Ms. Van Vliet, what is your position then?

MS. VAN VLIET:  They are no longer relying on the offense -- at least as I understand it now -- of violation of the drug laws of the British Virgin Islands; is that right?

MR. GERARDE:  That's correct, Your Honor.

THE COURT:  Okay.

MR. GERARDE:  And so we did not include that as one of the SUAs in our proposed jury instructions.

THE COURT:  So SUA number two that the Government references on page 22, what is the corollary reference in your jury instructions, Ms. Van Vliet?

MS. VAN VLIET:  It would be specified unlawful activity number four.

THE COURT:  Okay.

MS. VAN VLIET:  Which is on page 39; bribery punishable under the laws of the BVI.

THE COURT:  And so it looks like the Government's now SUA three is the UK --

MS. VAN VLIET:  Yes.

THE COURT:  And that's your SUA three as well?

MS. VAN VLIET:  Yes, ma'am.

THE COURT:  So page 38 of yours.

MS. VAN VLIET:  I believe so -- my eyes are pretty bad -- it is unlawful activity number three, bribery punishable under the laws of the United Kingdom.

MR. GERARDE:  Judge, it is 28.

MS. VAN VLIET:  Thank you, Mr. Gerarde.

THE COURT:  All right.  So, the only thing that the Government is missing is the definitions.

MS. VAN VLIET:  Correct.

THE COURT:  Do you see that, Mr. Gerarde, in Ms. Van Vliet's?

MR. GERARDE:  Yes, Judge.  What we tried to do is incorporate those definitions in the description of the second element.

THE COURT:  Oh, yes, I see it.

So let's now go to attempted money laundering.  That's page 24 of the Government's and Ms. Van Vliet's page 31.

Do you want me to edit or not, Ms. Van Vliet, the Government's attempted money laundering instruction?

MR. GERARDE:  Well, Judge, I think the difference is the promotional --

MS. VAN VLIET:  Right.

MR. GERARDE:  The promotional money laundering charged in instruction 15.

THE COURT:  Right.

MR. GERARDE:  And we did not modify that definition in Count II dealing with promotional money laundering; we only modified it as to the concealment money laundering.

THE COURT:  So do you want that addressed in any way?

MS. VAN VLIET:  No, Your Honor, because this -- they have only alleged an attempt to commit promotional money laundering.  This standard of -- in promotional money laundering -- it can be any money in the world; it doesn't have to be the proceeds of...

THE COURT:  Right; I understand.  I didn't know if there was any language that the parties had thought of to make the distinction of the two clear; but I'm not going to press that.

So page 24, 25, 26, 27 all goes to attempted money laundering.  Any objection or edits.

MS. VAN VLIET:  Judge, we do object to the language on page 25 of the Government's -- where the elements are being set forth -- and the Government has added in the word strongly corroborated in their subsection two description.

MR. GERARDE:  Judge, our intent was to track the pattern -- I'm pulling it up now.

THE COURT:  Well, it was your intent to track, but it doesn't track, right?

MR. GERARDE:  Judge, I'm looking at S11, and I think it does track what's in the 11th Circuit pattern.

THE COURT:  I must admit, I'm at a disadvantage because I have the old hard copy.

MS. VAN VLIET:  My apologies -- I was looking at the old hard copy too.

THE COURT:  All right. So we have resolved that Mr. Gerarde is reading the appropriate language.

MS. VAN VLIET: Yes, Your Honor.

THE COURT:  What about page 26, Ms. Van Vliet?

MS. VAN VLIET:  I think we just carry over any changes we've made to the other specified unlawful activities.

THE COURT:  Very good.  Page 28 Interstate and Foreign travel; was it modified, Mr. Gerarde, do you remember?

MR. GERARDE:  Your Honor, we modified this to the extent that on page 29 we broke out the two unlawful activities.

THE COURT:  Oh, yes, okay.

All right. Ms. Van Vliet, do you have any objections or any modifications you believe need to made?

MS. VAN VLIET:  Judge, if you look at the unlawful activity number one -- it's defined for us -- but there is a slight problem with that since obviously they have not charged possession with intent to distribute or a conspiracy to do that.

THE COURT:  Okay.

MS. VAN VLIET: But they include it in the definition of the -- by section number -- of the kind of unlawful activity that Interstate travel in aid of racketeering could be supported by.

I do not dispute that possession with intent to distribute and conspiracy to possess with intent to distribute in violation of Title 21 United States Code Section 841 or 846, respectively, could form the basis for such an Interstate travel charge; but they didn't charge...

THE COURT:  Can't we just say that includes any business enterprise involving narcotics or controlled substances in violation of Title 21 United States Code Section 963 as charged in Count I?

MS. VAN VLIET:  That would be our recommendation.

MR. GERARDE:  Judge, that's fine; we can just reference 963.

MS. VAN VLIET:  We don't have any issues with the rest of the "travel" instruction.

THE COURT:  All right. That should take care of the instructions if I am not mistaken.

MS. VAN VLIET:  I believe so, Judge.

THE COURT:  Let's go to the verdict form.

Any edits or objections on behalf of the defendant?

MS. VAN VLIET:  I do have some proposed edits, Judge; and it's just more for ease of reading.

THE COURT:  Okay.

MS. VAN VLIET:  If you look at subparagraph 1A of the first page.

THE COURT:  Yes.

MS. VAN VLIET:  Subparagraph 1A; if you find the defendant not guilty as charged in Count 1 please skip to paragraph....

Now it just has two with a period, but where they want the person to go is "paren" two with a period.

So I would actually just add to each the parens so it is precise.

THE COURT:  Maybe we should just take the parens off of one and two and three -- because I think the parens go to the subsections -- and so that would make it easier to follow.

MS. VAN VLIET:  That's fine.

MR. GERARDE:  Government agrees.

THE COURT:  All right. Anything else?

MR. GERARDE:  This is as to the SUA -- where it reads we the jury -- the last line should read; place an X in each appropriate box because it is possible to find that more than one SUA was violated.  So instead of the appropriate box it should read each appropriate box.

THE COURT:  Okay.

MR. GERARDE:  That was a mistake we made just in this one instance -- because in the other counts -- Count II, for example, it reads place an X in each...

THE COURT:  Got it.

MS. VAN VLIET:  We're fine with that, Judge.

THE COURT:  All right. Any other edits or objections by either the defense or the Government?

MS. VAN VLIET:  Other than those that have been previously stated, no.

THE COURT:  All right.  I think that takes care of it. Is there anything we have not addressed?

MS. VAN VLIET: I apologize, Judge, there is the theory of defense instruction...

THE COURT: Oh, yes. Is everyone in agreement that that theory of defense will be included?

MR. GERARDE: Yes, Your Honor.

THE COURT: Is there any particular place you want me to put it?

MS. VAN VLIET: I would think right after the offense instructions.

THE COURT: And so right after the offense, but before the --

MS. VAN VLIET: Before the bookend; the last one.

MR. GERARDE: That's fine with the Government, Judge.

THE COURT: All right. Before you leave, I would ask that you meet with Mr. Santorufo to go through and make sure you have all agreed on the exhibits that were admitted.

And also if you would; make certain that the laptop you will be sending back to the jury is a clean laptop with whatever password or encryption they need to access it.

And make sure that Ms. Van Vliet or Ms. Delgado have had an opportunity to take a look at it as well.

MR. GERARDE: Yes, Your Honor; we will do so.

All right. I will see you all back here at 9:00.

COURT IN RECESS

- - -

**C E R T I F I C A T E**

  I hereby certify that the foregoing is an accurate

transcription of proceedings in the above-entitled matter.


       /S/PATRICIA SANDERS

_____     _____

DATE FILED     PATRICIA SANDERS, RPR

## $

**$10,000** [1] - 58:4
**$100** [1] - 75:18
**$100,000** [4] - 47:14, 48:6, 48:10, 76:2
**$133,000** [4] - 23:8, 46:16, 46:21, 47:5
**$20,000** [3] - 18:9, 18:11, 18:15
**$200,000** [4] - 29:8, 41:12, 47:8, 75:14
**$300** [1] - 59:12
**$500** [1] - 59:7
**$500,000** [8] - 29:8, 41:11, 59:5, 59:15, 75:13, 87:18, 87:23, 88:7
**$53,000** [1] - 59:7
**$700,000** [2] - 45:12, 76:11
**$78** [1] - 75:1
**$83,000** [5] - 23:2, 23:5, 23:6, 23:7

## /

**/S/PATRICIA** [1] - 117:6

## 1

**1** [7] - 2:18, 56:22, 56:24, 70:3, 71:7, 71:13, 114:22
**1-284-541-0993** [1] - 20:6
**10** [8] - 21:2, 21:4, 21:10, 21:20, 21:21, 21:22, 73:3, 86:21
**101** [1] - 23:16
**102** [1] - 24:3
**10:00** [2] - 39:19, 82:20
**10:02** [1] - 39:21
**10:30** [1] - 19:2
**11** [10] - 2:4, 2:10, 2:12, 19:17, 20:5, 20:20, 21:3, 21:10, 27:22, 49:8
**11-3** [1] - 1:18
**11th** [1] - 112:16
**12** [6] - 2:8, 2:13, 18:2, 21:17, 22:10, 23:19
**12:09** [1] - 19:8
**12:30** [1] - 19:10
**12:45** [1] - 26:21
**12B** [1] - 90:1
**13** [3] - 24:9, 24:14, 52:20

**133** [2] - 24:1, 24:5
**137** [1] - 101:13
**14** [1] - 90:1
**15** [10] - 8:22, 8:24, 21:3, 21:10, 39:17, 50:22, 86:21, 87:2, 87:3, 111:15
**15C-1** [5] - 19:16, 20:20, 21:17, 39:16, 40:6
**15C-2** [2] - 21:7, 28:15
**15C-6** [1] - 19:4
**15C1** [1] - 87:2
**16** [5] - 9:19, 17:6, 19:5, 50:22, 90:2
**17** [4] - 10:1, 10:8, 10:13, 89:20
**18** [4] - 10:16, 10:18, 20:3, 89:17
**186** [1] - 8:15
**187** [1] - 15:8
**18C-2** [2] - 24:10, 26:3
**19** [5] - 10:22, 25:17, 26:5, 26:20, 27:3
**191** [1] - 15:18
**1A** [2] - 114:18, 114:21

## 2

**2** [9] - 2:4, 2:10, 2:11, 7:18, 40:17, 49:6, 70:4, 70:5, 70:7
**2-7-2024** [1] - 1:9
**2.2** [1] - 54:24
**20** [4] - 10:25, 56:22, 56:24, 106:22
**2018** [2] - 103:8, 103:16
**2022** [13] - 15:3, 23:19, 24:14, 25:17, 26:5, 26:20, 27:3, 28:18, 68:15, 68:17, 72:7, 102:14, 103:22
**209** [2] - 16:6, 16:15
**20C-4** [1] - 23:16
**20th** [3] - 50:8, 56:5, 72:23
**21** [8] - 3:2, 11:3, 13:1, 16:15, 106:23, 108:9, 113:23, 114:3
**212** [1] - 17:6
**22** [3] - 13:13, 107:18, 110:5
**22-CR-2019-KMW** [1] - 1:3
**22nd** [9] - 28:17, 56:18, 57:14, 58:22, 59:5, 61:9, 72:17, 72:20, 87:16
**236** [1] - 17:24

**24** [2] - 111:8, 112:5
**24th** [2] - 29:18
**25** [2] - 112:5, 112:8
**26** [3] - 31:22, 112:5, 112:24
**27** [1] - 112:5
**27th** [21] - 29:4, 30:5, 31:3, 31:20, 32:7, 33:4, 33:13, 34:4, 34:8, 35:6, 39:18, 42:5, 42:9, 42:11, 43:3, 43:18, 78:2, 78:14, 80:14, 82:19, 85:5
**28** [4] - 6:10, 42:5, 110:21, 113:3
**28th** [9] - 39:12, 40:11, 45:13, 76:12, 76:15, 77:22, 83:11, 83:13, 85:10
**29** [6] - 93:13, 93:19, 100:20, 100:21, 100:23, 113:6
**2B** [2] - 49:6, 52:21
**2nd** [1] - 28:1

## 3

**3,000** [2] - 45:6, 94:12
**30** [1] - 76:24
**3000** [1] - 5:14
**305.523.5528** [1] - 1:19
**31** [2] - 50:21, 111:8
**31st** [6] - 43:16, 62:9, 62:13, 63:4, 65:19, 66:2
**32** [1] - 99:8
**33** [3] - 6:10, 52:20, 54:17
**33128** [1] - 1:18
**34** [1] - 53:6
**35** [3] - 16:6, 21:7, 66:8
**375** [1] - 109:14
**38** [1] - 110:17
**38,000** [1] - 99:8
**39** [1] - 110:10

## 4

**4/28/2022** [1] - 87:8
**4/7** [1] - 19:23
**4/8** [1] - 21:18
**4/8/22** [2] - 20:24, 21:1
**40** [1] - 76:24
**400** [1] - 1:18
**47** [1] - 90:1
**48** [2] - 74:8, 96:2
**49** [1] - 24:11

## 5

**500** [2] - 18:3, 18:6
**5213384212563** [1] - 23:23
**53** [5] - 73:2, 94:10, 94:23, 98:5, 98:16
**54** [3] - 24:10, 98:5, 98:16
**5410993** [1] - 39:22
**5429325** [1] - 39:22
**55** [1] - 26:3
**58** [1] - 28:15
**59** [1] - 16:15
**5B** [3] - 62:22, 63:1, 66:8

## 6

**60** [1] - 46:4
**6:12** [1] - 19:23
**6:47** [1] - 21:1
**6B** [1] - 89:16

## 7

**7** [7] - 16:14, 21:20, 21:21, 21:22, 23:4, 87:12
**70** [1] - 72:5
**700,000** [3] - 75:16, 76:4, 76:16
**72** [2] - 74:8, 96:2
**79** [2] - 109:6, 109:9
**7:00** [1] - 79:16
**7A** [1] - 15:5
**7B** [4] - 15:8, 17:24, 72:1, 94:7
**7th** [15] - 14:14, 19:25, 20:17, 22:23, 25:8, 25:16, 29:14, 68:15, 68:17, 70:21, 71:19, 72:6, 73:1, 76:20, 94:8

## 8

**8** [3] - 21:11, 22:3, 22:15
**80** [1] - 109:9
**83** [2] - 24:5, 46:15
**841** [1] - 113:23
**846** [1] - 113:23
**8:21** [1] - 21:18
**8:32** [1] - 21:24
**8:36** [1] - 22:3
**8:38** [1] - 22:13
**8:45** [1] - 24:22
**8th** [1] - 19:8

## 9

**963** [2] - 114:4, 114:7
**9:00** [3] - 91:13, 93:7, 116:23
**9:40** [1] - 20:16
**9:44** [1] - 20:4
**9A** [1] - 27:1
**9B** [2] - 26:24, 27:22

## A

**a.m** [2] - 19:18, 19:10
**A.U.S.A** [3] - 1:13, 1:13, 105:1
**abetting** [1] - 6:10
**able** [2] - 31:13, 106:3
**abnormal** [1] - 55:17
**above-entitled** [1] - 117:4
**abroad** [2] - 25:22, 26:11
**absolutely** [1] - 104:19
**accept** [2] - 32:23, 91:24
**acceptable** [1] - 91:16
**access** [1] - 116:19
**accompany** [3] - 35:14, 37:14, 76:15
**accompanying** [1] - 75:10
**according** [6] - 3:11, 25:15, 28:23, 29:2, 40:20, 99:17
**accounted** [1] - 57:2
**accurate** [3] - 7:3, 8:9, 117:3
**acknowledged** [2] - 106:23, 107:3
**activities** [2] - 113:2, 113:7
**activity** [17] - 7:11, 7:20, 7:24, 8:2, 8:6, 11:18, 12:14, 12:16, 12:21, 13:16, 108:7, 108:10, 109:4, 110:7, 110:19, 113:12, 113:18
**add** [3] - 12:9, 92:4, 115:1
**added** [2] - 5:22, 112:9
**adding** [1] - 85:16
**addition** [2] - 14:18, 58:8
**additional** [2] - 23:15, 28:5
**addressed** [5] - 101:19, 107:10,

107:20, 111:20, 115:25
**adjourns** [1] - 79:11
**adjustment** [1] - 28:4
**adjustments** [1] - 27:24
**administration** [1] - 75:24
**administrative** [1] - 105:6
**admit** [1] - 112:17
**admitted** [2] - 19:4, 116:16
**advised** [4] - 14:3, 92:7, 102:17, 103:13
**affairs** [1] - 65:3
**affidavit** [2] - 106:17, 106:18
**affixed** [1] - 4:5
**afternoon** [3] - 24:20, 40:18, 92:21
**Agent** [10] - 102:13, 103:10, 103:14, 103:15, 103:19, 103:23, 104:14, 104:16, 106:4, 106:20
**agent** [15] - 11:24, 12:8, 12:14, 12:22, 55:14, 55:16, 55:22, 56:3, 94:2, 102:8, 102:10, 104:7, 105:20, 106:21, 108:7
**agent's** [1] - 103:21
**agents** [5] - 101:15, 102:18, 105:4, 105:24
**agree** [3] - 5:25, 11:10, 12:3
**agreed** [7] - 2:14, 13:12, 40:14, 50:7, 55:7, 102:2, 116:16
**agreeing** [1] - 100:15
**agreement** [5] - 6:19, 17:9, 58:18, 68:12, 116:3
**agrees** [1] - 115:7
**ahead** [2] - 16:5, 25:12
**aid** [1] - 113:19
**aiding** [1] - 6:9
**airplane** [3] - 83:15, 83:17, 85:9
**airport** [2] - 41:1, 83:14
**akin** [1] - 5:16
**allegation** [2] - 103:12, 103:17
**allegations** [1] - 65:3
**alleged** [1] - 111:22

**allowed** [1] - 62:11
**allows** [1] - 4:23
**almost** [1] - 92:22
**Alright** [1] - 14:23
**ALTURO** [1] - 1:6
**America** [1] - 99:11
**AMERICA** [1] - 1:4
**amount** [15] - 2:20, 3:5, 3:25, 4:8, 9:3, 23:2, 23:12, 37:24, 58:7, 59:8, 59:9, 88:6, 96:11, 97:12, 97:14
**analogous** [1] - 4:1
**AND** [2] - 62:17, 84:4
**Andrew** [2] - 27:9, 87:10
**ANDREW** [1] - 1:6
**announced** [2] - 90:17, 92:15, 102:9
**answer** [2] - 105:23, 106:13
**answered** [2] - 21:13, 22:21
**answering** [3] - 44:21, 44:22, 106:9
**answers** [1] - 51:1
**anyplace** [1] - 48:13
**anyway** [1] - 66:18
**apart** [1] - 99:22
**apologies** [4] - 2:11, 2:23, 44:24, 112:19
**apologize** [2] - 27:23, 116:1
**appear** [1] - 89:12
**aPPEARANCES** [1] - 1:12
**appeared** [1] - 58:10
**appointment** [1] - 55:14
**approach** [2] - 56:6, 70:1
**appropriate** [8] - 9:11, 88:15, 93:24, 107:10, 112:22, 115:11, 115:12, 115:13
**April** [52] - 14:14, 19:8, 19:25, 20:17, 21:10, 22:3, 22:15, 22:23, 23:4, 23:19, 24:9, 24:14, 25:8, 25:17, 26:5, 26:20, 27:3, 28:17, 29:4, 29:14, 34:4, 34:8, 35:6, 39:12, 39:18, 40:11, 42:5, 42:9, 42:11, 42:18, 43:3, 43:18, 44:11, 45:13, 68:14, 68:17, 70:21,

72:6, 72:20, 73:1, 76:12, 76:15, 76:20, 77:22, 80:14, 83:11, 83:13, 85:5, 85:10, 94:8
**Arab** [1] - 49:21
**Arabs** [1] - 50:1
**area** [4] - 17:19, 69:5, 80:18, 86:16
**argue** [1] - 93:24
**arguing** [1] - 93:16
**argument** [4] - 9:11, 97:7, 99:14, 99:16
**arguments** [1] - 91:13
**arrange** [1] - 68:5
**arranged** [1] - 36:17
**arrangements** [2] - 24:6, 43:12
**arranging** [1] - 28:10
**arrest** [2] - 41:18, 84:21
**arrested** [10] - 41:16, 41:17, 64:16, 84:23, 85:4, 85:9, 86:6, 86:8, 86:9, 86:11
**arrive** [2] - 9:14, 78:2
**arrived** [2] - 69:3, 83:13
**Aschleman** [3] - 103:10, 103:14, 104:14
**aside** [1] - 69:1
**aspects** [1] - 102:7
**Assembly** [2] - 14:20, 14:22
**assist** [4] - 25:23, 26:16, 55:8, 88:2
**associated** [2] - 20:7, 21:8
**assumes** [1] - 100:14
**assure** [2] - 51:3, 51:22
**assured** [2] - 65:7, 107:8
**assures** [1] - 51:22
**assuring** [1] - 53:9
**athletes** [5] - 26:8, 26:10, 26:13, 26:17, 28:10
**attempt** [1] - 111:22
**attempted** [3] - 111:7, 111:10, 112:5
**attend** [3] - 30:15, 31:10, 43:4
**attended** [3] - 46:3, 78:5, 103:15
**attending** [1] - 78:4
**attention** [1] - 73:3
**attorney** [3] - 91:23, 102:22, 103:2

**AUDIOTAPE** [7] - 15:7, 15:17, 16:7, 16:16, 27:13, 27:21, 28:8
**authorities** [4] - 45:20, 85:14, 85:19, 85:20
**Authority** [1] - 55:8
**available** [3] - 28:11, 29:1, 29:6
**Avenue** [1] - 1:18
**avoid** [1] - 93:4
**aware** [4] - 69:23, 86:7, 100:8, 102:15
**away..** [1] - 84:3
**awful** [1] - 43:7

## B

**bad** [1] - 110:19
**bald** [1] - 104:4
**bare** [1] - 93:18
**base** [1] - 97:2
**based** [5] - 42:1, 65:10, 94:1, 98:18, 105:19
**Based** [1] - 89:24
**basis** [2] - 101:14, 107:7, 113:24
**became** [4] - 48:1, 48:3, 102:13, 103:6
**become** [1] - 104:10
**becoming** [1] - 56:3
**began** [1] - 81:24
**begin** [4] - 2:2, 27:11, 44:21, 92:19
**beginning** [8] - 44:4, 44:13, 44:15, 52:4, 75:23, 89:19, 92:2, 97:18
**behalf** [6] - 31:8, 47:12, 91:3, 92:12, 101:12, 114:14
**behavior** [1] - 56:3
**belated** [1] - 48:6
**belonged** [3] - 37:13, 59:16, 77:23
**below** [2] - 13:7, 59:14
**benefit** [1] - 12:10
**best** [3] - 71:15, 96:24
**better** [6] - 7:14, 15:12, 15:13, 42:8, 61:10
**between** [11] - 5:2, 16:23, 19:5, 23:17, 31:5, 37:19, 56:1, 59:5, 60:16, 68:13, 85:5
**big** [4] - 66:14, 83:17, 89:7
**bigger** [1] - 19:19

**bill** [3] - 47:8, 47:9, 75:18
**bills** [6] - 23:6, 48:7, 59:15, 59:22, 75:19, 88:3
**binder** [5] - 15:5, 15:8, 15:19, 26:24, 62:22
**bit** [4] - 34:21, 48:9, 68:4, 76:14
**black** [1] - 70:18
**blocked** [2] - 70:12, 70:15
**blockout** [1] - 71:5
**blot** [1] - 5:17
**blots** [1] - 4:5
**blue** [3] - 70:8, 71:8
**boat** [4] - 51:17, 93:5, 99:1, 99:23
**boats** [1] - 55:9
**bond** [1] - 17:9
**book** [2] - 49:4, 72:2
**bookend** [1] - 116:12
**bottom** [2] - 20:2, 74:23
**box** [4] - 83:14, 115:11, 115:12, 115:13
**boxes** [2] - 83:23, 84:13
**bracket** [1] - 13:6
**brackets** [2] - 24:5, 24:6
**bravo** [1] - 52:21
**Bravo** [5] - 62:22, 63:2, 66:8, 72:1, 94:7
**break** [1] - 56:21
**breakfast** [2] - 40:16, 40:22
**bribe** [1] - 105:14
**bribery** [2] - 110:10, 110:19
**brief** [1] - 60:24
**BRIEF** [1] - 8:20
**briefcase** [2] - 41:4
**briefly** [2] - 82:16, 90:22
**bring** [14] - 14:6, 14:14, 25:6, 57:3, 57:21, 73:9, 87:16, 92:9, 94:11, 96:8
**bringing** [1] - 57:17, 91:18, 95:5
**British** [25] - 14:18, 16:4, 17:3, 20:12, 25:19, 25:24, 26:16, 32:20, 32:22, 33:20, 34:2, 35:2, 35:15, 42:21, 50:11, 50:15, 51:9, 55:10, 64:20,

65:11, 77:5, 89:9, 99:2, 99:12, 109:24
**broke** [2] - 57:8, 113:6
**brought** [8] - 5:14, 34:23, 42:23, 57:22, 61:21, 87:17, 92:3, 96:6
**bucket** [2] - 73:22, 74:1
**buckets** [2] - 74:2, 95:21
**building** [3] - 15:25, 20:13, 56:12
**Building** [2] - 16:1, 16:2
**bulk** [1] - 69:16
**business** [30] - 14:21, 16:22, 16:24, 17:1, 30:15, 32:15, 32:19, 32:21, 32:22, 33:1, 33:2, 34:2, 34:23, 41:13, 49:16, 49:17, 52:23, 53:22, 55:18, 57:17, 60:10, 60:11, 60:14, 61:16, 61:20, 64:8, 78:12, 79:18, 114:2
**businesses** [8] - 17:2, 32:24, 33:5, 33:21, 34:24, 79:1, 79:3, 79:8
**busy** [1] - 49:20
**BVI** [15] - 45:21, 46:5, 48:3, 55:18, 56:11, 57:18, 57:21, 60:11, 74:7, 78:11, 85:21, 94:17, 96:2, 109:6, 110:11
**BY** [1] - 1:17

## C

**caboodle** [1] - 74:25
**calculation** [1] - 74:23
**calculations** [1] - 74:21
**cannot** [2] - 58:6, 93:17, 102:24
**capacity** [1] - 60:15
**car** [2] - 69:3, 69:13
**care** [3] - 108:2, 114:10, 115:24
**cargo** [2] - 55:23, 60:18
**carry** [1] - 113:1
**carrying** [1] - 108:10
**cartel** [1] - 97:23
**case** [42] - 1:3, 3:5, 4:4, 5:16, 5:18, 7:19, 55:22, 56:24, 59:8,

90:15, 90:17, 90:19, 90:23, 91:6, 91:11, 92:17, 92:19, 92:22, 92:25, 93:6, 93:7, 94:23, 97:8, 97:11, 102:7, 102:12, 102:18, 102:22, 103:2, 103:3, 103:19, 103:22, 104:9, 104:22, 105:5, 105:7, 105:11, 106:17, 107:13
**case-in-chief** [1] - 90:19
**cases** [1] - 97:17
**cash** [2] - 35:16, 37:13
**catch** [1] - 82:1
**caused** [1] - 46:20
**certain** [6] - 48:24, 98:12, 99:6, 101:23, 102:7, 116:17
**certainly** [2] - 71:16, 105:15
**certify** [1] - 117:3
**challenged** [1] - 4:18
**Chambers** [1] - 108:24
**change** [3] - 24:2, 90:7, 90:9
**changed** [5] - 29:23, 30:2, 39:13, 82:3, 82:7
**changes** [3] - 18:20, 28:14, 113:1
**Chapman** [3] - 4:3, 5:16, 97:11
**charge** [6] - 2:2, 14:5, 93:15, 96:16, 107:17, 113:25
**charge..** [1] - 113:25
**charged** [17] - 3:24, 7:7, 7:17, 11:14, 85:3, 94:21, 96:17, 96:22, 97:5, 98:14, 98:20, 98:24, 100:1, 111:14, 113:13, 114:4, 114:22
**charges** [2] - 6:2, 41:18
**charter** [2] - 37:12, 83:18
**chat** [4] - 19:5, 34:13, 34:20, 34:22
**check** [2] - 40:21, 41:7
**checked** [1] - 40:22
**Checking** [1] - 19:9
**chemical** [2] - 53:2, 53:6
**chemist** [2] - 5:21, 96:6

**chief** [1] - 90:19
**children** [2] - 25:23, 26:11
**CI** [15] - 3:20, 11:17, 61:14, 63:17, 64:11, 64:14, 66:2, 76:18, 85:15, 94:3, 96:4, 99:17, 100:12, 102:16, 106:19
**CI's** [3] - 102:3, 103:3, 106:24
**circle** [1] - 19:15
**circling** [1] - 100:7
**Circuit** [1] - 112:16
**circumstances** [1] - 98:12
**cited** [1] - 97:11
**clarify** [1] - 76:14
**clause** [1] - 12:4
**clean** [2] - 96:3, 116:18
**cleaning** [1] - 49:17
**clear** [11] - 3:8, 13:22, 29:12, 46:14, 77:13, 92:1, 95:12, 100:25, 103:10, 103:11, 112:3
**client** [4] - 4:23, 91:5, 91:24, 92:4
**climb** [2] - 88:6, 88:8
**close** [7] - 41:15, 47:22, 77:11, 85:7, 92:20, 100:23
**closed** [3] - 17:18, 17:19, 19:3
**closest** [1] - 50:16
**closing** [1] - 91:13
**Cocaine** [2] - 96:22, 97:2, 97:9, 98:10
**cocaine** [48] - 3:5, 3:13, 3:14, 3:15, 3:23, 3:25, 4:11, 4:14, 4:23, 5:3, 5:5, 5:9, 5:14, 9:3, 9:7, 17:2, 25:15, 35:3, 45:22, 46:4, 52:3, 52:5, 52:16, 53:11, 54:22, 73:16, 75:5, 76:23, 94:20, 95:9, 95:16, 96:1, 96:10, 96:11, 96:14, 96:21, 97:14, 97:17, 97:23, 98:1, 98:7, 98:15, 99:13, 99:17, 99:18, 100:9, 100:18
**cocoa** [2] - 97:1, 97:3
**Code** [3] - 109:6, 113:23, 114:3
**code** [6] - 60:7, 88:10, 88:11, 88:13, 88:15

**COI** [8] - 65:1, 65:3, 65:7, 89:2, 89:11, 89:13, 89:23, 90:8
**colloquy** [1] - 91:19
**Colombia** [2] - 45:7, 95:3
**Columbia** [3] - 73:8, 76:23, 99:2
**combined** [1] - 108:21
**comfortable** [4] - 11:20, 39:14, 73:21, 95:19
**coming** [4] - 37:15, 37:20, 63:25, 99:1
**comments** [3] - 54:8, 64:24, 103:21
**commerce** [2] - 55:19, 78:12
**commercial** [1] - 83:17
**Commission** [5] - 64:18, 64:25, 89:1, 89:5, 90:2
**commit** [3] - 16:18, 16:21, 111:22
**commits** [1] - 16:23
**common** [1] - 17:9
**communication** [1] - 56:1
**Communications** [1] - 22:6
**company** [1] - 45:13
**complete** [2] - 92:5, 108:15
**comported** [1] - 106:20
**concealment** [5] - 7:8, 8:3, 10:7, 12:5, 111:19
**Concealment** [1] - 7:16
**concept** [1] - 60:3
**concern** [8] - 42:7, 44:10, 63:24, 64:14, 65:11, 89:5, 89:8, 89:23
**concerned** [9] - 43:20, 64:1, 81:25, 89:9, 89:12, 89:15, 89:25, 90:8, 107:2
**concerning** [3] - 17:1, 37:22, 89:11
**concise** [1] - 3:8
**conclude** [2] - 93:7, 101:6
**concluded** [3] - 60:23, 82:18, 92:22
**conclusion** [1] - 58:17
**concrete** [1] - 71:22
**conditions** [1] - 67:18

**conduct** [4] - 52:23, 105:4, 105:8, 107:2
**Conference** [3] - 78:4, 78:6, 78:8
**conference** [6] - 2:2, 14:5, 30:14, 33:11, 79:18, 107:18
**conferences** [1] - 30:16
**confidential** [11] - 43:2, 46:2, 46:3, 63:12, 63:14, 69:24, 80:5, 94:4, 94:11, 94:15, 103:15
**confirm** [1] - 70:17
**confused** [1] - 109:4
**connection** [7] - 3:2, 14:23, 26:12, 35:3, 55:7, 67:4, 102:12
**conscience** [1] - 93:17
**conspiracies** [1] - 7:7
**conspiracy** [15] - 7:17, 7:18, 9:20, 36:20, 41:19, 98:25, 99:1, 99:4, 99:10, 99:15, 99:20, 100:8, 113:14, 113:22
**conspired** [1] - 100:17
**conspiring** [2] - 3:24, 94:21
**constructed** [1] - 96:18
**construction** [15] - 3:22, 5:8, 49:17, 51:17, 51:18, 51:19, 52:2, 52:13, 53:7, 53:8, 74:2, 75:5, 76:6, 95:13, 96:9
**consultant** [1] - 40:5
**contact** [4] - 20:9, 21:5, 33:23, 34:1
**containing** [5] - 2:19, 3:4, 3:25, 9:3, 97:14
**contends** [1] - 9:1
**content** [1] - 26:6
**contention** [1] - 101:15
**contentiousness** [1] - 60:16
**context** [3] - 102:21, 103:6, 103:11
**continuation** [1] - 9:19
**continue** [9] - 14:4, 14:9, 15:4, 44:25, 45:6, 57:6, 90:21, 106:4, 107:17
**continues** [2] - 73:25, 99:4

**Continuing** [1] - 28:7
**contractor** [1] - 20:12
**contrary** [1] - 102:14
**controlled** [7] - 2:20, 3:3, 3:16, 94:20, 96:23, 98:12, 114:2
**conversation** [9] - 15:24, 43:18, 53:19, 63:4, 65:19, 66:1, 82:15, 88:20, 92:3
**conversations** [2] - 49:25, 92:2
**cook** [1] - 76:23
**cooperating** [1] - 106:19
**copies** [1] - 8:18
**copy** [2] - 112:18, 112:20
**corollary** [1] - 110:5
**correct** [61] - 33:16, 42:9, 43:6, 46:5, 46:12, 46:16, 48:9, 51:13, 53:11, 54:12, 55:6, 55:16, 57:15, 57:18, 58:3, 58:12, 58:15, 58:19, 60:15, 61:5, 61:11, 61:22, 62:1, 62:4, 62:11, 62:18, 63:5, 63:12, 64:9, 64:12, 64:20, 68:6, 68:17, 68:22, 69:3, 69:13, 70:19, 71:3, 71:11, 71:22, 72:15, 72:17, 72:18, 74:15, 75:2, 75:16, 76:12, 77:3, 77:11, 78:16, 78:23, 79:23, 80:3, 80:5, 81:3, 82:9, 85:10, 101:18, 101:19, 107:19, 109:25
**Correct** [77] - 46:13, 57:16, 57:19, 57:23, 58:13, 58:16, 58:20, 60:19, 60:22, 61:8, 61:12, 61:17, 61:23, 62:2, 62:5, 62:7, 62:19, 62:21, 63:9, 63:13, 63:16, 64:5, 64:10, 64:13, 64:17, 64:21, 64:23, 65:2, 65:6, 65:9, 65:13, 68:10, 68:23, 69:4, 69:14, 69:18, 70:20, 71:6, 71:10, 71:12, 71:23, 71:25, 72:8, 72:25, 74:9, 74:12, 74:19, 75:3, 75:17, 76:10, 76:17, 76:21, 77:1, 77:4, 77:7,

77:10, 77:12, 77:19, 77:24, 78:7, 78:10, 78:13, 79:5, 79:10, 79:13, 79:20, 79:24, 80:4, 80:6, 80:15, 81:1, 81:4, 81:12, 83:12, 83:16, 85:22, 110:25
**corrected** [3] - 43:10, 107:5, 107:21
**correctly** [5] - 42:22, 47:13, 49:24, 51:5, 51:24
**correspondence** [3] - 32:14, 32:17, 32:18
**corroborated** [1] - 112:10
**COUNSEL** [2] - 62:17, 84:4
**counsel** [2] - 65:17, 92:3
**counsel's** [1] - 106:7
**counseled** [1] - 105:4
**Count** [9] - 2:18, 7:18, 93:14, 98:20, 98:24, 111:18, 114:4, 114:22, 115:16
**count** [5] - 3:2, 7:18, 41:7, 83:24, 84:1
**counted** [2] - 84:11, 84:15
**country** [4] - 26:2, 66:14, 96:11, 100:3
**counts** [2] - 93:20, 115:16
**couple** [6] - 51:15, 52:17, 56:15, 65:19, 74:10, 89:4
**course** [12] - 5:10, 5:20, 11:24, 12:8, 12:22, 33:1, 55:17, 91:17, 97:2, 101:1, 101:20, 108:7
**COURT** [150] - 1:1, 1:10, 2:1, 2:6, 2:9, 2:13, 2:21, 2:25, 3:6, 3:12, 4:10, 5:6, 5:12, 5:24, 6:7, 6:9, 6:14, 6:16, 6:21, 7:1, 7:12, 7:15, 8:11, 8:16, 8:19, 8:21, 9:4, 9:9, 9:19, 9:23, 10:1, 10:8, 10:11, 10:13, 10:16, 10:21, 10:25, 11:3, 11:13, 11:23, 12:6, 12:12, 12:17, 12:19, 13:1, 13:4, 13:9, 13:13, 13:18, 13:22, 14:1, 14:7, 14:8, 36:21, 38:8,

41:21, 44:20, 44:25, 55:2, 55:4, 56:20, 57:1, 57:4, 57:5, 65:16, 70:2, 84:5, 84:6, 86:1, 86:17, 87:4, 87:5, 87:20, 90:13, 90:16, 90:25, 91:1, 91:9, 91:17, 91:22, 92:8, 92:10, 92:11, 92:14, 93:8, 93:10, 93:13, 93:21, 94:6, 97:20, 98:21, 99:14, 100:11, 100:15, 101:1, 101:3, 101:9, 104:6, 105:22, 106:4, 106:13, 107:16, 107:17, 107:20, 107:23, 108:2, 108:5, 108:18, 108:23, 109:1, 109:8, 109:11, 109:14, 109:18, 109:20, 110:1, 110:4, 110:9, 110:12, 110:15, 110:17, 110:23, 111:1, 111:6, 111:16, 111:20, 112:1, 112:13, 112:17, 112:21, 112:24, 113:3, 113:8, 113:16, 114:1, 114:10, 114:13, 114:17, 114:20, 115:3, 115:8, 115:14, 115:18, 115:20, 115:24, 116:3, 116:6, 116:10, 116:14, 116:24
**Court** [13] - 1:17, 4:3, 4:7, 6:19, 91:25, 94:7, 101:14, 101:21, 103:1, 104:11, 105:3, 105:11, 107:12
**Court's** [1] - 4:16
**courtroom** [5] - 101:5, 102:2, 104:4, 104:15, 107:14
**COURTROOM** [1] - 101:8
**Courts** [1] - 105:3
**cousin** [1] - 47:14
**cover** [2] - 2:3, 23:12
**COVID** [1] - 26:1
**cowboys** [1] - 104:24
**created** [1] - 100:11
**creativity** [1] - 96:24

**credentials** [2] - 44:6, 44:15
**credibility** [3] - 103:4, 103:18, 106:24
**crime** [1] - 4:24
**criminal** [2] - 61:15, 61:19
**Criminal** [1] - 109:6
**critical** [1] - 92:23
**cross** [2] - 57:6, 103:23
**Cross** [1] - 41:21
**cross-examination** [2] - 57:6, 103:23
**CS** [8] - 43:19, 58:23, 63:8, 64:15, 71:24, 77:16, 85:9, 94:9

## D

**danger** [1] - 90:4
**DATE** [1] - 117:8
**date** [11] - 20:23, 22:14, 23:17, 24:8, 24:13, 25:6, 26:4, 27:2, 27:3, 27:4, 30:4
**dates** [1] - 21:23
**days** [11] - 25:7, 25:8, 30:18, 52:25, 53:2, 53:5, 53:13, 55:9, 56:15, 74:10, 96:13
**DEA** [5] - 5:20, 86:13, 86:14, 96:6, 97:19
**deal** [7] - 37:9, 46:1, 46:9, 46:11, 48:2, 50:18, 50:19
**dealing** [5] - 4:1, 37:23, 88:14, 105:12, 111:18
**deals** [3] - 11:21, 77:15, 109:16
**debt** [2] - 48:11, 76:2
**debts** [1] - 59:22
**decided** [3] - 31:2, 91:6, 91:7
**decision** [1] - 91:20
**deemed** [1] - 107:10
**defendant** [18] - 1:15, 5:4, 5:7, 7:19, 15:22, 17:6, 25:9, 30:10, 32:2, 37:7, 86:7, 86:12, 87:23, 91:20, 94:21, 99:6, 114:14, 114:22
**defendant's** [3] - 11:15, 93:23, 101:15
**Defendant's** [6] - 70:3, 70:4, 70:7, 71:7, 71:13

**defense** [17] - 2:6, 2:16, 4:12, 8:8, 9:1, 9:21, 10:13, 10:23, 11:2, 92:6, 92:13, 92:15, 102:22, 103:2, 115:21, 116:2, 116:4
**defense's** [1] - 109:16
**defined** [1] - 113:12
**definition** [7] - 7:3, 11:5, 11:7, 13:6, 109:9, 111:17, 113:17
**definitions** [2] - 110:24, 111:4
**Delgado** [2] - 1:15, 116:20
**deliberations** [1] - 92:19
**demand** [1] - 61:13
**demands** [3] - 62:10, 62:15, 63:18
**demeanor** [1] - 107:2
**denied** [2] - 100:10, 101:21
**denominations** [1] - 75:18
**deny** [1] - 100:20
**depart** [1] - 84:20
**Department** [1] - 107:9
**describe** [1] - 89:4
**described** [5] - 8:7, 48:25, 50:5, 51:15, 109:5
**describing** [1] - 96:4
**description** [3] - 2:18, 111:4, 112:10
**descriptions** [1] - 94:4
**detail** [3] - 43:1, 58:3, 91:5
**details** [8] - 50:24, 68:3, 72:12, 72:16, 72:22, 73:2, 77:14, 77:16
**detectable** [12] - 2:20, 3:5, 3:12, 3:25, 4:8, 9:3, 96:11, 97:12, 97:14, 97:24, 98:2
**detected** [1] - 4:11
**detection** [1] - 4:22
**Detective** [1] - 78:16
**detention** [2] - 102:14, 103:21, 103:25
**determine** [1] - 56:9
**determined** [2] - 68:18, 68:19
**device** [1] - 74:24
**Devon** [1] - 40:3
**difference** [1] - 111:11

**different** [6] - 41:18, 41:19, 43:24, 44:7, 88:4, 106:12
**difficulties** [1] - 48:14
**difficulty** [1] - 26:2
**direct** [1] - 15:8
**Directing** [3] - 19:21, 28:15, 90:1
**directing** [2] - 28:15, 54:7
**direction** [2] - 8:5, 39:14
**directions** [1] - 39:13
**directly** [7] - 23:13, 33:25, 34:11, 38:22, 42:16, 53:18, 87:5
**director** [1] - 60:17
**disadvantage** [1] - 112:17
**disagree** [2] - 5:2, 7:4
**disconnect** [1] - 109:15
**discuss** [12] - 17:20, 24:20, 25:2, 32:10, 32:12, 33:5, 33:8, 34:20, 34:22, 35:7, 79:8, 90:23
**discussed** [14] - 11:8, 18:21, 25:4, 29:3, 35:6, 35:9, 40:21, 43:11, 45:12, 62:15, 82:16, 89:7, 89:15, 91:5
**discusses** [1] - 94:22
**discussing** [3] - 9:20, 88:12, 94:11
**discussion** [20] - 5:2, 5:4, 10:16, 18:19, 22:23, 37:3, 37:5, 37:22, 39:9, 39:11, 43:21, 44:1, 46:14, 49:21, 76:8, 78:25, 79:6, 87:24, 89:11, 103:16
**discussions** [9] - 3:14, 4:21, 38:20, 45:2, 48:24, 57:10, 60:8, 92:24, 93:2
**disguise** [1] - 88:17
**dismiss** [5] - 92:20, 101:13, 105:20, 106:16, 107:12
**dismissal** [1] - 105:9
**dismissed** [1] - 91:16
**displeasure** [1] - 63:15
**dispute** [1] - 113:21
**distinction** [2] - 5:2, 112:3
**distribute** [4] - 96:18,

113:14, 113:22
**DISTRICT** [3] - 1:1, 1:2, 1:10
**District** [1] - 105:10
**DIVISION** [1] - 1:2
**docket** [3] - 8:15, 101:13, 108:18
**docketed** [1] - 108:22
**document** [3] - 102:22, 102:25, 103:1
**dollar** [1] - 23:6
**dollars** [1] - 59:11
**Dominguez** [1] - 78:16
**Dominican** [2] - 73:9, 95:4
**done** [5] - 33:21, 34:14, 53:22, 96:25, 104:23
**doors** [1] - 15:23
**doubt** [1] - 101:14
**down** [10] - 21:2, 24:4, 50:22, 52:16, 54:11, 54:12, 60:11, 76:23, 97:17, 109:12
**drafts** [1] - 2:15
**dream** [1] - 48:11
**Dreams** [1] - 48:16
**drinks** [1] - 17:20
**drive** [1] - 69:1
**driver** [5] - 17:11, 17:16, 69:3, 69:13, 83:6
**driving** [2] - 41:17, 83:3
**drove** [1] - 17:13
**drug** [6] - 48:18, 48:21, 97:18, 99:9, 109:17, 109:24
**drugs** [2] - 52:15, 87:17
**duration** [8] - 20:18, 20:19, 20:24, 21:25, 22:3, 22:16, 27:6, 39:25
**During** [3] - 18:19, 43:1, 70:21
**during** [17] - 5:3, 15:24, 19:24, 22:23, 25:7, 26:1, 35:8, 42:17, 43:3, 43:7, 48:24, 59:4, 69:24, 71:19, 102:1, 103:11, 104:15

**E**

**e-mail** [2] - 6:22, 108:24
**each..** [1] - 115:17

**early** [2] - 49:25, 101:21
**earned** [2] - 12:1, 12:4
**ease** [1] - 114:16
**easier** [1] - 115:5
**Eastman** [1] - 69:7
**eat** [1] - 17:19
**edit** [1] - 111:9
**edits** [4] - 112:6, 114:14, 114:15, 115:20
**effect** [1] - 51:8
**Eight** [1] - 27:7
**eight** [6] - 15:12, 19:21, 20:20, 20:24, 21:1, 49:8
**either** [9] - 8:4, 45:8, 74:17, 77:15, 93:3, 97:18, 102:23, 106:13, 115:21
**elbow** [1] - 70:11
**electronic** [1] - 74:24
**element** [2] - 11:6, 111:5
**elements** [3] - 109:3, 112:8
**Elmo** [1] - 70:4
**Embassy** [5] - 31:21, 32:1, 32:2, 35:20, 40:15
**emoji** [1] - 19:12
**encryption** [1] - 116:19
**end** [12] - 13:6, 16:8, 16:12, 18:23, 28:9, 35:19, 39:17, 55:6, 68:12, 79:11, 81:10, 93:23
**end?** [1] - 82:19
**ended** [2] - 17:10, 35:20
**enforcement** [6] - 8:4, 11:17, 64:3, 78:19, 85:20, 106:21
**engaged** [1] - 46:2
**enterprise** [1] - 114:2
**entire** [6] - 13:10, 35:25, 36:2, 71:20, 99:10, 100:8
**entirety** [1] - 3:20
**entitled** [1] - 117:4
**entry** [3] - 8:15, 101:13, 108:18
**error** [2] - 23:25, 27:24
**especially** [1] - 37:3
**ESQ** [2] - 1:15, 1:15
**established** [2] - 11:16, 64:19
**estate** [1] - 35:1
**evade** [1] - 4:22

**evening** [14] - 18:12, 18:18, 31:15, 32:8, 32:11, 33:7, 33:9, 33:11, 34:5, 42:9, 42:11, 80:25, 82:15, 83:6
**Evening** [1] - 19:1
**event** [5] - 60:20, 67:3, 71:2, 78:22, 107:3
**events** [1] - 42:6
**Eventually** [1] - 68:19
**eventually** [9] - 50:4, 50:7, 67:19, 68:11, 69:2, 75:9, 94:12, 100:18, 104:1
**evidence** [6] - 3:20, 90:18, 91:11, 92:16, 94:1, 100:24
**ex** [2] - 101:24, 102:6
**exact** [3] - 39:20, 106:8, 106:11
**exactly** [2] - 12:10, 88:20
**examination** [3] - 41:21, 57:6, 103:23
**example** [3] - 68:1, 97:1, 115:17
**exchanged** [1] - 80:10
**excluded** [1] - 42:8
**excuse** [4] - 36:10, 72:10, 80:11, 91:12
**EXCUSED** [1] - 93:9
**excused** [2] - 36:8, 69:19
**exemplary** [1] - 104:21
**Exhibit** [28] - 15:5, 16:14, 17:24, 19:4, 19:16, 21:7, 21:17, 23:16, 24:10, 26:3, 27:1, 28:15, 31:22, 39:16, 40:6, 49:6, 52:21, 63:1, 66:8, 70:3, 70:4, 70:5, 70:7, 71:7, 71:13, 87:2, 89:16, 90:1
**exhibit** [1] - 50:21
**exhibits** [1] - 116:16
**existed** [1] - 75:7
**expect** [1] - 104:3
**expected** [1] - 37:2
**expecting** [1] - 104:1
**expects** [1] - 106:21
**expenses** [2] - 23:12, 75:23
**experience** [1] - 3:1
**expert** [1] - 5:21
**explain** [7] - 40:10, 72:19, 72:20, 73:11, 95:7, 95:9, 97:23

**explained** [1] - 57:14
**explaining** [1] - 71:24
**express** [1] - 44:9
**expresses** [2] - 63:15, 64:14
**extent** [3] - 104:7, 105:1, 113:6
**extracted** [5] - 5:10, 5:13, 96:13
**extraction** [1] - 95:12
**eyes** [1] - 110:18

**F**

**face** [7] - 68:13, 70:12, 70:15, 71:5, 77:13, 104:4
**face-to** [1] - 68:13
**facilitate** [3] - 31:5, 32:22, 55:13
**fact** [12] - 4:10, 7:5, 35:11, 52:20, 67:22, 68:19, 69:23, 72:21, 78:19, 102:18, 103:14, 108:14
**facts** [2] - 97:8, 101:23
**FAHIE** [1] - 1:6
**Fahie** [132] - 3:21, 6:14, 9:16, 15:9, 16:12, 16:17, 18:11, 20:14, 20:16, 23:11, 23:15, 24:18, 24:21, 24:23, 25:11, 26:4, 26:12, 27:9, 27:16, 27:20, 27:23, 28:1, 28:12, 28:17, 30:1, 32:16, 35:11, 35:13, 35:23, 36:7, 36:14, 37:13, 37:19, 37:23, 41:12, 41:25, 43:7, 43:22, 44:4, 44:10, 44:14, 46:11, 47:10, 47:19, 49:24, 56:6, 56:15, 57:9, 57:14, 58:5, 58:8, 58:15, 58:22, 59:5, 59:16, 60:23, 60:25, 61:9, 61:11, 61:14, 61:22, 61:25, 62:12, 62:15, 63:19, 64:2, 64:7, 64:15, 64:18, 65:8, 65:11, 67:8, 67:11, 67:13, 67:15, 67:18, 67:22, 68:6, 68:14, 69:2, 69:12, 69:16, 69:23, 70:22, 71:5, 71:24, 72:17, 72:20, 73:11, 73:17, 73:24, 74:23, 75:14, 75:21, 76:20, 77:2, 77:23,

78:5, 79:3, 80:3, 82:5, 83:3, 83:6, 85:8, 85:11, 86:11, 86:16, 86:24, 87:3, 87:10, 87:15, 87:25, 88:3, 88:9, 88:11, 88:18, 88:22, 89:7, 89:19, 90:5, 90:8, 91:3, 92:12, 94:9, 94:24, 95:7, 95:10, 95:23, 99:10, 100:8
**fahie** [1] - 101:12
**Fahie's** [12] - 19:21, 20:13, 40:5, 43:20, 47:15, 58:18, 59:22, 63:10, 65:4, 77:11, 89:5, 89:23
**failed** [1] - 98:20
**failure** [1] - 106:16
**fair** [2] - 63:14, 68:9
**Fair** [1] - 65:10
**familiar** [1] - 19:13
**far** [2] - 49:12, 99:22
**fast** [2] - 25:17, 68:4
**favor** [1] - 23:25
**favorable** [1] - 100:16
**Federal** [3] - 104:7, 105:10, 106:21
**fellow** [2] - 27:25, 46:14
**felt** [2] - 38:7, 54:4
**few** [4] - 42:1, 55:9, 69:19, 90:24
**field** [1] - 97:18
**figure** [2] - 50:22, 70:7
**filed** [4] - 8:15, 101:12, 101:13, 102:22
**FILED** [1] - 117:8
**fill** [1] - 38:13
**filled** [1] - 37:4
**final** [1] - 40:6
**finalize** [1] - 92:18
**finally** [1] - 107:3
**Finance** [1] - 14:24, 14:25
**financial** [1] - 48:14
**financially** [1] - 48:9
**findings** [1] - 102:11
**fine** [7] - 3:18, 107:25, 108:1, 114:6, 115:6, 115:19, 116:13
**finished** [6] - 38:17, 38:19, 38:20, 44:21, 44:22, 90:24
**finishes** [1] - 38:8
**first** [33] - 8:23, 10:1, 11:4, 12:4, 13:5, 19:17, 36:23, 38:5, 45:5, 50:17, 51:22, 52:7, 52:8, 52:12,

52:18, 57:10, 63:1, 64:25, 68:13, 72:5, 72:24, 73:5, 86:3, 87:15, 93:13, 94:9, 94:10, 95:1, 98:23, 100:11, 106:2, 114:19
**five** [5] - 3:15, 22:18, 22:22, 25:7, 74:2
**FL** [1] - 1:18
**flight** [13] - 26:2, 28:10, 28:11, 28:13, 31:7, 35:15, 37:14, 37:24, 39:14, 40:12, 40:17, 40:21, 41:3
**flip** [1] - 49:6
**FLORIDA** [1] - 1:2
**flown** [1] - 45:13
**fly** [1] - 29:17
**flying** [2] - 31:14, 38:2
**focus** [1] - 4:16
**focusing** [1] - 93:14
**Foley** [2] - 40:7, 40:9
**follow** [1] - 115:5
**followed** [1] - 39:13
**following** [1] - 35:15
**FOR** [1] - 1:13, 1:15, 15:7, 15:17, 16:7, 16:16, 27:13, 27:21, 28:8, 101:8
**foregoing** [1] - 117:3
**foreign** [4] - 7:3, 96:11, 103:4, 109:17
**Foreign** [2] - 103:18, 113:3
**Forgive** [1] - 68:24
**forgot** [2] - 61:18, 104:2
**form** [4] - 7:11, 51:20, 113:24, 114:13
**formally** [1] - 91:10
**forth** [2] - 35:8, 112:9
**forthcoming** [1] - 106:6
**forward** [5] - 25:10, 25:17, 29:20, 62:3, 68:4
**forwarded** [1] - 61:25
**four** [19] - 11:11, 11:19, 22:18, 22:22, 30:18, 45:3, 52:25, 53:2, 53:5, 53:13, 73:25, 74:13, 74:25, 95:24, 95:25, 96:13, 98:6, 98:17, 110:8
**Fourteen** [1] - 40:1
**fourth** [4] - 12:6, 12:20, 45:24, 102:14
**Frankly** [1] - 104:1, 104:21

**frankly** [2] - 12:10, 106:14
**free** [5] - 48:11, 51:2, 73:12
**French** [1] - 70:8
**friend** [4] - 40:5, 77:8, 77:9, 77:11
**friendly** [1] - 26:7
**friends** [1] - 47:23
**friendship** [1] - 16:22
**front** [9] - 28:20, 28:22, 41:3, 49:4, 104:8, 104:11, 105:10, 106:22, 107:2
**full** [2] - 77:14, 108:9
**fully** [1] - 92:7
**funding** [2] - 23:15, 29:6
**funds** [1] - 29:1
**future** [1] - 60:7

## G

**gallon** [1] - 74:2
**Garaway** [7] - 20:10, 20:11, 20:12, 20:16, 20:22, 39:23, 39:24
**garbage** [6] - 45:20, 54:13, 54:15, 76:18, 76:22, 77:17
**general** [2] - 54:9, 106:23
**generally** [1] - 102:3
**generated** [1] - 59:22
**gentleman** [5] - 33:16, 70:12, 72:19, 78:15, 86:10
**gentlemen** [6] - 49:22, 56:20, 90:16, 92:14, 92:23, 93:2
**Gerard** [1] - 6:22
**Gerarde** [16] - 1:13, 3:6, 6:17, 7:5, 9:4, 38:8, 42:2, 42:4, 87:20, 105:1, 105:23, 107:4, 109:3, 111:1, 112:22, 113:4
**GERARDE** [64] - 2:5, 3:7, 3:18, 6:8, 6:13, 8:14, 9:5, 9:24, 10:5, 10:9, 10:12, 10:15, 10:20, 10:24, 11:1, 11:4, 12:3, 12:18, 12:24, 13:2, 13:5, 13:10, 13:20, 13:24, 14:10, 16:5, 16:14, 19:16, 27:1, 27:11, 36:19, 41:20, 86:2,

87:21, 90:12, 90:14, 91:18, 98:23, 99:21, 106:2, 106:7, 107:19, 108:1, 109:7, 109:9, 109:12, 109:15, 109:25, 110:2, 110:21, 111:3, 111:11, 111:14, 111:17, 112:11, 112:15, 113:5, 114:6, 115:7, 115:9, 115:15, 116:5, 116:13, 116:22
**gerarde** [2] - 14:9, 110:22
**gesturing** [1] - 71:11
**gift** [2] - 18:13, 57:24
**given** [10] - 8:9, 18:11, 28:12, 32:14, 32:19, 39:13, 47:11, 57:24, 94:17, 108:15
**Glad** [1] - 24:5
**glib** [1] - 106:1
**God** [1] - 16:17
**Godson** [1] - 33:18
**godson** [1] - 79:22
**Government** [53] - 2:4, 3:18, 6:7, 6:12, 6:23, 7:18, 9:23, 10:3, 10:15, 10:20, 10:24, 11:1, 11:6, 11:20, 11:24, 12:2, 12:7, 12:14, 12:22, 14:21, 27:11, 40:6, 52:21, 67:12, 67:14, 67:15, 77:3, 88:1, 89:9, 90:14, 90:17, 91:2, 91:19, 92:14, 93:19, 98:22, 100:16, 102:10, 103:2, 105:5, 105:8, 106:18, 107:21, 108:1, 108:7, 109:5, 109:17, 110:4, 110:24, 112:9, 115:7, 115:21, 116:13
**Government's** [23] - 7:22, 8:14, 13:25, 15:4, 17:24, 19:4, 19:16, 21:7, 21:17, 23:16, 24:10, 31:22, 39:16, 87:2, 89:16, 94:2, 100:12, 100:24, 102:6, 110:12, 111:8, 111:10, 112:8
**Governor** [2] - 67:12
**grant** [1] - 107:7

**granting** [1] - 100:20
**grasshoppers** [1] - 65:21
**great** [2] - 43:1, 72:16
**green** [1] - 24:6
**grounds** [1] - 105:8
**guess** [4] - 88:19, 98:9, 104:24, 107:10
**guideline** [1] - 4:16
**guidelines** [1] - 4:2
**guilty** [3] - 4:24, 93:16, 114:22
**guy** [1] - 66:16
**guys** [2] - 80:21, 96:8

## H

**hand** [6] - 15:5, 16:18, 48:25, 49:10, 49:13, 68:13
**handcuffed** [2] - 84:24, 85:1
**handled** [1] - 105:5
**handlers** [1] - 100:13
**harbor** [1] - 94:17
**hard** [2] - 112:18, 112:20
**hate** [1] - 65:24
**HC** [1] - 23:25
**head** [2] - 48:3, 90:3
**hear** [9] - 2:16, 2:22, 27:18, 50:17, 87:6, 93:10, 93:13, 98:22, 101:9
**heard** [5] - 61:4, 65:11, 68:11, 89:24, 92:16
**hearing** [5] - 102:1, 102:15, 102:21, 103:22, 103:25
**held** [2] - 30:14, 33:12
**HELD** [2] - 1:9
**help** [1] - 8:8
**hereby** [1] - 117:3
**HERSELF** [1] - 89:21
**hesitancy** [1] - 83:22
**Highlighting** [2] - 21:20, 22:10
**highlighting** [1] - 22:18
**himself** [3] - 79:22, 103:15, 106:21
**hiring** [1] - 55:13
**hold** [1] - 33:6
**holder** [1] - 9:12
**home** [7] - 16:2, 20:13, 28:10, 32:6, 48:13, 83:4, 93:4
**honestly** [1] - 106:1
**Honor** [42] - 5:1, 6:6,

6:8, 8:14, 9:1, 9:5, 12:18, 13:20, 13:24, 14:10, 36:19, 38:10, 41:20, 41:22, 44:24, 55:3, 55:5, 86:18, 87:21, 90:14, 91:4, 91:18, 93:12, 98:4, 98:23, 99:21, 100:22, 101:2, 101:11, 101:24, 102:17, 103:7, 104:18, 107:16, 109:7, 109:15, 109:25, 111:21, 112:23, 113:5, 116:5, 116:22
**HONORABLE** [1] - 1:9
**hope** [2] - 105:15, 105:17
**hoping** [1] - 79:9
**horrible** [1] - 93:4
**hotel** [5] - 15:10, 32:5, 40:15, 80:17, 80:19
**hour** [2] - 35:9, 92:20
**hours** [4] - 16:6, 16:14, 74:8, 96:2
**house** [11] - 14:14, 48:10, 48:11, 48:15, 49:15, 49:18, 68:15, 68:20, 69:1, 69:3, 69:5
**House** [3] - 14:20, 14:21, 72:10
**Huck** [1] - 103:9
**huge** [1] - 103:24
**hum** [2] - 46:10, 95:10
**hundred** [1] - 23:6
**hundreds** [1] - 59:11
**hydrochloride** [1] - 94:20
**Hydrochloride** [4] - 96:23, 97:3, 97:9, 98:10

## I

**idea** [2] - 50:13, 55:16
**identified** [1] - 71:4
**identify** [1] - 19:7
**identifying** [1] - 102:3
**II** [5] - 2:20, 3:15, 96:23, 111:18, 115:16
**illegal** [2] - 5:17, 97:3
**imagine** [1] - 66:4
**impeach** [1] - 105:2
**impeached** [1] - 107:5
**imperative** [1] - 92:23
**import** [4] - 3:24, 94:21, 97:3, 99:15

**important** [6] - 3:19, 92:24, 98:24, 99:5, 102:13, 103:6
**importantly** [2] - 98:15, 103:13
**importation** [10] - 33:19, 35:4, 93:15, 96:16, 96:21, 96:22, 96:25, 97:9, 99:19, 100:2
**imported** [1] - 100:17
**importing** [2] - 4:21, 100:9
**impression** [1] - 88:22
**imprimatur** [1] - 100:12
**IN** [1] - 116:24
**in-person** [1] - 29:12
**INAUDIBLE** [1] - 65:14
**incident** [3] - 25:18, 48:19, 48:22
**incidental** [1] - 79:6
**include** [5] - 9:16, 48:15, 106:16, 110:2, 113:17
**included** [4] - 3:3, 4:5, 11:9, 116:4
**includes** [1] - 114:1
**including** [2] - 45:19, 106:5
**income** [1] - 12:5
**incomplete** [1] - 108:15
**incorporate** [1] - 111:4
**increase** [4] - 23:7, 23:8, 23:10, 23:11
**increased** [1] - 23:9
**indicated** [1] - 64:2
**indicates** [2] - 72:5, 73:4
**indicating** [1] - 63:19
**indication** [1] - 25:9
**indicative** [1] - 63:19
**indictment** [2] - 6:3, 107:12
**individual** [1] - 78:19
**info** [1] - 24:20
**informant** [12] - 43:2, 46:2, 46:4, 63:12, 63:14, 69:2, 69:24, 80:5, 94:4, 94:11, 94:15, 103:16
**information** [5] - 25:11, 37:18, 102:16, 106:17, 106:24
**informed** [1] - 102:10
**initial** [2] - 2:15, 88:5
**initials** [1] - 60:20

**input** [1] - 13:16
**inquire** [1] - 103:21
**Inquiry** [4] - 64:19, 65:1, 89:1, 89:6
**inquiry** [2] - 43:20, 91:22
**inside** [5] - 82:16, 84:12, 84:13, 96:19, 97:10
**instance** [2] - 3:13, 115:16
**instead** [1] - 115:12
**instructed** [1] - 4:9
**instruction** [10] - 6:3, 7:22, 8:9, 8:23, 9:6, 10:2, 10:4, 111:10, 111:15, 114:9
**instruction..** [1] - 116:2
**instructions** [16] - 3:8, 6:11, 6:17, 6:18, 6:24, 8:15, 8:18, 92:18, 97:13, 107:23, 108:16, 109:16, 110:3, 110:6, 114:11, 116:9
**intend** [1] - 91:3
**intended** [1] - 6:23
**intending** [1] - 17:18
**intends** [1] - 90:18
**intent** [10] - 4:15, 13:8, 93:23, 96:17, 108:10, 112:11, 112:13, 113:14, 113:21, 113:22
**intention** [5] - 32:23, 33:1, 48:5, 72:19, 85:14
**interested** [2] - 53:21, 58:11
**international** [2] - 99:24, 100:4
**Interstate** [3] - 113:3, 113:19, 113:24
**intervened** [1] - 106:22, 107:1
**introduced** [3] - 34:1, 36:6, 50:4
**investigated** [1] - 66:13
**investigating** [1] - 66:20
**investigation** [1] - 66:5
**investments** [2] - 56:11, 58:11
**investor** [4] - 56:11, 57:15, 58:9, 87:25
**invited** [1] - 26:14
**involve** [2] - 17:4,

100:8
**involved** [14] - 7:11, 7:20, 11:17, 33:22, 33:25, 35:23, 39:8, 42:14, 45:2, 48:1, 48:4, 48:18, 48:21, 88:15
**involvement** [2] - 46:19, 56:2
**involving** [3] - 25:19, 57:17, 114:2
**Iris** [2] - 40:7, 40:9
**iron** [1] - 68:8
**Island** [4] - 46:16, 59:18, 77:5, 89:10
**island** [6] - 57:22, 73:6, 85:12, 89:8, 95:2
**Islands** [28] - 14:19, 16:4, 17:3, 20:12, 25:19, 25:24, 26:16, 31:9, 32:20, 32:22, 33:21, 34:3, 35:2, 35:15, 42:21, 45:7, 50:10, 50:11, 50:12, 50:13, 50:15, 51:10, 55:10, 64:20, 99:2, 99:12, 109:24
**issue** [10] - 9:8, 9:9, 9:10, 11:4, 13:5, 25:21, 68:8, 91:24, 100:11, 106:18
**issues** [4] - 10:6, 13:3, 60:14, 114:8
**item** [4] - 20:14, 22:10, 87:3, 87:7
**items** [7] - 21:2, 21:10, 21:20, 21:21, 22:18, 61:16, 61:20
**itself** [1] - 5:17

## J

**January** [1] - 101:22
**job** [2] - 48:6, 60:16
**Jose** [7] - 33:16, 33:20, 35:23, 36:15, 78:19, 78:22, 79:21
**Jose's** [2] - 33:17, 33:19
**Joyce** [1] - 1:15
**judge** [2] - 3:10, 113:11
**Judge** [51] - 2:5, 2:7, 2:17, 3:7, 3:18, 3:19, 4:8, 6:13, 6:15, 6:20, 7:5, 10:9, 11:10, 12:3, 12:9, 12:24, 12:25, 13:2, 57:7, 70:1, 86:2, 90:12,

91:14, 92:1, 93:14, 94:15, 96:18, 96:22, 98:15, 103:9, 103:13, 103:18, 105:11, 105:16, 105:21, 106:2, 106:7, 107:25, 108:20, 110:21, 111:3, 111:11, 112:7, 112:11, 112:15, 114:6, 114:12, 114:15, 115:19, 116:1, 116:13
**JUDGE** [1] - 1:10
**Judge..** [1] - 84:5
**Judge...** [1] - 87:4
**judicial** [2] - 101:17, 103:5
**Judicial** [2] - 105:25, 106:3
**July** [1] - 76:9
**jumping** [1] - 65:20
**June** [1] - 76:9
**jurors** [1] - 14:4
**JURY** [1] - 93:9
**jury** [35] - 3:7, 3:8, 4:9, 6:2, 6:3, 6:23, 8:9, 8:15, 9:12, 9:13, 14:4, 14:6, 14:7, 20:11, 20:14, 57:3, 57:4, 90:22, 91:9, 91:15, 91:18, 92:10, 97:12, 104:5, 104:9, 104:12, 105:10, 105:14, 105:15, 106:22, 107:3, 110:3, 110:6, 115:10, 116:18

## K

**Kadeem** [16] - 17:21, 18:19, 23:17, 23:24, 26:18, 26:20, 27:9, 42:14, 48:18, 49:10, 54:8, 54:9, 55:24, 56:1, 63:8, 65:7
**Kadeem's** [2] - 23:14, 23:21
**KATHLEEN** [1] - 1:9
**keep** [4] - 2:21, 3:7, 9:13, 65:16
**keeping** [1] - 51:9
**Kevin** [1] - 1:13
**kicked** [2] - 36:16, 36:21
**kilo** [1] - 99:7
**kilogram** [2] - 54:20, 54:24

**kilograms** [7] - 3:15, 4:21, 45:6, 46:4, 50:19, 54:22, 94:12
**kilos** [2] - 3:14, 5:14
**kind** [12] - 5:3, 51:19, 68:4, 68:8, 70:8, 72:12, 73:22, 78:11, 80:16, 95:21, 102:5, 113:18
**Kingdom** [2] - 64:19, 110:20
**kit** [1] - 74:25
**kitchen** [1] - 19:3
**knowing** [1] - 91:21
**knowingly** [1] - 92:5
**knowledge** [6] - 11:16, 37:11, 46:12, 48:20, 71:15, 102:7
**known** [3] - 65:1, 89:2, 90:19
**knows** [1] - 62:9
**Kye** [3] - 21:22, 22:5, 22:6

## L

**lab** [1] - 97:19
**lack** [3] - 42:8, 61:10, 103:4
**lacked** [1] - 103:18
**ladies** [3] - 56:20, 92:22, 93:1
**Ladies** [2] - 90:16, 92:14
**Lampeck** [2] - 102:19, 103:2
**land** [1] - 24:7
**landed** [1] - 85:10
**language** [18] - 2:14, 2:19, 2:24, 3:2, 9:2, 9:10, 9:17, 10:17, 10:21, 11:20, 11:21, 11:22, 13:16, 97:13, 107:24, 112:2, 112:7, 112:22
**lap** [2] - 84:13, 84:17
**laptop** [2] - 116:17, 116:18
**last** [5] - 102:1, 108:5, 108:9, 115:10, 116:12
**late** [2] - 34:16, 42:18
**laundering** [17] - 7:7, 7:8, 7:9, 7:16, 10:2, 10:7, 12:5, 41:19, 93:20, 111:7, 111:10, 111:14, 111:18, 111:19, 111:23, 111:24, 112:6

**law** [16] - 7:3, 8:4, 8:7, 11:16, 12:11, 64:3, 78:19, 85:20, 98:19, 106:17, 106:21, 107:13, 108:12, 108:15, 108:16, 108:17
**laws** [4] - 109:17, 109:24, 110:11, 110:20
**lawyers** [3] - 101:6, 104:19, 104:21
**lays** [1] - 94:22
**leader** [1] - 14:21
**learn** [2] - 78:18, 102:11
**least** [9] - 3:20, 51:15, 70:11, 75:21, 84:8, 102:6, 105:17, 105:19, 109:23
**leave** [5] - 39:12, 40:17, 69:12, 85:13, 116:14
**leaving** [2] - 29:18, 101:17
**left** [8] - 14:13, 17:16, 36:12, 36:24, 82:4, 86:15, 107:18
**leftovers** [1] - 76:23
**legal** [1] - 90:20
**legitimate** [3] - 55:20, 60:11, 78:11
**legitimately** [2] - 12:1, 12:4
**less** [2] - 101:16, 106:6
**letter** [2] - 20:7, 20:9
**level** [2] - 43:20, 107:11
**liability** [1] - 4:19
**lie** [1] - 104:12
**lies** [2] - 104:5, 105:2
**light** [2] - 100:16, 101:23
**likely** [1] - 25:4
**line** [15] - 11:5, 17:6, 18:2, 19:21, 20:3, 49:8, 50:22, 50:23, 52:20, 54:15, 73:3, 74:23, 89:19, 107:21, 115:10
**lines** [3] - 15:12, 90:1, 109:12
**liquid** [7] - 51:20, 52:2, 53:7, 71:22, 74:14, 76:6, 98:8
**list** [13] - 21:2, 43:15, 44:6, 48:14, 61:10, 61:16, 61:18, 61:24, 62:9, 62:15, 63:11,

106:18, 109:3
**listening** [2] - 69:11, 88:19
**listing** [2] - 43:23, 44:13
**literally** [2] - 8:22, 92:2
**located** [2] - 69:6, 69:7
**location** [3] - 33:10, 68:18, 68:19
**longstanding** [1] - 78:8
**look** [13] - 2:23, 19:14, 49:8, 63:1, 66:16, 89:16, 93:17, 106:10, 113:11, 114:18, 116:21
**Look** [1] - 18:2
**looked** [5] - 41:5, 41:8, 84:3, 84:7, 84:10
**looking** [8] - 21:5, 64:19, 65:3, 79:2, 81:17, 81:19, 112:15, 112:19
**Looking** [2] - 29:20, 81:18
**looks** [2] - 19:15, 110:12
**loquacious** [1] - 99:17
**low** [1] - 45:21
**LSD** [2] - 4:4, 5:17
**lunch** [11] - 31:14, 33:14, 33:15, 34:4, 34:14, 34:15, 35:6, 35:9, 56:21, 57:8, 79:11
**LUNCH** [1] - 56:25
**lurking** [1] - 71:16

## M

**ma'am** [70] - 10:19, 41:24, 42:10, 42:19, 42:25, 43:5, 45:10, 45:15, 45:23, 46:8, 47:16, 47:18, 47:24, 48:23, 49:5, 49:7, 49:23, 50:3, 50:6, 50:9, 50:20, 51:11, 52:19, 53:12, 53:16, 54:3, 54:6, 54:21, 55:1, 55:12, 55:15, 55:21, 55:25, 56:4, 56:8, 56:14, 56:17, 56:19, 57:12, 59:3, 59:13, 59:20, 59:24, 60:9, 60:12, 61:3, 61:3, 61:6, 62:23, 63:2, 65:22, 66:9,

67:6, 67:10, 67:21, 69:9, 69:22, 69:25, 70:13, 71:18, 72:14, 75:8, 75:15, 76:5, 83:9, 84:10, 84:19, 84:22, 85:24, 110:16
**magic** [4] - 3:21, 4:11, 4:23, 95:13
**magical** [1] - 5:19
**mail** [2] - 6:22, 108:24
**main** [6] - 31:5, 33:20, 45:1, 46:1, 48:16, 79:7
**mainland** [2] - 99:21, 99:24
**majority** [2] - 43:4, 80:24
**mall** [3] - 34:15, 34:17, 34:21
**man** [5] - 22:24, 22:25, 48:25, 58:11, 66:20
**manage** [1] - 24:1
**managed** [1] - 48:7
**Manager** [1] - 55:8
**manager** [3] - 28:19, 29:11, 60:15
**March** [9] - 15:3, 43:16, 50:8, 56:18, 58:22, 62:9, 62:13, 63:4, 87:15
**Maria's** [4] - 17:15, 17:17, 17:18, 69:2
**marks** [1] - 96:24
**Martin** [5] - 22:24, 28:2, 28:6, 30:6, 46:16
**Master** [1] - 31:11
**material** [15] - 3:22, 5:8, 51:16, 51:17, 51:18, 51:20, 52:13, 53:7, 53:8, 71:22, 74:2, 74:3, 74:14, 76:7, 96:9
**materials** [6] - 51:9, 52:2, 52:9, 75:6, 94:16, 95:13
**mathematical** [1] - 74:21
**matter** [9] - 7:5, 52:20, 88:12, 88:15, 90:20, 98:19, 105:12, 107:9, 117:4
**matters** [1] - 92:4
**Maynard** [22] - 14:11, 15:21, 16:8, 19:18, 24:13, 25:18, 27:9, 28:9, 28:17, 41:23, 45:1, 57:8, 70:3, 85:23, 86:3, 87:6, 87:15, 87:22, 89:22,

90:7, 95:9
**maynard** [2] - 87:7, 90:10
**McLaughlin** [1] - 1:13
**meal** [1] - 93:5
**mean** [13] - 15:14, 17:8, 27:15, 28:22, 30:6, 34:12, 44:11, 52:1, 54:12, 65:23, 65:25, 81:20, 105:14
**Meaning** [1] - 77:5
**meaning** [6] - 17:9, 73:4, 77:2, 90:18, 92:15, 98:7
**means** [2] - 54:14, 94:19
**meant** [6] - 8:1, 49:3, 52:11, 53:14, 67:1, 82:2
**measures** [1] - 24:4
**meet** [11] - 24:23, 24:25, 28:25, 32:12, 50:15, 57:9, 58:15, 58:18, 87:23, 116:15
**meeting** [118] - 14:14, 16:8, 16:13, 17:10, 17:21, 18:12, 18:23, 19:22, 19:24, 22:23, 23:4, 25:1, 25:3, 25:7, 25:8, 25:16, 28:19, 29:4, 29:11, 29:12, 29:14, 29:20, 31:5, 31:14, 31:15, 31:19, 31:20, 32:7, 32:11, 33:3, 33:6, 33:8, 33:10, 33:11, 33:13, 34:5, 34:7, 34:18, 35:18, 35:19, 35:22, 35:23, 35:25, 36:2, 36:5, 36:16, 37:1, 38:3, 38:12, 38:15, 38:20, 38:22, 38:23, 39:6, 39:17, 42:8, 43:3, 43:8, 43:11, 43:15, 44:5, 44:11, 50:8, 50:17, 52:7, 52:8, 52:18, 53:25, 55:6, 56:5, 58:17, 58:22, 59:4, 60:2, 60:23, 60:24, 61:9, 62:16, 63:11, 67:8, 67:20, 68:12, 68:13, 68:21, 69:11, 69:16, 69:21, 69:24, 70:21, 71:19, 71:20, 72:9, 72:23, 72:24, 76:19, 78:14, 78:15, 78:22, 79:8, 79:11, 79:14, 79:19, 79:21, 80:9, 80:11, 80:21,

80:24, 80:25, 81:2, 81:13, 81:14, 81:24, 82:4, 82:16, 82:18, 82:23, 94:8, 103:14
**meetings** [4] - 31:10, 31:11, 42:5, 46:3
**member** [2] - 36:19, 59:23
**members** [1] - 105:15
**memorandum** [2] - 102:23, 102:24
**memory** [1] - 21:6
**mention** [1] - 28:14
**mentioned** [8] - 33:5, 39:6, 47:10, 57:24, 58:6, 77:8, 79:1, 80:16
**message** [13] - 19:5, 23:18, 23:20, 23:21, 23:22, 23:24, 24:8, 24:13, 24:15, 24:19, 26:3, 26:6, 61:21
**messages** [6] - 15:13, 23:17, 46:18, 46:19, 47:1
**met** [4] - 25:2, 57:14, 66:4, 87:15
**Methamphetamine** [2] - 98:11, 98:13
**metric** [1] - 4:18
**Mexicans** [1] - 66:25
**mIAMI** [1] - 1:2
**Miami** [34] - 1:18, 1:18, 5:15, 28:25, 29:4, 29:17, 30:4, 30:6, 30:7, 30:10, 30:19, 30:21, 31:2, 31:3, 31:6, 35:10, 35:13, 42:6, 42:17, 44:5, 45:8, 45:13, 48:12, 48:13, 74:17, 75:1, 75:10, 76:16, 77:22, 78:2, 85:6, 94:13, 96:15, 96:21
**microphone** [3] - 7:12, 86:17, 87:5
**might** [3] - 92:4, 97:6, 99:15
**million** [1] - 75:2
**mind** [1] - 48:8
**mine** [1] - 81:19
**minimum** [2] - 93:18, 103:20
**Minister** [2] - 14:23, 14:25
**Ministers** [1] - 22:6
**minute** [1] - 22:4
**minutes** [10] - 16:15, 20:19, 20:25, 22:1, 22:17, 27:7, 40:1,

56:22, 86:21, 90:24
**misconduct** [2] - 104:10, 105:19
**missed** [5] - 20:2, 21:14, 21:19, 22:21, 22:22
**missing** [1] - 110:24
**mistake** [1] - 115:16
**mistaken** [3] - 16:13, 23:9, 114:11
**misunderstood** [1] - 27:25
**mixture** [5] - 2:19, 3:4, 3:25, 9:2, 97:13
**modifications** [1] - 113:10
**modified** [3] - 111:19, 113:4, 113:5
**modify** [1] - 111:17
**moment** [1] - 2:24
**moments** [1] - 114:9
**money** [58] - 7:7, 7:8, 7:9, 7:16, 10:2, 10:7, 11:17, 11:23, 12:5, 12:7, 12:13, 12:15, 12:21, 18:4, 18:18, 22:24, 23:2, 25:5, 37:15, 37:20, 37:21, 37:23, 40:21, 41:6, 41:7, 41:10, 41:19, 45:12, 47:12, 48:5, 74:20, 75:5, 75:9, 75:13, 75:21, 75:22, 76:15, 77:16, 77:21, 77:23, 79:7, 83:23, 84:9, 84:10, 85:9, 88:5, 88:8, 93:19, 108:6, 111:7, 111:10, 111:14, 111:18, 111:19, 111:22, 111:23, 111:24, 112:5
**Monies** [1] - 18:8
**monies** [2] - 25:14, 28:5
**months** [2] - 76:9, 89:4
**morning** [16] - 2:1, 7:6, 14:11, 14:12, 24:20, 32:9, 32:10, 33:3, 33:13, 40:10, 41:23, 41:24, 62:9, 81:23, 83:10, 91:13
**mortgage** [3] - 48:2, 48:10, 48:11
**mortgage-free** [1] - 48:11
**most** [6] - 8:11, 8:14, 8:18, 88:15, 94:3, 100:16

**mother** [1] - 40:9
**motion** [10] - 93:13, 100:10, 100:23, 101:3, 101:13, 101:15, 101:21, 105:20, 106:16, 107:7
**motions** [1] - 91:15
**move** [1] - 35:18
**movement** [2] - 35:8, 79:7
**Moving** [1] - 21:2
**MR** [64] - 2:5, 3:7, 3:18, 6:8, 6:13, 8:14, 9:5, 9:24, 10:5, 10:9, 10:12, 10:15, 10:20, 10:24, 11:1, 11:4, 12:3, 12:18, 12:24, 13:2, 13:5, 13:10, 13:20, 13:24, 14:10, 16:5, 16:14, 19:16, 27:1, 27:11, 36:19, 41:20, 86:2, 87:21, 90:12, 90:14, 91:18, 98:23, 99:21, 106:2, 106:7, 107:19, 108:1, 109:7, 109:9, 109:12, 109:15, 109:25, 110:2, 110:21, 111:3, 111:11, 111:14, 111:17, 112:11, 112:15, 113:5, 114:6, 115:7, 115:9, 115:15, 116:5, 116:13, 116:22
**MS** [87] - 2:7, 2:11, 2:17, 2:23, 3:1, 3:10, 3:19, 5:1, 5:7, 5:13, 6:6, 6:15, 6:20, 6:22, 7:2, 7:13, 7:16, 9:1, 9:18, 9:22, 10:14, 10:19, 10:23, 11:2, 11:10, 11:14, 12:9, 12:13, 12:25, 13:12, 13:15, 36:18, 41:22, 44:24, 55:5, 57:7, 70:1, 87:19, 91:4, 91:14, 92:1, 92:13, 93:12, 93:14, 93:22, 94:7, 98:4, 100:14, 100:22, 101:2, 101:11, 104:7, 107:22, 107:25, 108:4, 108:14, 108:20, 108:24, 109:19, 109:22, 110:7, 110:10, 110:14, 110:16, 110:18, 110:22,

110:25, 111:13, 111:21, 112:7, 112:19, 112:23, 113:1, 113:11, 113:17, 114:5, 114:8, 114:12, 114:15, 114:18, 114:21, 115:6, 115:19, 115:22, 116:1, 116:8, 116:12
**multi** [1] - 50:19
**multi-thousand** [1] - 50:19
**must** [3] - 88:13, 90:20, 112:17
**muster** [1] - 99:16
**mystical** [1] - 5:19

# N

**naive** [1] - 52:4
**name** [19] - 20:7, 21:8, 22:19, 33:16, 40:7, 41:25, 43:23, 58:22, 58:23, 58:25, 60:3, 60:4, 60:7, 61:14, 61:18, 69:5, 102:4, 103:3
**narcotics** [1] - 114:2
**nature** [1] - 56:13
**near** [1] - 84:3
**necessarily** [1] - 9:9
**neck** [1] - 67:1
**need** [12] - 15:10, 46:20, 51:3, 53:6, 73:6, 88:17, 92:18, 93:18, 95:1, 113:10, 116:19
**needed** [2] - 81:14, 88:1
**needs** [5] - 4:9, 8:9, 9:2, 11:11, 11:12
**negative** [4] - 3:23, 94:18, 94:19, 96:9
**negotiation** [1] - 64:8
**nephew** [1] - 79:22
**Never** [2] - 44:16, 53:5
**never** [27] - 26:19, 34:17, 35:9, 51:4, 51:23, 52:24, 53:3, 53:5, 53:10, 75:4, 75:5, 82:12, 87:17, 89:7, 89:10, 89:15, 90:6, 101:19, 102:15
**New** [4] - 24:20, 45:8, 74:17, 99:7
**new** [1] - 4:22
**next** [13] - 2:9, 6:9, 6:16, 40:2, 44:22, 55:4, 70:11, 74:4,

83:10, 90:13, 95:8, 95:11, 108:11
**nice** [1] - 104:24
**night** [6] - 35:18, 44:11, 79:14, 80:13, 82:18, 83:7
**nine** [1] - 49:8
**nobody** [3] - 37:4, 37:20, 82:12
**None** [1] - 12:18
**none** [4] - 9:22, 61:20, 75:6, 79:2
**nonetheless** [1] - 59:15
**normal** [1] - 64:8
**North** [1] - 1:18
**nose** [2] - 105:25, 106:3
**note** [4] - 9:16, 97:21, 104:13, 104:18
**noted** [1] - 107:4
**notes** [1] - 103:14
**Nothing** [1] - 39:13
**nothing** [1] - 34:18
**noticed** [1] - 109:2
**notorious** [1] - 103:3
**November** [2] - 103:7, 103:16
**novice** [2] - 53:18, 54:5
**Number** [5] - 1:3, 20:24, 22:22, 71:7
**number** [32] - 13:17, 13:20, 20:7, 21:1, 21:24, 22:2, 22:3, 23:22, 23:23, 24:16, 26:19, 42:16, 48:13, 52:24, 53:1, 54:17, 54:19, 61:13, 62:6, 73:19, 73:20, 95:17, 107:20, 108:18, 110:4, 110:8, 110:19, 113:12, 113:18

# O

**o'clock** [3] - 40:17, 87:12, 91:13
**oath** [1] - 104:8
**object** [9] - 7:17, 7:22, 8:10, 10:7, 13:11, 13:15, 108:4, 108:5, 112:7
**Objection** [2] - 36:18, 87:19
**objection** [20] - 2:8, 2:10, 2:11, 6:12, 8:24, 9:21, 9:24, 10:13, 10:14, 10:15,

10:17, 10:21, 11:1, 11:2, 12:17, 12:24, 12:25, 13:14, 108:13, 112:6
**objections** [5] - 2:4, 6:5, 113:9, 114:14, 115:20
**objects** [2] - 7:6, 10:17
**obligations** [1] - 46:20
**obviously** [7] - 5:3, 75:4, 80:7, 80:23, 84:17, 93:15, 113:13
**occasions** [1] - 51:16
**odds** [2] - 11:5, 12:5
**OF** [2] - 1:2, 1:4
**of..** [1] - 111:25
**offense** [4] - 109:10, 109:23, 116:8, 116:10
**Office** [3] - 67:12, 67:14, 67:15
**office** [10] - 25:1, 26:14, 27:16, 66:17, 67:9, 67:13, 67:20, 86:11, 86:13, 86:14
**OFFICER** [7] - 8:19, 14:7, 57:4, 90:25, 92:10, 93:8, 107:16
**officer** [4] - 8:4, 64:3, 78:20, 107:14
**Officer** [1] - 91:25
**official** [2] - 67:11, 78:11
**okay.** [1] - 63:23
**old** [2] - 112:18, 112:20
**oldest** [2] - 49:10, 49:15
**Olivine** [1] - 27:9
**once** [4] - 17:14, 34:2, 91:22, 94:23
**one** [55] - 2:3, 3:13, 12:1, 13:11, 13:17, 13:21, 15:15, 15:16, 17:9, 22:4, 22:6, 27:2, 31:16, 37:23, 38:17, 41:11, 41:17, 43:17, 45:24, 46:1, 48:13, 49:15, 50:21, 54:17, 65:18, 66:15, 68:13, 70:17, 80:13, 81:5, 82:5, 83:3, 84:6, 90:6, 93:24, 94:3, 100:14, 102:20, 105:20, 106:21, 107:20, 108:2, 108:11, 108:20, 108:21, 108:23, 109:2,

109:10, 110:2, 113:12, 115:4, 115:12, 115:16, 116:12
**ones** [2] - 46:1, 60:20
**online** [1] - 93:3
**open** [1] - 107:14
**operation** [4] - 11:24, 12:8, 12:23, 108:8
**opportunity** [3] - 6:17, 70:14, 116:21
**opposed** [2] - 50:10, 96:17
**OPR** [1] - 105:6
**opted** [1] - 31:1
**or..** [1] - 98:3
**order** [4] - 8:2, 52:23, 98:5, 99:23
**original** [2] - 48:5, 75:22
**originally** [4] - 6:24, 30:24, 56:5, 59:7
**Originally** [1] - 37:18
**Osborn** [1] - 40:3
**outcome** [1] - 89:9
**outrageous** [2] - 66:3, 105:8
**outs** [1] - 103:3
**outside** [9] - 3:17, 32:16, 37:2, 38:18, 38:19, 97:9, 99:19, 100:2, 100:5
**owed** [4] - 47:12, 47:14, 48:6, 48:17
**own** [6] - 14:1, 14:2, 92:6, 102:24, 105:2, 107:5
**owning** [2] - 48:11, 48:15
**Owning** [1] - 48:13

**P**

**p.m** [2] - 26:21, 79:16
**packaged** [1] - 97:24
**packages** [2] - 41:4, 41:6
**packet** [2] - 6:3, 8:13
**Page** [2] - 10:25, 11:3
**page** [79] - 2:3, 2:8, 2:13, 6:10, 8:13, 8:22, 8:24, 9:19, 10:1, 10:8, 10:9, 10:10, 10:13, 10:16, 10:18, 10:22, 13:1, 13:13, 13:19, 15:8, 15:18, 16:6, 16:15, 17:6, 17:24, 19:5, 19:16, 19:17, 20:2, 20:5, 20:20, 21:7,

21:17, 23:16, 24:3, 24:10, 24:11, 26:3, 27:2, 27:14, 27:22, 28:15, 28:16, 39:17, 49:8, 50:21, 52:20, 63:1, 66:8, 72:5, 73:2, 73:14, 74:4, 87:2, 87:3, 89:16, 90:1, 94:10, 94:23, 95:8, 107:18, 108:9, 108:11, 110:5, 110:10, 110:17, 111:8, 112:5, 112:8, 112:24, 113:3, 113:6, 114:19
**pages** [7] - 2:4, 2:10, 2:11, 74:20, 98:5, 98:16, 106:22
**paid** [3] - 22:24, 23:2, 88:3
**paper** [2] - 4:4, 5:16
**papers** [2] - 18:6, 18:7
**paragraph** [4] - 13:7, 13:10, 108:9, 109:13
**paragraph...** [1] - 114:23
**paragraphs** [1] - 95:11
**Pardon** [1] - 73:7
**paren** [1] - 114:25
**parens** [3] - 115:1, 115:3, 115:4
**part** [14] - 5:4, 12:4, 35:9, 37:9, 55:19, 58:18, 66:1, 66:7, 75:21, 76:4, 99:4, 99:19, 101:7, 102:7
**parte** [2] - 101:24, 102:6
**participants** [2] - 27:8, 63:7
**participation** [1] - 99:10
**particular** [7] - 43:9, 88:12, 88:14, 89:10, 89:11, 101:7, 116:6
**particularly** [1] - 65:8
**parties** [4] - 2:14, 4:10, 90:20, 112:2
**parties'** [1] - 2:14
**party** [4] - 59:16, 59:23, 86:10, 88:3
**Party** [1] - 59:18
**pass** [6] - 51:2, 51:3, 51:7
**passage** [7] - 51:8, 52:10, 53:22, 73:6, 74:6, 94:17, 95:2
**passed** [2] - 67:19, 99:16
**passing** [2] - 35:8,

99:2
**passport** [3] - 81:16, 81:17, 81:18
**password** [1] - 116:19
**PATRICIA** [2] - 1:17, 117:8
**patricia_sanders@ flsd.uscourts.gov** [1] - 1:19
**pattern** [3] - 6:11, 112:12, 112:16
**paused** [1] - 27:14
**pay** [8] - 47:8, 47:9, 48:2, 48:5, 48:16, 59:15, 75:23, 87:23
**payment** [2] - 46:15, 46:20
**payments** [3] - 17:4, 32:23, 33:2
**pejorative** [1] - 64:3
**penalties** [1] - 4:17
**people** [6] - 65:20, 66:15, 66:25, 71:2, 71:14, 88:23
**per** [2] - 7:9, 7:10
**perceive** [1] - 88:17
**perceived** [1] - 89:5
**percent** [2] - 76:24
**perception** [2] - 90:7, 90:9
**perfectly** [2] - 55:20, 100:25
**perhaps** [3] - 63:19, 80:23, 82:5
**period** [7] - 26:1, 71:13, 81:24, 96:13, 101:20, 114:24, 114:25
**perjury** [1] - 105:10
**permit** [1] - 103:20
**person** [12] - 29:12, 33:20, 33:23, 34:1, 38:24, 41:11, 47:17, 48:17, 62:20, 70:18, 93:3, 114:25
**personal** [2] - 46:19, 47:23
**Personally** [1] - 54:10
**personally** [2] - 47:8, 80:25
**personnel** [1] - 105:5
**persons** [1] - 36:14
**Phone** [1] - 1:18
**phone** [19] - 15:10, 15:15, 15:16, 19:6, 19:21, 23:14, 23:21, 24:16, 27:17, 28:9, 39:3, 43:14, 61:2, 62:12, 62:18, 63:7, 63:10, 87:13

99:2
**photograph** [2] - 61:15, 71:8
**photographs** [3] - 61:19, 67:4, 69:24
**physically** [2] - 76:8, 84:15
**pick** [2] - 40:14, 88:20
**picked** [2] - 33:10, 73:15
**picture** [6] - 43:23, 66:5, 66:19, 67:2, 68:2, 70:15
**piece** [1] - 53:3
**pieces** [2] - 32:14, 74:2
**Pier** [1] - 17:20
**pilots** [1] - 37:14
**place** [34] - 3:16, 5:10, 9:12, 25:1, 25:5, 31:20, 31:21, 35:19, 35:20, 39:7, 50:16, 56:21, 63:4, 63:10, 67:9, 67:20, 68:14, 68:16, 68:20, 72:9, 79:15, 79:19, 94:14, 95:14, 96:19, 97:10, 98:17, 99:19, 100:2, 100:4, 100:5, 115:10, 115:17, 116:6
**placed** [4] - 26:17, 27:17, 84:21, 94:16
**plan** [22] - 18:20, 25:16, 32:19, 32:21, 33:19, 34:23, 39:12, 45:18, 50:18, 51:12, 51:14, 55:9, 56:6, 61:16, 61:20, 64:7, 71:21, 72:13, 72:16, 94:11, 94:13, 98:19
**plane** [15] - 40:20, 40:24, 41:1, 41:7, 41:14, 41:15, 77:21, 83:18, 83:19, 83:20, 83:21, 83:22, 84:8, 84:20, 85:12
**planning** [1] - 76:1
**plans** [8] - 28:23, 28:24, 28:25, 45:2, 45:11, 77:14
**plants** [2] - 97:2, 97:3
**PLAYED** [7] - 15:7, 15:17, 16:7, 16:16, 27:13, 27:21, 28:8
**playing** [1] - 25:22
**pleasantries** [1] - 80:10
**pleased** [1] - 67:25
**point** [25] - 23:7, 25:7, 25:12, 29:15, 29:16,

38:17, 41:16, 47:7, 57:9, 59:4, 61:9, 63:24, 65:18, 68:18, 69:11, 69:15, 81:2, 81:6, 85:5, 85:6, 86:23, 102:17, 104:10, 105:7, 108:23
**points** [3] - 45:21, 65:19, 77:3
**political** [2] - 56:12, 59:16
**politics** [1] - 65:4
**Port** [1] - 55:8
**port** [4] - 30:14, 55:18, 60:15, 60:17
**portion** [2] - 67:7, 97:16
**posed** [2] - 105:24, 106:11
**position** [6] - 2:16, 5:24, 14:24, 26:16, 90:4, 109:20
**positive** [21] - 5:8, 9:8, 51:5, 51:24, 52:3, 52:6, 52:10, 52:14, 52:15, 52:17, 52:24, 53:4, 53:10, 73:10, 73:18, 73:23, 75:6, 76:7, 95:6, 95:15, 95:22
**possess** [2] - 99:15, 113:22
**possession** [3] - 96:17, 113:14, 113:21
**possible** [2] - 5:21, 115:11
**possibly** [1] - 104:23
**potential** [1] - 57:15
**pounds** [1] - 54:24
**prayer** [2] - 16:9, 16:12
**pre** [1] - 69:1
**precise** [1] - 115:2
**precisely** [1] - 82:1
**precludes** [1] - 100:19
**precursor** [4] - 97:1, 98:9, 98:10, 98:13
**predecessor** [2] - 59:23, 65:4
**predicated** [1] - 4:17
**preliminaries** [3] - 32:11, 32:12, 32:13
**Premier** [27] - 14:17, 14:18, 15:9, 17:10, 18:21, 19:6, 19:7, 21:2, 21:10, 21:18, 21:20, 23:4, 25:23, 28:21, 29:17, 30:19,

30:21, 31:1, 31:4, 31:15, 34:7, 34:19, 36:11, 37:9, 39:21, 56:10, 67:12
**Premier's** [3] - 14:19, 19:6, 19:10
**presence** [2] - 94:19, 96:10
**present** [6] - 35:25, 36:2, 56:10, 57:1, 57:25, 94:9
**presentation** [2] - 56:15, 102:6
**presented** [3] - 90:18, 91:11, 94:1
**press** [1] - 112:3
**presumably** [1] - 100:12
**pretrial** [2] - 103:21, 103:25
**pretty** [2] - 94:22, 110:18
**previous** [1] - 8:13
**previously** [4] - 9:22, 30:10, 101:12, 115:23
**primarily** [1] - 54:8
**printed** [1] - 8:18
**privacy** [1] - 33:12
**private** [1] - 79:17
**privy** [1] - 5:4
**problem** [4] - 12:2, 66:21, 96:16, 113:13
**proceeding** [1] - 103:5
**proceedings** [3] - 101:7, 104:16, 117:4
**PROCEEDINGS** [1] - 1:9
**proceeds** [10] - 7:10, 7:19, 8:5, 11:17, 12:15, 12:21, 13:6, 99:9, 108:6, 111:25
**process** [18] - 5:19, 15:25, 52:25, 53:2, 53:5, 53:6, 53:14, 56:3, 73:25, 74:13, 95:24, 95:25, 98:6, 98:17, 105:6
**processing** [2] - 74:25, 95:12
**product** [1] - 99:11
**professionalism** [1] - 104:22
**projects** [1] - 56:12
**promised** [4] - 34:14, 34:16, 40:23, 47:7
**promote** [2] - 13:8, 108:10
**promotional** [7] - 7:7, 7:22, 111:12,

111:14, 111:18, 111:22, 111:23
**Promotional** [1] - 7:9
**proposed** [8] - 6:18, 6:24, 8:15, 9:6, 10:4, 108:16, 110:3, 114:15
**proposing** [1] - 11:6
**proposition** [3] - 4:20, 73:5, 95:1
**prosecutors** [1] - 107:8
**prove** [1] - 96:5
**provide** [2] - 44:5, 46:4
**provided** [8] - 9:6, 11:23, 12:7, 12:14, 12:22, 61:14, 103:1, 108:7
**provision** [2] - 11:14, 11:15
**provision.** [1] - 11:22
**Pseudoephedrine** [1] - 98:11
**public** [2] - 22:9, 107:15
**publically** [1] - 102:22
**publish** [3] - 15:4, 27:1, 28:7
**publishing** [1] - 27:12
**Publishing** [1] - 16:14
**Puerto** [16] - 5:9, 5:10, 5:22, 45:8, 46:6, 74:15, 74:25, 95:14, 96:3, 96:12, 96:20, 98:18, 99:3, 99:21, 99:23
**pull** [1] - 7:13
**pulling** [1] - 112:12
**punishable** [2] - 110:10, 110:19
**purpose** [3] - 32:21, 33:19, 79:7
**purposes** [4] - 4:6, 8:3, 104:13
**pursuing** [1] - 109:17
**put** [5] - 5:17, 5:19, 9:12, 11:19, 27:14, 27:18, 60:18, 70:3, 91:6, 108:11, 116:7
**putting** [1] - 69:1

## Q

**quality** [1] - 45:21
**quarrel** [1] - 104:19
**QUESTION** [1] - 65:14
**questioning** [1] - 102:15
**questions** [12] - 41:20,

42:1, 42:4, 43:7, 43:13, 43:19, 44:10, 63:22, 63:25, 64:2, 85:23, 90:12
**Quintero** [74] - 26:23, 27:10, 27:17, 31:6, 33:15, 35:24, 36:7, 36:15, 37:19, 37:24, 42:12, 42:23, 43:2, 43:15, 43:21, 44:1, 44:9, 45:2, 47:7, 48:19, 48:22, 48:25, 49:9, 50:5, 50:7, 50:14, 51:1, 51:7, 54:2, 54:7, 54:18, 56:2, 56:10, 57:10, 57:15, 57:20, 57:24, 58:9, 58:10, 58:14, 58:18, 58:23, 60:8, 60:21, 60:24, 61:19, 62:3, 62:9, 63:7, 63:17, 65:7, 65:20, 66:23, 67:7, 67:19, 67:23, 68:6, 68:13, 68:21, 69:15, 70:19, 70:21, 71:4, 71:8, 72:12, 72:20, 72:22, 73:1, 73:4, 78:15, 78:25, 82:15, 87:16, 95:11
**Quintero's** [6] - 44:9, 50:18, 55:9, 55:23, 56:6, 62:6
**Quintero.** [1] - 62:16
**quite** [4] - 18:24, 81:8, 102:20, 106:14
**quote** [3] - 45:21, 54:19, 56:10

## R

**racketeering** [1] - 113:19
**rambling** [2] - 65:24, 66:23
**reach** [2] - 6:19, 23:13
**reached** [3] - 37:24, 85:12, 93:18
**reaction** [4] - 36:21, 36:23, 38:5, 38:11
**read** [12] - 12:7, 12:20, 23:22, 23:24, 26:20, 51:5, 51:22, 51:24, 89:19, 98:4, 115:10, 115:13
**reading** [4] - 2:22, 89:24, 112:22, 114:16
**reads** [3] - 100:2, 115:9, 115:17

**READS** [1] - 89:21
**ready** [1] - 81:8
**real** [7] - 35:1, 60:4, 60:10, 75:4, 75:5, 96:5
**realize** [1] - 52:5
**realized** [1] - 86:11
**really** [10] - 2:7, 35:7, 53:2, 53:18, 53:23, 54:1, 66:12, 96:6
**reason** [10] - 29:22, 30:1, 31:5, 35:10, 48:1, 59:2, 67:2, 97:17, 97:15, 100:10
**receive** [1] - 92:16
**received** [1] - 25:11
**recent** [3] - 8:12, 8:14, 8:18
**recently** [1] - 102:11
**RECESS** [3] - 8:20, 56:25, 116:24
**recess** [1] - 56:21
**recipient** [1] - 23:22
**recitation** [1] - 102:5
**recognize** [2] - 22:18, 31:22
**recollection** [3] - 35:7, 44:17, 66:22
**recommendation** [1] - 114:5
**record** [12] - 13:22, 13:24, 16:5, 61:15, 61:19, 91:14, 92:1, 100:19, 100:22, 100:25, 104:13, 104:18
**RECORD** [8] - 15:7, 15:17, 16:7, 16:16, 27:13, 27:21, 28:8, 101:8
**recording** [4] - 15:6, 61:4, 72:6, 73:16
**redefined** [1] - 108:5
**Redirect** [1] - 86:1
**redirect** [1] - 105:2
**refer** [1] - 94:3
**reference** [11] - 13:20, 13:21, 28:3, 46:9, 49:14, 49:15, 54:19, 60:21, 72:22, 110:5, 114:6
**references** [3] - 13:11, 109:14, 110:5
**Referring** [1] - 26:11
**referring** [21] - 15:1, 16:20, 16:24, 17:24, 18:7, 18:10, 18:11, 25:13, 25:14, 26:9, 26:23, 29:7, 33:24, 38:1, 49:12, 54:2,

54:20, 54:22, 95:16, 98:16, 108:20
**refers** [1] - 94:7
**refresh** [2] - 21:6, 66:22
**regard** [1] - 106:16
**regarding** [4] - 49:22, 50:18, 57:10, 89:5
**registered** [1] - 31:11
**reign** [1] - 104:23
**reiterate** [1] - 106:15
**Rejected** [1] - 21:14
**rejected** [2] - 21:14, 22:22
**relate** [1] - 32:18
**related** [2] - 31:17, 35:1
**relating** [1] - 89:22
**relation** [1] - 25:4
**relationship** [2] - 14:19, 33:17
**relax** [1] - 93:5
**relayed** [1] - 63:11
**relaying** [2] - 46:18, 47:1
**Relevance** [1] - 36:18
**relevant** [1] - 4:8
**reluctantly** [1] - 83:14
**relying** [1] - 109:22
**remain** [1] - 54:14
**remainder** [1] - 38:15
**remained** [2] - 36:14, 38:19
**remember** [19] - 14:14, 21:5, 21:6, 41:11, 42:15, 43:14, 44:18, 57:11, 58:2, 58:7, 59:2, 65:20, 65:21, 66:1, 66:6, 66:7, 96:1, 102:25, 113:4
**remind** [1] - 20:11
**reminder** [1] - 26:7
**removed** [2] - 11:11, 13:11
**renew** [2] - 101:12, 105:20
**renewed** [2] - 100:24, 107:7
**rent** [1] - 34:4
**rented** [1] - 33:11
**repeat** [2] - 65:15, 107:24
**repeated** [1] - 105:19
**repeatedly** [1] - 53:9
**rephrase** [3] - 46:22, 76:13, 87:20
**REPORTED** [1] - 1:17
**REPORTER** [3] - 65:16, 84:5, 87:4

**Reporter** [1] - 1:17
**represent** [1] - 41:25
**representation** [4] - 9:7, 11:16, 91:23, 91:24
**representations** [1] - 101:23
**represented** [9] - 8:5, 12:13, 12:15, 12:21, 41:10, 79:22, 98:19, 103:7, 108:6
**representing** [2] - 37:9, 98:9
**Republic** [2] - 73:9, 95:4
**request** [3] - 61:21, 68:8, 88:8
**requesting** [1] - 91:19
**requests** [3] - 63:15, 63:18, 67:23
**require** [2] - 7:9, 7:10
**required** [1] - 106:18
**requirement** [1] - 11:5
**requirements** [3] - 43:15, 61:10, 63:11
**requires** [1] - 7:18
**reserve** [1] - 91:15
**residence** [1] - 48:2
**resolved** [2] - 10:6, 112:21
**respect** [4] - 10:6, 12:3, 36:11, 82:7
**respectfully** [1] - 5:1
**respectively** [1] - 113:24
**respond** [2] - 18:16, 18:17
**responded** [1] - 18:9
**responds** [2] - 73:11, 73:24
**response** [4] - 19:10, 29:19, 89:24, 102:23
**responsibilities** [1] - 31:8
**rest** [7] - 13:1, 54:17, 58:9, 74:5, 91:8, 91:10, 114:8
**Restaurant** [1] - 17:16
**restaurant** [1] - 19:2
**rested** [3] - 90:17, 91:2, 92:15
**rests** [2] - 90:15, 92:13
**results** [1] - 29:21
**resume** [1] - 14:5
**return** [3] - 17:4, 81:2, 81:5
**returned** [1] - 37:4
**reviewing** [2] - 80:23, 107:9
**rickety** [2] - 83:19,

83:20
**Rico** [16] - 5:9, 5:10, 5:23, 45:8, 46:6, 74:15, 75:1, 95:14, 96:3, 96:12, 96:20, 98:18, 99:3, 99:21, 99:23
**right-hand** [1] - 48:25
**rise** [6] - 8:19, 14:7, 57:4, 90:25, 92:10, 93:8
**rises** [1] - 107:11
**Road** [7] - 17:12, 17:13, 17:14, 60:3, 60:6, 60:10, 60:17
**Roberto** [72] - 15:12, 15:22, 17:10, 17:15, 17:17, 17:21, 18:3, 18:4, 18:9, 18:13, 18:19, 23:11, 23:13, 23:17, 23:24, 24:3, 26:15, 26:17, 26:19, 26:23, 27:10, 27:17, 28:9, 28:12, 29:12, 29:14, 29:23, 31:6, 31:14, 31:19, 32:7, 32:15, 32:19, 33:3, 33:15, 33:17, 33:22, 33:24, 34:8, 34:13, 34:18, 35:24, 36:6, 36:8, 36:14, 37:19, 38:21, 38:22, 39:10, 40:14, 43:21, 52:21, 58:23, 66:11, 73:4, 73:12, 73:14, 73:16, 73:18, 73:25, 74:14, 87:16, 87:18, 87:23, 89:19, 90:2, 94:22, 95:8, 95:20, 98:15, 98:19, 99:5
**Roberto's** [2] - 42:16, 79:21
**role** [1] - 55:7
**room** [28] - 27:18, 27:19, 33:11, 34:4, 36:5, 36:12, 36:13, 36:22, 36:24, 37:2, 37:4, 38:18, 69:16, 71:2, 71:14, 79:17, 79:18, 82:24, 82:25, 83:2, 86:9, 86:13, 86:15, 86:20, 86:24, 90:22, 103:10
**rough** [1] - 104:9
**Roxane** [2] - 85:7
**Roxanne** [28] - 31:7, 35:14, 35:23, 36:2, 36:6, 36:12, 37:6, 37:14, 37:15, 37:22, 37:23, 40:14, 75:10,

76:15, 77:14, 78:1, 80:10, 80:18, 80:20, 81:13, 81:21, 83:14, 84:11, 84:23, 86:3, 86:12, 86:14, 86:23
**Roy** [6] - 20:10, 20:11, 20:16, 20:22, 39:23, 39:24
**royal** [1] - 70:8
**RPR** [2] - 1:17, 117:8
**RTW** [6] - 24:20, 28:19, 29:11, 60:3, 60:20, 88:15
**Rule** [5] - 93:13, 93:19, 100:20, 100:23
**rulings** [1] - 89:10
**run** [2] - 45:6, 76:6
**Rymer** [3] - 21:22, 22:5, 22:6

## S

**S11** [1] - 112:15
**safe** [13] - 51:2, 51:3, 51:7, 51:8, 51:14, 52:10, 53:22, 73:6, 74:6, 94:17, 95:2
**safely** [1] - 25:24
**sale** [1] - 75:1
**sanders** [1] - 2:21
**SANDERS** [3] - 1:17, 117:6, 117:8
**Sanders** [1] - 107:14
**santorufo** [1] - 116:15
**sat** [3] - 41:5, 52:16, 106:7
**satisfactory** [1] - 13:1
**saw** [5] - 18:15, 41:5, 70:17, 84:8, 86:9
**scant** [1] - 97:16
**scenario** [4] - 94:2, 96:8, 96:18, 96:24
**Schedule** [3] - 2:20, 3:15, 96:23
**scheduled** [3] - 29:17, 30:24, 31:10
**schools** [1] - 56:12
**score** [3] - 24:1, 24:4
**screen** [1] - 19:18
**Sea** [11] - 30:11, 30:13, 30:14, 30:17, 30:19, 30:24, 31:8, 31:17, 78:4, 78:6, 78:8
**sea** [2] - 30:14, 30:15
**seal** [2] - 101:5, 101:13
**sealed** [1] - 102:1
**SEALED** [1] - 101:8

**Sean** [1] - 1:13
**seat** [1] - 41:3
**seated** [7] - 2:1, 8:21, 14:8, 57:5, 84:17, 91:1, 92:11
**second** [6] - 7:17, 13:7, 27:24, 45:11, 107:21, 111:4
**seconds** [2] - 16:6, 16:15
**section** [1] - 113:18
**Section** [6] - 109:6, 109:9, 109:14, 113:23, 114:3
**secure** [1] - 66:18
**secured** [1] - 79:17
**SECURITY** [7] - 8:19, 14:7, 57:4, 90:25, 92:10, 93:8, 107:16
**See** [1] - 73:18
**see** [30] - 6:19, 15:9, 16:17, 18:2, 18:13, 18:18, 19:11, 19:18, 24:11, 27:23, 40:24, 41:2, 41:7, 48:3, 56:24, 70:5, 70:14, 71:16, 73:1, 83:7, 83:10, 83:23, 84:16, 87:13, 87:22, 93:6, 106:11, 111:1, 111:6, 116:23
**sees** [1] - 83:14
**seized** [2] - 45:20, 85:9
**selected** [1] - 60:21
**sell** [1] - 56:10
**send** [2] - 24:17, 43:23
**sending** [1] - 116:18
**Senegal** [3] - 22:25, 46:15, 47:17
**sent** [12] - 6:22, 19:7, 23:20, 23:24, 24:15, 24:18, 26:20, 61:10, 61:25, 67:18, 96:12, 108:21
**sentence** [9] - 11:7, 11:9, 11:11, 12:7, 12:20, 13:7, 108:6
**sentencing** [7] - 4:2, 4:6, 102:21, 102:23, 102:24, 102:25, 103:9
**separate** [5] - 9:8, 11:8, 35:5, 38:25, 92:3
**series** [1] - 92:2
**set** [6] - 8:17, 32:16, 33:23, 34:24, 43:16, 112:8
**seven** [4] - 15:12,

20:19, 21:24, 87:7
**shaking** [1] - 48:3
**sham** [3] - 4:13, 5:3, 5:5
**shared** [1] - 37:19
**shipment** [3] - 17:1, 25:15, 35:4
**shipping** [4] - 55:14, 55:16, 55:22, 56:3
**ships** [2] - 35:8, 55:19
**shirt** [2] - 70:8, 71:8
**shop** [1] - 34:6
**shopping** [1] - 79:11
**shops** [1] - 31:16
**shorthand** [1] - 60:7
**shortly** [2] - 80:9, 84:20
**show** [2] - 8:2, 93:5
**Showing** [5] - 19:4, 21:7, 24:10, 26:3, 31:22
**showing** [4] - 23:16, 39:16, 70:4, 87:2
**shows** [2] - 30:15, 71:7
**side** [6] - 46:1, 46:9, 46:11, 70:23, 70:24, 77:15
**sign** [1] - 19:15
**simple** [1] - 3:8
**SIMULTANEOUSLY**
[2] - 62:17, 84:4
**Sinaloa** [1] - 97:22
**sitting** [7] - 41:3, 53:17, 53:20, 70:7, 70:11, 70:22, 70:23
**situation** [1] - 4:1
**six** [4] - 20:20, 20:24, 25:8, 87:3
**skip** [2] - 16:5, 114:22
**sleep** [1] - 93:1
**slight** [1] - 113:13
**slightly** [2] - 44:7, 106:12
**Small** [1] - 83:21
**small** [8] - 13:5, 36:5, 66:15, 83:18, 83:19, 83:20, 84:8
**smaller** [2] - 59:8, 75:18
**Smith** [6] - 21:9, 21:12, 21:19, 22:11, 56:2
**smoking** [1] - 76:25
**Soccer** [1] - 25:19
**soccer** [1] - 25:22
**sold** [4] - 46:5, 94:12, 99:7, 99:13
**someone** [6] - 8:4, 66:5, 66:13, 66:18,

66:19, 67:4
**Someone** [1] - 41:16
**someplace** [1] - 59:14
**sometimes** [7] - 73:7, 73:8, 95:2, 95:3, 99:7
**somewhat** [1] - 103:3
**somewhere** [1] - 74:7
**son** [25] - 42:14, 42:17, 42:22, 42:23, 46:2, 48:18, 48:25, 49:10, 49:12, 50:4, 50:7, 53:25, 54:8, 55:24, 60:24, 61:25, 62:12, 63:8, 63:12, 64:6, 64:15, 67:14, 68:5, 68:20, 77:15
**soon** [1] - 34:14
**sorry** [4] - 10:9, 24:11, 46:22, 60:6
**sort** [2] - 51:20, 64:8
**sourced** [1] - 102:16
**south** [1] - 59:14
**South** [1] - 99:11
**sOUTHERN** [1] - 1:2
**space** [1] - 84:7
**SPEAK** [2] - 62:17, 84:4
**speaker** [2] - 27:15, 27:18
**speaking** [8] - 10:5, 52:4, 52:5, 52:6, 52:13, 52:15, 53:18, 53:20
**spearheading** [1] - 82:6
**Special** [1] - 104:14
**special** [1] - 4:22
**specific** [3] - 3:5, 58:7, 74:3
**specifically** [4] - 45:12, 97:5, 102:3, 102:20
**specified** [5] - 13:16, 108:10, 109:4, 110:7, 113:2
**speech** [1] - 65:24
**spiel** [1] - 76:22
**spoken** [1] - 91:23
**square** [1] - 70:18
**St** [11] - 22:24, 28:2, 28:6, 30:6, 46:16, 50:8, 50:10, 50:16, 52:18, 55:6, 55:10
**stand** [5] - 43:9, 95:6, 103:19, 104:5, 104:17
**standard** [2] - 6:11, 111:23
**standing** [1] - 9:5

**stands** [1] - 4:20
**start** [8] - 8:22, 39:16, 42:4, 50:22
**started** [8] - 34:2, 52:12, 59:7, 59:8, 65:20, 80:9, 88:6, 100:7
**Starting** [1] - 27:22
**starting** [3] - 2:3, 73:1, 93:5
**starts** [4] - 10:16, 72:12, 73:2, 97:22
**startup** [1] - 41:13
**statement** [4] - 43:9, 86:4, 86:23, 108:15
**statements** [1] - 54:16
**STATES** [4] - 1:1, 1:4, 1:10, 1:13
**States** [25] - 1:17, 3:16, 3:17, 4:3, 5:11, 95:14, 96:13, 96:20, 97:4, 97:10, 99:12, 99:18, 99:22, 99:24, 100:2, 100:5, 100:6, 100:9, 100:17, 102:19, 102:24, 113:23, 114:3
**statute** [8] - 3:11, 7:10, 7:21, 11:15, 13:21, 97:14, 100:1, 107:24
**statutory** [8] - 2:19, 3:2, 9:2, 9:10, 9:17, 11:21, 11:22, 13:16
**stay** [5] - 23:5, 32:2, 38:15, 80:20, 81:10
**stayed** [2] - 32:1, 32:5
**staying** [3] - 32:4, 35:21, 96:2
**step** [4] - 38:16, 38:18, 90:21, 101:6
**Stephan** [1] - 27:9
**stick** [2] - 6:1, 6:23
**Still** [1] - 35:6
**still** [9] - 3:11, 9:13, 28:19, 28:21, 39:12, 52:20, 62:23, 84:13, 90:23
**sting** [6] - 4:14, 8:2, 8:3, 11:14, 11:15, 11:22
**stopping** [1] - 15:18
**storing** [1] - 51:16
**story** [2] - 37:8, 85:16
**stranded** [1] - 26:11
**strike** [2] - 68:16, 85:6
**striking** [1] - 11:6
**strongly** [1] - 112:9
**struggling** [1] - 48:9
**stuff** [3] - 65:10,

83:24, 96:2
**stuff"** [1] - 98:8
**SUA** [13] - 13:20, 107:20, 108:2, 108:3, 108:11, 108:12, 108:13, 109:16, 110:4, 110:13, 110:15, 115:9, 115:12
**SUAs** [1] - 110:3
**sub** [1] - 108:11
**subject** [1] - 59:5
**subjected** [1] - 97:19
**submitted** [2] - 2:14, 6:18
**subparagraph** [2] - 114:18, 114:21
**subsection** [3] - 109:10, 112:10
**subsections** [1] - 115:5
**subsequent** [1] - 107:23
**substance** [13] - 2:19, 2:20, 3:4, 3:16, 3:25, 9:3, 24:19, 50:19, 94:20, 96:23, 97:13, 100:17, 105:12
**substances** [2] - 3:4, 114:3
**substantive** [2] - 6:16, 8:23
**succinct** [3] - 7:3, 94:3, 108:17
**succinctly** [1] - 94:22
**sufficient** [2] - 8:3, 107:7
**Suite** [1] - 1:18
**Suites** [5] - 31:21, 32:1, 32:2, 35:20, 40:15
**suites** [1] - 79:17
**sum** [4] - 23:7, 23:8, 23:10, 25:21
**summarize** [2] - 6:2, 43:2
**summary** [2] - 2:8, 6:1
**summer** [1] - 76:9
**support** [2] - 97:9, 107:13
**supported** [1] - 113:20
**supposed** [8] - 23:6, 33:20, 46:15, 74:7, 76:12, 76:15, 77:21, 79:15
**Supreme** [4] - 4:3, 4:7, 4:16, 105:3
**surcharge** [1] - 60:18
**surprise** [1] - 103:24

**survive** [1] - 93:19
**suspicious** [1] - 85:16
**Sylvester** [11] - 35:14, 35:23, 36:6, 77:8, 78:1, 80:1, 83:1, 83:3, 83:7, 83:10, 86:4
**Sylvester's** [5] - 45:14, 68:15, 68:20, 69:3, 72:10
**System** [2] - 105:25, 106:3

## T

**tab** [4] - 26:24, 49:6, 62:22, 72:1
**table** [2] - 53:17, 106:7
**TAKEN** [3] - 8:20, 56:25
**tamper** [1] - 105:14
**tape** [1] - 69:11
**tapes** [5] - 45:18, 45:19, 64:25, 65:10, 80:24
**Tarham** [2] - 69:7, 69:8
**TARHAM** [1] - 69:8
**tea** [1] - 97:4
**Team** [1] - 25:19
**team** [1] - 25:22
**telephone** [2] - 42:12, 43:18
**Ten** [2] - 22:17, 53:1
**ten** [8] - 19:17, 20:2, 22:2, 22:3, 47:19, 53:1, 74:1
**tended** [1] - 94:4
**term** [2] - 61:10, 64:4
**terminal** [1] - 41:15
**terms** [16] - 8:1, 39:8, 40:21, 43:22, 48:10, 53:21, 71:21, 76:8, 82:3, 84:8, 94:13, 99:6, 101:16, 101:23, 104:22
**territory** [1] - 100:3
**test** [28] - 3:22, 5:8, 45:6, 50:18, 51:4, 51:12, 51:23, 52:3, 52:10, 52:24, 52:25, 53:3, 53:4, 53:10, 71:21, 72:13, 73:23, 75:6, 76:6, 76:7, 79:7, 94:11, 94:13, 94:17, 95:21, 95:22, 96:9
**test-run** [1] - 45:6
**tested** [3] - 3:22, 9:7, 97:18

**testified** [10] - 30:10, 47:19, 69:12, 76:1, 76:18, 77:13, 78:5, 81:23, 83:24, 102:14
**testify** [4] - 91:7, 91:20, 91:21, 92:6
**testifying** [1] - 91:7
**testimony** [15] - 14:5, 42:2, 47:13, 49:22, 49:24, 57:13, 59:21, 60:13, 61:24, 69:10, 74:13, 96:1, 104:10, 104:15, 106:5
**testing** [9] - 52:14, 52:15, 52:17, 73:10, 73:18, 94:19, 95:5, 95:15, 97:19
**tests** [1] - 77:15
**text** [6] - 19:5, 23:18, 24:13, 24:15, 46:18, 61:21
**that..** [1] - 95:19
**THE** [157] - 1:9, 1:13, 1:15, 2:1, 2:6, 2:9, 2:13, 2:21, 2:25, 3:6, 3:12, 4:10, 5:6, 5:12, 5:24, 6:7, 6:9, 6:14, 6:16, 6:21, 7:1, 7:12, 7:15, 8:11, 8:16, 8:19, 8:21, 9:4, 9:9, 9:19, 9:23, 10:1, 10:8, 10:11, 10:13, 10:16, 10:21, 10:25, 11:3, 11:13, 11:23, 12:6, 12:12, 12:17, 12:19, 13:1, 13:4, 13:9, 13:13, 13:18, 13:22, 14:1, 14:8, 15:7, 15:17, 16:7, 16:16, 27:13, 27:21, 28:8, 36:21, 36:23, 38:8, 38:10, 41:21, 44:20, 44:25, 55:2, 55:3, 55:4, 56:20, 57:1, 57:5, 65:16, 70:2, 84:5, 84:6, 86:1, 86:17, 86:18, 87:4, 87:5, 87:20, 90:13, 90:16, 91:1, 91:9, 91:17, 91:22, 92:8, 92:11, 92:14, 93:10, 93:13, 93:21, 94:6, 97:20, 98:21, 99:14, 100:11, 100:15, 101:1, 101:3, 101:8, 101:9, 104:6, 105:22, 106:4, 106:13, 107:16, 107:17, 107:20, 107:23,

108:2, 108:5, 108:18, 108:23, 109:1, 109:8, 109:11, 109:14, 109:18, 109:20, 110:1, 110:4, 110:9, 110:12, 110:15, 110:17, 110:23, 111:1, 111:6, 111:16, 111:20, 112:1, 112:13, 112:17, 112:21, 112:24, 113:3, 113:8, 113:16, 114:1, 114:10, 114:13, 114:17, 114:20, 115:3, 115:8, 115:14, 115:18, 115:20, 115:24, 116:3, 116:6, 116:10, 116:14
**theory** [2] - 116:1, 116:4
**Thereafter** [1] - 101:22
**thereafter** [2] - 84:20, 103:20
**therefore** [1] - 4:14
**thereof** [1] - 99:19
**Theresa** [2] - 1:15, 41:25
**they've** [2] - 11:14, 104:23
**thinking** [1] - 106:8
**thinks** [1] - 64:15
**third** [6] - 11:5, 11:7, 11:10, 12:6, 12:19, 45:18
**Thomas** [6] - 50:8, 50:10, 50:16, 52:18, 55:6, 55:10
**thoroughly** [1] - 92:7
**thousand** [1] - 50:19
**thousands** [3] - 3:14, 4:21, 59:11
**Three** [2] - 22:1, 36:14
**three** [29] - 8:18, 11:19, 16:23, 26:22, 27:14, 30:18, 42:23, 42:24, 45:1, 49:21, 52:22, 52:24, 53:1, 54:17, 54:19, 71:2, 71:14, 71:15, 73:20, 74:10, 95:17, 109:2, 109:3, 109:12, 110:13, 110:15, 110:19, 115:4
**three-way** [2] - 26:22, 42:24
**throughout** [2] - 89:4,

104:22
**thumb** [2] - 105:25, 106:3
**tiles** [1] - 15:22
**Title** [3] - 3:2, 113:23, 114:3
**TO** [1] - 89:21
**Tobago** [2] - 73:8, 95:3
**today** [1] - 56:23
**together** [6] - 17:7, 17:12, 34:13, 34:20, 34:22, 86:14
**Together** [1] - 17:9
**tomorrow** [3] - 91:13, 92:19, 93:16
**tonight** [1] - 18:6
**took** [10] - 25:1, 31:21, 37:1, 63:4, 66:5, 72:9, 83:3, 103:19, 104:8, 108:9
**top** [3] - 27:22, 28:16, 53:6
**topic** [1] - 89:7
**Tortola** [8] - 14:14, 14:18, 29:9, 31:7, 75:11, 76:16, 77:22, 85:10
**Total** [1] - 75:16
**total** [2] - 23:7, 75:13
**totally** [1] - 27:23
**touch** [1] - 85:12
**tourism** [1] - 78:11
**Town** [9] - 17:13, 17:14, 60:3, 60:6, 60:10, 60:17, 69:7, 69:8
**traceable** [1] - 15:16
**track** [8] - 2:18, 9:2, 15:15, 56:23, 112:11, 112:13, 112:14, 112:16
**tracking** [3] - 9:10, 11:21, 13:15
**Trade** [11] - 30:11, 30:13, 30:14, 30:17, 30:19, 30:24, 31:8, 31:17, 78:4, 78:6, 78:8
**trade** [1] - 30:15
**traffic** [1] - 93:4
**trafficking** [2] - 48:18, 48:21
**transaction** [6] - 25:12, 25:13, 25:14, 47:2, 47:4, 47:11
**transactions** [2] - 25:4, 25:15
**transcript** [14] - 16:6, 16:15, 49:4, 72:2,

72:5, 72:6, 72:9, 94:8, 94:10, 94:23, 98:16, 103:9, 104:9, 106:10
**transcription** [1] - 117:4
**transcripts** [2] - 15:6, 94:14
**transfer** [1] - 76:11
**transpired** [1] - 103:7
**transport** [1] - 99:23
**transportation** [1] - 29:2
**travel** [8] - 30:4, 31:7, 93:20, 99:24, 113:4, 113:19, 113:25, 114:9
**traveled** [3] - 30:6, 30:7, 31:3
**traveling** [1] - 37:12
**treated** [1] - 104:4
**treating** [1] - 64:7
**tremendously** [1] - 8:8
**TRIAL** [1] - 1:9
**trial** [2] - 101:22, 106:5
**tried** [2] - 97:1, 111:3
**Trinidad** [2] - 73:8, 95:3
**trip** [1] - 42:17
**trolleys** [1] - 41:17
**trouble** [1] - 88:23
**true** [1] - 64:22
**trust** [1] - 63:20
**truthful** [1] - 101:16
**try** [3] - 9:14, 68:4, 96:25
**trying** [5] - 3:7, 19:11, 25:23, 64:15, 106:10
**turn** [6] - 6:16, 26:24, 50:21, 62:3, 62:22, 72:1, 73:3, 73:14, 100:18
**Turn** [1] - 66:8
**Turning** [1] - 21:17
**turning** [2] - 2:13, 53:6
**turns** [1] - 78:16
**two** [33] - 2:3, 7:6, 9:14, 10:7, 10:17, 11:6, 13:2, 16:6, 16:14, 20:14, 32:14, 45:16, 73:19, 91:14, 95:11, 95:17, 104:19, 104:21, 104:24, 108:3, 108:4, 108:5, 108:12, 108:13, 109:5, 109:16, 110:4, 112:3, 112:10, 113:6,

114:24, 114:25, 115:4
**type** [2] - 32:13, 52:14
**typo** [4] - 13:21, 13:23, 13:25, 107:21

## U

**U.S** [3] - 50:10, 50:12, 50:13
**uh-hum** [1] - 46:10
**UK** [1] - 110:13
**ultimate** [1] - 48:11
**ultimately** [3] - 99:16, 106:20, 106:23
**um-hum** [1] - 95:10
**uncomfortable** [4] - 41:6, 43:22, 44:2, 44:4
**uncomfortable..** [1] - 44:3
**under** [8] - 8:15, 11:15, 41:18, 66:4, 84:21, 101:13, 110:11, 110:20
**undercover** [7] - 11:24, 12:8, 12:22, 94:2, 100:13, 108:8
**underlined** [1] - 22:19
**underlying** [1] - 46:20
**underneath** [1] - 27:4
**understood** [9] - 9:18, 47:13, 54:10, 54:18, 54:23, 65:25, 74:6, 75:13, 77:20
**Understood** [1] - 54:16
**uneasy** [2] - 37:3, 39:6
**unintelligible** [3] - 18:14, 73:13, 73:15
**UNITED** [3] - 1:1, 1:4, 1:13
**uNITED** [1] - 1:10
**United** [27] - 1:17, 3:16, 3:17, 4:3, 5:10, 64:19, 95:14, 96:12, 96:19, 96:20, 97:4, 97:10, 99:12, 99:18, 99:22, 99:24, 100:2, 100:5, 100:9, 100:17, 102:19, 102:24, 110:20, 113:23, 114:3
**unlawful** [19] - 7:11, 7:20, 7:23, 8:2, 8:5, 11:18, 12:14, 12:15, 12:21, 13:16, 108:7, 108:10, 109:4, 110:7, 110:19, 113:2, 113:6,

113:11, 113:18
**unquote** [3] - 45:21, 54:19, 56:10
**unreliable** [1] - 4:18
**up** [37] - 2:8, 2:21, 7:13, 14:1, 25:6, 28:9, 32:16, 33:23, 34:24, 35:19, 40:15, 46:4, 49:4, 59:6, 61:21, 65:17, 69:1, 72:10, 73:15, 79:11, 85:16, 87:16, 87:17, 88:5, 88:6, 88:20, 96:8, 96:25, 97:6, 99:7, 101:3, 104:8, 104:11, 104:16, 105:1, 107:4, 112:12
**Up** [2] - 29:15, 29:16
**upfront** [2] - 73:22, 95:20
**upset** [3] - 63:17, 63:18, 67:23
**upstairs** [3] - 39:2, 82:23, 82:25
**urgent** [1] - 26:7
**Utilities** [1] - 22:9

## V

**Van** [26] - 1:15, 6:4, 9:10, 10:5, 11:8, 13:14, 41:25, 57:5, 86:4, 91:2, 92:12, 98:21, 99:14, 101:9, 105:22, 106:8, 107:6, 108:18, 109:14, 109:20, 110:6, 111:2, 111:8, 111:9, 112:24, 113:9
**VAN** [87] - 2:7, 2:11, 2:17, 2:23, 3:1, 3:10, 3:19, 5:1, 5:7, 5:13, 6:6, 6:15, 6:20, 6:22, 7:2, 7:13, 7:16, 9:1, 9:18, 9:22, 10:14, 10:19, 10:23, 11:2, 11:10, 11:14, 12:9, 12:13, 12:25, 13:12, 13:15, 36:18, 41:22, 44:24, 55:5, 57:7, 70:1, 87:19, 91:4, 91:14, 92:1, 92:13, 93:12, 93:14, 93:22, 94:7, 98:4, 100:14, 100:22, 101:2, 101:11, 104:7, 107:22, 107:25, 108:4, 108:14, 108:20, 108:24, 109:19, 109:22,

110:7, 110:10, 110:14, 110:16, 110:18, 110:22, 110:25, 111:13, 111:21, 112:7, 112:19, 112:23, 113:1, 113:11, 113:17, 114:5, 114:8, 114:12, 114:15, 114:18, 114:21, 115:6, 115:19, 115:22, 116:1, 116:8, 116:12
**van** [5] - 5:25, 7:12, 92:8, 93:11, 116:20
**vehicle** [2] - 17:12, 17:15
**verdict** [2] - 93:16, 114:13
**version** [2] - 8:12, 70:14
**versus** [2] - 4:3, 102:19
**vessel** [1] - 94:16
**vessels** [4] - 55:23, 57:17, 57:20, 58:9
**via** [1] - 99:23
**vicinity** [2] - 74:8, 75:1
**views** [1] - 63:18
**Vilet** [1] - 41:25
**VILET** [2] - 36:18, 44:24
**violated** [1] - 115:12
**violation** [4] - 109:5, 109:23, 113:23, 114:3
**VIP** [2] - 59:18, 59:23
**Virgin** [31] - 14:19, 16:4, 17:3, 20:12, 25:19, 25:24, 26:16, 31:9, 32:20, 32:22, 33:21, 34:2, 35:2, 35:15, 42:21, 45:7, 50:10, 50:11, 50:12, 50:13, 50:15, 51:10, 55:10, 59:18, 64:20, 77:5, 89:10, 99:2, 99:12, 109:24
**Vliet** [27] - 1:15, 5:25, 6:4, 7:12, 9:10, 10:5, 11:8, 13:14, 57:5, 86:4, 91:2, 92:8, 92:12, 93:11, 98:21, 101:9, 105:22, 106:8, 107:6, 108:19, 109:14, 109:20, 110:6, 111:9, 112:24, 113:9, 116:20
**VLIET** [85] - 2:7, 2:11,

71:22
**waterproofing** [1] - 74:5
**waters** [4] - 57:18, 57:21, 99:25, 100:4
**ways** [1] - 38:25
**wealthy** [2] - 58:11, 87:25
**Wednesday** [3] - 30:5, 31:2, 31:3
**weight** [4] - 4:2, 4:6, 4:17, 54:24
**welcome** [1] - 90:11
**whole** [9] - 47:2, 48:2, 60:2, 62:15, 67:5, 74:25, 77:16, 80:20, 99:4
**Wholesale** [4] - 60:5, 60:6, 60:10, 60:17
**wholesale** [1] - 60:6
**WILLIAMS** [1] - 1:9
**willing** [1] - 49:19
**window** [1] - 96:3
**windows** [1] - 15:23
**wishes** [1] - 9:16
**Witek** [7] - 102:13, 103:15, 103:19, 103:23, 104:16, 106:4, 106:20
**witness** [8] - 44:22, 84:4, 89:21, 90:13, 104:5, 105:2, 106:19, 107:5
**WITNESS** [5] - 36:23, 38:10, 55:3, 62:17, 86:18
**witnesses** [1] - 91:3
**wondering** [4] - 38:12, 81:19, 81:20, 82:3
**word** [6] - 42:8, 43:19, 54:13, 58:2, 88:16, 112:9
**words** [6] - 46:6, 51:18, 66:23, 66:24, 88:10, 88:11, 88:13, 95:18, 96:10
**Works** [1] - 22:7
**works** [1] - 22:8
**world** [1] - 111:24
**worried** [2] - 67:3, 68:1
**worth** [1] - 75:1
**write** [2] - 24:3, 28:17
**written** [1] - 27:4

## Y

**yard** [1] - 24:7
**year** [2] - 30:15, 78:9
**years** [4] - 4:18, 47:20,

101:16, 101:20
**yesterday** [10] - 14:13, 21:5, 45:19, 49:21, 50:5, 57:13, 59:21, 60:13, 74:21, 108:16
**Yesterday** [1] - 61:7
**York** [3] - 45:9, 74:18, 99:7
**yourself** [4] - 63:8, 68:6, 69:19, 107:4
**yourselves** [1] - 80:11
**Youth** [1] - 25:19

## W

**W's** [1] - 21:5
**Wade** [6] - 21:9, 21:12, 21:19, 22:11, 56:2
**Wait** [2] - 38:8, 44:20
**wait** [5] - 38:8, 44:21, 48:16, 81:9, 109:1
**waiting** [8] - 9:13, 9:14, 55:9, 72:23, 80:16, 80:18, 80:20
**waived** [1] - 92:6
**walk** [1] - 85:13
**wants** [4] - 56:11, 57:21, 62:16, 66:16
**war** [1] - 97:18
**Warehouse** [1] - 60:3
**was...** [1] - 86:16
**waterproof** [2] - 3:21,